# Declaration of Jeffrey R. Schwindt

I, Jeffrey R. Schwindt, being duly warned of the penalties for perjury under 18 U.S.C. § 1001, hereby declare as follows:

1. I am competent to testify from personal knowledge as to all matters set forth in this declaration unless otherwise indicated.

2. I am the founder and president of Air Systems Engineering, Inc. (ASE), located at 5142 E. 65th Street, Indianapolis, Indiana 46220. A copy of my resume is attached as Exhibit 1.

3. I am preparing this declaration to clarify the events that led to my involvement with certain companies, including Promex, Suros Surgical Systems, Inc., and Hologic, Inc. I am further preparing this declaration to clarify the events that led to the issuance of U.S. Patent No. 7,316,726, attached as Exhibit 2.

4. As discussed in more detail below, in approximately June of 2000, a company named Suros Surgical Systems, Inc. was created to apply certain technology that I co-developed with Promex.

5. I was one of the original 50 investors in Suros.

6. In 1986, I graduated from Northeastern University in Boston, Massachusetts, obtaining a Bachelors of Science in Mechanical Engineering.

7. In 1988, I graduated from Clarkson University in Potsdam, New York, obtaining a Masters of Science in Engineering Science. During my master's training, I wrote a thesis paper directed toward air motor controls entitled "Design of a Computer Controlled Air Motor for Robotic Applications," published September 24, 1987. A copy of that thesis paper is attached as Exhibit 3.

8. My thesis paper provides evidence I had previous knowledge of air motors, how they work, and their control methods. For example, Figure 2.1 on page 15 of the thesis describes a circuit with a reversible motor. The circuit I designed in U.S. Patent No. 6,758,824 to Suros ("the '824 patent") (attached as Exhibit 32), illustrated in Figures 10 and 11 of the '824 patent (discussed in more detail below), uses a single-direction motor with an air pilot operated valve instead of a solenoid valve. Additionally, the air motor described in section 2.2 (beginning on page 12) and Appendix E of my thesis is the same manufacturer – Micro Motor Design – as the air motor I specified and ordered for Promex. A

copy of a quote, dated June 5, 2000 and a purchase order, dated June 7, 2000, are attached as Exhibit 4.

9. I am a named inventor on multiple United States patent applications, including U.S. Patent Application Serial Nos. 2003/0196693, 2003/0199786, 2003/0199787, 2005/0075581, and 2005/0113715, all of which use pneumatic circuits and related components. Copies of these patent applications are attached as Exhibits 5, 6, 7, 8, and 9, respectively. The 2003/0199786 patent application resulted in U.S. Patent No. 7,316,726, referenced above.

10. In early 2000, I was contacted by one of ASE's suppliers, Karl Fancher of C.M. Buck and Associates, who suggested I meet with certain individuals at Promex regarding development of a new surgical cutting device.

11. Prior to this time, I had never met anyone at Promex.

12. At that time, Mr. Fancher indicated he believed my expertise in pneumatic circuits would be helpful to Promex in the development of the surgical cutting device.

13. On March 16th, 2000, I met Joe Mark, the vice president of Promex, at the Promex facility in Franklin, IN. At that time, I signed

a non-disclosure agreement, a copy of which is attached as Exhibit 10. Mr. Mark discussed several concepts that were presently on the market relating to breast biopsy procedures. He also verbally disclosed a concept of a handheld biopsy device Promex was considering.

14.    After reviewing the Promex concept, I suggested that electric or pneumatic were both control options for the proposed device.

15.    At this initial meeting, I also described my background and expertise in the area of pneumatic controls to Mr. Mark. Mr. Mark and I agreed I was well qualified to assist in the creation and development of a control system.

16.    After the initial meeting, I constructed a flowchart showing the use of timers and provided the flowchart, dated March 21st, 2000, to Promex. A copy of that flowchart is attached as Exhibit 11.

17.    The flowchart described a sequence of operation using pneumatic timers to step the handheld device through the cycle.

18.    At some point after I submitted the flowchart, I saw a prototype Promex had fashioned from the housing of a Maglite flashlight. This prototype used an air cylinder and battery-powered electric motor with an offset gear drive that spun an inner cannula.

19.   The Maglite prototype had no control system to run the device
      and I was told by Joe Mark that Promex had no internal
      organizational capability to design or build such a system.

20.   I determined that the electric drive system proposed by Promex
      would cause many problems in the future, and I proposed using
      some form of air drive for the motor instead of the electric motor.

21.   Based on my expertise with pneumatics, I described to Joe
      Mark and the president of Promex, Mike Miller, the advantages of
      using an air motor. They both agreed that a pneumatic design was
      the superior solution for several reasons: electric components
      might not have survived the sterilization process; pneumatic
      components required no connections to wall power and required
      no battery pack; there was less weight to a pneumatic handpiece;
      a pneumatic handpiece was usable in a MRI environment;
      pneumatic operation could be facilitated by bottled dry nitrogen;
      and a pneumatic concept could have a higher running RPM,
      higher running torque, and would be easier to get through the UL
      approval process than electric motors.

22.   I met with Joe Mark and Mike Miller to discuss the types of air
      motors that could be used in the device. I understood that neither

Joe Mark nor Mike Miller had any experience with pneumatic controls or air motors. I described for them at this meeting how piston, turbine, and vane-type air motors worked. Due to RPM requirements and the necessity of compact size, I recommended the vane-type air motor. This conclusion was later confirmed by the Rose-Hulman Ventures report, which I reference below.

23.    I also recommended that the motor be placed inline with the cylinder and that the motor use the inner cannula as its axle, in contrast to the offset gear drive prototype that Promex had developed.

24.    Promex repeatedly expressed concern about the cost of prototype controls development, and I quickly realized that Promex had little to no budget for the project.

25.    To keep the project moving, and because of my personal interest in the concept (my wife's mother died of breast cancer at age 40), I decided to provide my services and expertise as my equity in the project, with a goal of my company becoming the console manufacturer for the new product.

26.    During this time, Promex issued purchase orders to my company to cover the cost of items that I did not have in my excess inventory.

27.    During the second quarter of 2000, I designed and developed a working prototype. Certain components of the prototype used pneumatic parts sold through a company named Parker. A copy of a Parker parts catalog is attached as Exhibit 12.

28.    The parts purchased from Parker are generally considered in the industry to be building block logic components, and are often used to create specific sequences similar to the use of individual components in the design and development of electrical circuits.

29.    Without input from Promex, I selected the individual logic components and created the desired pneumatic control circuit from these components. I used the Anver vacuum generator referenced earlier in Exhibit 4 and a pneumatic foot switch to power the circuit.

30.    Once I finished building this prototype circuit, Mike Miller and I tested the system. I then made several additional changes and built another prototype control system on a steel back plate.

31.   Mike Miller integrated my steel back plate prototype into a soft-sided suitcase for portability.

32.   During the summer of 2000, Promex formalized a relationship with Dr. Tim Geodde, a prominent breast surgeon who indicated an interest in testing the prototype. The prototype that I designed and built was successful, although I believed further changes could be implemented. At the time, the prototype was a dry nitrogen-powered logic control system with a battery-powered rotational motor. Dr. Geodde discussed the prototype in the news clip video attached as Exhibit 23.

33.   During this time, I made several design changes to optimize my control circuit and built two more prototypes.

34.   A copy of the updated circuit diagram, dated October 20, 2000, is attached as Exhibit 19. ASE billed Promex for my prototype control circuit. A copy of the quotation and purchase order, both dated 9-20-2000, are attached as Exhibits 13 and 14, respectively.

35.   A Kit List I used to build the circuit, dated 10-02-2000, as well as some of my handwritten notes and a sketch related to the circuit, is attached as Exhibit 15.

36.    I also created circuit drawings of the circuit I designed. A copy of the early circuit drawings I created is attached as Exhibit 16.

37.    Shortly thereafter, I created more formal circuit drawings, attached as Exhibit 17 and dated 10-10-2000.

38.    Several of the symbols on my circuit drawing attached as Exhibit 17 are derived from a Master Symbol Library I created. I later annotated this circuit drawing indicating some of the symbols that came from my Master Symbol Library.

39.    When I drew circuit diagrams, I often used symbols from this Master Symbol Library. I created this library, which is not published anywhere. I used this Master Symbol Library to illustrate parts of a circuit that may not have otherwise had a symbol expressing their functions. A copy of my Master Symbol Library at the time is attached as Exhibit 18. Many of these symbols were uniquely created by me, and to the best of my knowledge, cannot be found anywhere else (with the exception of Figs. 10 and 11 in the '824 patent).

40.    The circuit shown in Exhibit 19 was copied into Figure 10 of the '824 patent without my knowledge or consent.

41.    One of the significant design changes I implemented at this
stage was to substitute a pressure switch for the "cutter extend
timer." This cutter extend timer was originally proposed by
Promex. The change I implemented allowed for closed loop
monitoring of the end of stroke for the cutter cylinder. This
monitoring could occur independent of the cutter speed.

42.    My design change allowed the system to react to the motion of
the cutter rather than merely reacting to a fixed time function. This
feature greatly increased the flexibility of the system and also
increased tissue sample quality. The pressure switch I used was
an AIRTROL® product, for which my company was a distributor.

43.    An enlarged view of the pneumatic output pressure switch
symbol, labeled PP-701-30, from my circuit drawing shown in
Exhibit 19 is reproduced in Exhibit 20. Since I was not aware of a
commonly accepted symbol for a pneumatic output pressure
switch, I created my own symbol. This symbol was part of the
copied circuit in Figure 10 of the '824 patent (attached as Exhibit
32).

44.    Furthermore, an enlarged view of the electric output pressure
switch symbol, labeled F-4200-60, from my circuit drawing shown

in Exhibit 19 is reproduced in Exhibit 21. Notably, there is an ANSI symbol for an electric output pressure switch, which can be seen on page 4 in the Norgren Graphic Symbol Library (symbol Elec02), attached as Exhibit 22. However, I chose not to use the ANSI standard symbol. Instead, I used my own symbol. My unique and original symbol is also part of the copied circuit in Figure 10 of the '824 patent (attached as Exhibit 32).

45.    During the summer of 2000, Mike Miller and I also visited Rose-Hulman Ventures and explained the concept to some of the engineering professors affiliated with Rose-Hulman Ventures. The professors investigated multiple methods of creating rotary motion and came to the same conclusion I did: that a vane-type air motor would be the best.  A copy of the Rose-Hulman Ventures Report is attached as Exhibit 24.

46.    The Rose-Hulman professors also built a crude all-plastic air motor and demonstrated with tests that the concept would work. Originally it was believed that the air motor would have to be plastic to work in the MRI environment, as discussed in the Report in Exhibit 24. We learned later that the aluminum rotor with non-ferrous vanes would also work.

47.   Prior to June 7, 2000, as I continued to develop the air motor, a

central concern arose in that vane-type air motors have a major

weakness: a low starting torque. With merely a minimum of static

friction, the air motors might stall at start-up, called a "blow-by,"

and as a result not rotate at all. Notably, vane-type air motors rely

on centrifugal force to push the vanes against the wall to seal.

48.   The proposed handpiece assembly had several friction points. I

pointed out the handpiece would likely also sit in a warehouse of

varying temperatures for several months before it was used,

potentially contributing to a difficult start. Therefore, I suggested

that a different design would be advantageous.

49.   A typical air motor has four or five vanes with one chamber to

create the starting torque. I proposed a design that instead used a

six-vane air motor. A six-vane motor could have two chambers

exposed to the inlet air to start the rotation, significantly increasing

the chances of starting the rotation. In testing, this proved to be a

significant advantage. A drawing of the concept I developed is

attached as Exhibit 25.

50.   On or about June 7th, 2000, I investigated buying air motors

from Micro Motors in California. This was the same company that I

referenced in my Master's Thesis, attached as Exhibit 3. Mike

Miller authorized the purchase of one in order to further explore

how it was built. A copy of the purchase order relating to the Micro

Motor is attached as Exhibit 4.

51.    As I had outlined to Mike Miller, the goal was to find a low-cost,

disposable motor with a short life. Micro Motors eventually

indicated that it was not interested in the project, and we began to

look at other options.

52.    Mike Miller pursued another avenue with GAST Manufacturing,

of Benton Harbor, MI. Tom Rhoads of ISAACS fluid power was the

GAST Representative. Tom also has a non-disclosure agreement

with Suros. However, it became apparent that GAST also wanted

too much time and money to develop this new air motor.

53.    On or about September 22nd, 2000, I considered using an

impeller concept for the air motor. I hired Models, Inc. of Lebanon,

Indiana to help with the air motor. Eventually, this design was

abandoned in favor of the more superior six-vane motor. I issued a

quote and Promex issued a purchase order for the motor dated

9/22/00, a copy of which his attached as Exhibit 26.

54.    By the fall of 2000, Mike Miller, Joe Mark, and I had collectively come to the conclusion that a motor would have to be designed from scratch. Because neither Promex nor my company had the equipment to manufacture air motors, I brought in another local machine shop, JWS Machine, to manufacture the motors. JWS Machine, Mike Miller, and I worked on the design details of the air motor. Eventually, my proposed six-vane design was used to create several prototypes (built by JWS Machine) for Mike Miller, which were built into the first prototype handpieces. I then shifted my focus to design of the console, which included the pneumatic control circuit.

55.    Due to my knowledge of pneumatic circuits, I was the controls engineer, and I solely designed the pneumatic circuit and the console. Suros provided cosmetic and operator interface input. For example, Suros provided the setup steps that primed the handpiece with saline prior to a procedure. However, it was up to me to design and manufacture the console such that the steps could be performed.

56.    During development, I determined that a pneumatically operated pinch valve was needed to start and stop saline and

vacuum flows. (See the pinch valve 72, disclosed and illustrated in Exhibit 5.) Joe Mark provided a sample of an ASCO electric pinch valve that could be used as a concept. Joe Mark also suggested that I try to capture the tube, in some way, to minimize the chance that it could be inadvertently pulled out during operation. I proceeded to develop the pinch valve and conceived of a way to capture the tube by adding wings to the sides of the pinch surfaces with openings in the opposite direction of the pinching surfaces. I contacted JWS machine and built prototypes. No one from Promex or Suros was involved in this stage of the development. It was also noted during this time that if a user wrapped the silicone tubing through the openings, opened the pinch valve and pulled axially on the tubing, the tubing would automatically center in the pinchers. I showed the finalized concept to Mike Miller and Joe Mark, and they agreed that it was an important concept to incorporate into the console.

57.    Prior to September 20th, 2000, as an alternative to the Parker logic controls, I suggested the concept of using a pneumatic circuit manifold. I suggested the pneumatic circuit manifold concept would be far superior from both cost and function aspects (i.e. if it

incorporated standard pneumatic logic rather than the Parker logic).

58.    In an effort to first prove the concept and components, I built two prototypes using the components plumbed directly together with tubing (and no manifold). Promex was charged, via a purchase order, for these prototypes. A copy of the quotation and purchase order are attached as Exhibits 13 and 14, respectively.

59.    Pictures of this prototype, showing components plumbed together, are attached as Exhibit 27.

60.    I then designed and built two prototype manifolds, a picture of which is attached as Exhibit 28. Essentially, I had created the pneumatic equivalent of a silicon chip, which has a significant portion of its wiring embedded in the chip. I asserted that doing this with a pneumatic circuit would be advantageous as well as novel, given that this manifold had never been built prior to this time and was completely unique to this particular application.

61.    I understand that Mike Miller and Joe Mark were consulting patent attorneys during this time. Sometime before October 20, 2000, Mike Miller asked me to provide a circuit diagram of the design I had developed (attached as Exhibit 19 and discussed

above). I was not told why Miller needed the circuit diagram.

Unbeknownst to me, the circuit diagram was incorporated into

patent applications that failed to name me as an inventor. Because

this particular patent was never published and was hidden from

my attorneys when specifically requested during negotiations, I

was unaware of its existence until it issued in 2004.

62.   I learned later that U.S. Patent Application No. 09/707,022 was

filed on November 6th, 2000, naming Michael E. Miller, Joseph L.

Mark, Charles Butcher, and John P. Hancock as inventors. This

application eventually resulted in the '824 Patent (attached as

Exhibit 32), and is the parent of U.S. Patent No. 6,638,235

(attached as Exhibit 29).

63.   I note that Figs. 10 and 11 of the '824 and '235 patents use my

symbols that did not exist in any circuit books, as I discussed

above. In particular, I invented symbols including that of the foot

switch, pressure switch (both pneumatic and electric), vacuum

switch, and plugged ports. The '824 patent referenced my circuit in

Figs. 10 and 11, and made claims related to the circuit I

developed. Nonetheless, the patent did not name me as co-

inventor.

64.    At some point during this time, I discussed the potential of patenting my concepts with Mike Miller, but Miller told me that none of the concepts I developed could be patented. It was only later, when I retained counsel, that I was told that many of my concepts were patentable.

65.    On May 29th, 2001, based on the success of the prototypes I had been constantly developing and revising, Suros asked that I build several stainless steel consoles to be mounted on an IV pole. I detailed the manifold concept and built the consoles. However, the continuing use of nitrogen to power the air motor, cylinder, controls, and vacuum generator made it apparent that another form of compressed gas would be needed. I suggested a compressor that could be housed in a suitcase. I was the sole inventor of the compressor "suitcase" solution to the compressed gas problem. I proceeded to build the compressor into a suitcase-shaped enclosure, meanwhile regulating the pressure and muffling the noise from the compressor.

66.    As I continued to develop the circuit, I also contained the heat and moisture that was generated by the compression process. Using a heat exchanger and fan combination, I was able to

stabilize the heat generated. I also designed the pressure control system and incorporated a relief regulator, which exhausted excess pressure out of the cabinet when the system was idling.

67.    Additionally, I experimented with mufflers on the exhaust. I observed that the water vapor being collected by the coalescing filter turned to liquid and could be evaporated through a uniquely positioned filter that was used as a muffler, rather than its intended purpose as a filter. This ended up being a significant contribution to the circuit, since the alternative was to have a collection bottle for the fluid, or to have the fluid just drip inside the console. Moreover, the evaporation system I conceived was effective at a nominal cost compared to alternatives. This concept was captured in U.S. Patent Application No. 10/420,296 attached as Exhibit 6, which was recently allowed.

68.    Prior to the end of June 2001, Suros sought venture capital. I had the opportunity to become a shareholder and purchased $50,000.00 of Series B Stock on June 30, 2001. My investment was part of the original $5,000,000.00 used to finance the company.

69.    Clinical trials, which I observed, were positive and informative. Through the trials, I was able to learn that certain modifications could further improve the system, and I began to make modifications. One determination I made was that the system needed more vacuum flow. This was accomplished with the addition of a vacuum pump.

70.    At approximately this time, I asked Joe Mark if I should have a contract with Suros relating to our relationship and my development of the prototypes. Up to this point, we never had a written contract of any kind, with the exception of the Non Disclosure Agreement attached as Exhibit 10.

71.    Joe Mark suggested that it would be appropriate for me to have a contract with Suros, and I approached Jim Pearson, the president of Suros with my request and my attorneys worked on a proposed contract.

72.    This resulted in a meeting being called between Suros, me, and legal counsel for both parties. At the meeting, Suros' attorneys, Henderson Daily, claimed all intellectual property as belonging to Suros. The meeting quickly became confrontational. However, once Mike Miller admitted in the meeting that he had nothing to do

with the pneumatic circuit designs, the tone seemed to change and I believed Suros and its attorneys wanted to come to some sort of arrangement. My attorneys submitted a revised contract to Suros shortly thereafter.

73.    Rather than an agreement being reached, however, the talks completely broke down in June of 2002. From that point forward, I was left out of the communication loop on Suros' engineering. I was also told by both Jim Pearson and Joe Mark that the contractual discussions I prompted were "not doing you any long term good …" Since I had hired a number of new employees in order to sufficiently supply Suros with consoles and I had relied upon Suros' business when I employed these individuals, I decided to continue without a contract.

74.    During this time, I also contacted an electrical cabinet manufacturer, Hoffman, located in Anoka, MN, and helped design a new enclosure that could house the entire system. A concept drawing of the enclosure is attached as Exhibit 30.

75.    On April 23, 2002, I filed provisional application number 60/374,952, which included circuit diagrams and disclosures of all aspects of my control system, including the console, circuit, and

setup fixturing designed specifically to manufacture the control system for the breast biopsy handpiece. That application is attached as Exhibit 31.

76.    Several related utility patent applications were filed later. Those applications (and patent) are referenced above and attached as Exhibits 2, 5, 6, 7, and 8.

77.    Suros filed a "Protest" against all of my then-pending patent applications. A copy of the Protest is attached as Exhibit 33.

78.    In June 2007, Tissue Extraction Devices, LLC ("TED"), which now owns the rights to the applications and patents attached as Exhibits 2, 5, 6, 7, and 8, suggested an interference at the patent office against the '824 Patent.

79.    When I was manufacturing consoles for Suros, I shipped at least nine consoles to hospitals and clinics located in the Northern District of Illinois. Copies of the Console Release Forms related to these shipments are attached as Exhibit 34.

80.    As a result of my own customer service policy, I have also serviced some of the consoles located in the Northern District of Illinois. Copies of my records for such service and travel related thereto are attached as Exhibit 35.

81.   My company built the nine consoles that were shipped to the Northern District of Illinois and I am therefore aware of the construction of those nine consoles.

82.   The nine consoles were built to my specifications and fall within the scope of my patent, Exhibit 2.

83.   At least one of the original nine consoles I shipped to the Northern District of Illinois is still in operation. I have not yet been able to ascertain whether the other eight consoles have been upgraded to a newer model.

84.   Based on my understanding of the newer model ATEC consoles, the new consoles still fall within the scope of the claims of my patent, attached as Exhibit 2.

85.   I am presently not aware of the totality of consoles in the Southern District of Indiana, or whether any consoles are in operation in the Southern District of Indiana.

86.   For the past two years, I and/or representatives of TED have personally met with employees of Hologic at the Radiological Society of North America's ("RSNA") annual meeting and trade show in Chicago.

87.    During each of these trade shows, Hologic set up a display relating to the Accused Products, offered the Accused Products for sale, and provided information on the Internet illustrating how to find Hologic at the trade show. A copy of Hologic's RSNA listing for both years is attached as Exhibit 36.

88.    At the 2007 RSNA show, I and other TED decision-makers met at length with executives from Hologic. Included in those meetings were Robert Cascella, Hologic's President and Chief Operating Officer, and Jay Stein, Hologic's Chairman Emeritus and Chief Technical Officer.

89.    At the in-person meeting, we sat at a conference table and discussed my involvement in the development of the Accused Product.

90.    I became aware that Suros executives were also nearby during this meeting, but they were not invited.

91.    I have shipped all of the documents of relevance in this matter to the Northern District of Illinois. In particular, my attorneys in Chicago have the originals of every document that would be relevant to an infringement, invalidity, patentability, or similar inquiry.

Dated: 8th day of April 2008

Jeffrey R. Schwindt
Air Systems Engineering
5142 E. 65th Street
Indianapolis, IN 46220
317-842-7888