

**PROTEST UNDER 37 CFR § 1.291**
I hereby certify that this correspondence is being deposited with the U.S. Postal Service as Express
Mail, Airbill No. EV 508827873 US, in an envelope addressed to: MS Petitions, Commissioner for
Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on the date shown below.

Dated: 02/04/2005     Signature: _____ (Sarah J. Goodwin)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:     Jeffrey Schwindt          Examiner:  J. Foreman

Application Serial No.:  10/420,197               Group Art Unit:  3736

Filed:  04/22/2003                                Confirmation No. 3918

For:          PNEUMATIC CIRCUIT

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## PROTEST UNDER 37 CFR § 1.291

Dear Sir:

Pursuant to 37 C.F.R. § 1.291, Suros Surgical Systems, Inc., hereby files its

Protest in connection with the above-identified pending patent application. The specific

grounds for the Protest are set forth in greater detail below.

## FACTUAL BACKGROUND

### I.     Development of the Invention Embodied in the Claims of the Schwindt Application

Suros Surgical Systems, Inc. ("Suros") is a leading developer, manufacturer, and

distributor of a variety of unique and proprietary surgical products, including, but not

limited to, surgical cutting instruments for biopsies. Exhibit A.  To protect its innovative

biopsy products in the marketplace, Suros has sought and received patent protection in

the United States, as well as in other foreign jurisdictions. For example, Suros is the owner, through assignment, of numerous U.S. patents directed to surgical cutting instruments for use in tissue removal. Such patents include, but are not limited to, U.S. Patent Nos. 5,403,276; 5,411,513; 5,423,844; 5,575,293; 5,643,304; 5,669,876; 5,685,840; 5,782,849; 5,911,701; 5,997,560; 6,120,518; 6,245,084; 6,358,263; 6,638,235; and 6,758,824. Exhibit B, Declaration of Joseph L. Mark, ¶3; Exhibit C, Declaration of Michael E. Miller, ¶3. In addition, Suros is also the owner, by assignment, of a number of pending patent applications. Id.

Two of Suros' co-founders, Joseph L. Mark and Michael E. Miller, worked together in the 1990's at Promex, Inc., to jointly develop a high speed rotary blade for cutting small pieces of tissue that were capable of being removed and collected from the body via a vacuum generator from the sampling site. Exhibit B, ¶4; Exhibit C, ¶4. As part of that work, Mr. Mark and Mr. Miller conceived of the specific idea of a biopsy device for selectively cutting and collecting tissue samples. Id. At least as early as March 6, 1998, Mr. Mark and Mr. Miller further conceived the idea of a biopsy device that included a cannula configured for insertion into a body to a point such that the orifice of the cannula was adjacent to a tissue mass to be biopsied. Exhibit B, ¶5; Exhibit C, ¶5.

At that same time, Mr. Mark and Mr. Miller also conceived of the idea of using a pneumatic motor for rotating a cutter that was disposed within the cannula. Id. As the cutter rotated, tissue was selectively cut and drawn out of a rear end of an inner cannula of the cutter. Id. Throughout 1998 and 1999, Mr. Mark and Mr. Miller discussed their ideas for implementing the biopsy technology that they developed with Dr. Timothy A. Goedde. Exhibit B, ¶6; Exhibit C, ¶6. As part of those discussions, they specifically

2

focused on using the biopsy device in breast biopsies and tissue removal. Id. Well before February, 2000, Mr. Mark and Mr. Miller determined that using a pneumatic motor for powering the cutting element of the handheld biopsy device that they developed would be extremely advantageous in that the biopsy device could be used in a Magnetic Resonance Imaging (MRI) environment. Id. In early 2000, Mr. Mark and Mr. Miller conducted experiments to test their idea of using a pneumatic motor to power the cutting element of the biopsy device to cut human tissue. Exhibit B, ¶7; Exhibit C, ¶7. Their experiments proved successful. Id.

After successfully concluding their testing, Mr. Mark and Mr. Miller contacted Mr. Karl Fancher regarding developing a suitable pneumatic drive for a handpiece of the biopsy device (hereinafter, "the project"). Exhibit B, ¶8; Exhibit C, ¶8. Mr. Fancher introduced Mr. Mark and Mr. Miller to Mr. Jeffrey Schwindt (the sole named inventor on the present application) and Air Systems Engineering, Inc. (ASE), Mr. Schwindt's company. Id.

Before Mr. Schwindt could work on the project, it was necessary for Mr. Mark and Mr. Miller to spend many hours educating Mr. Schwindt with respect to their tissue extracting device, as well as the medical procedures to be performed using the device. Exhibit B, ¶9; Exhibit C, ¶9. As part of the education process, Mr. Mark and Mr. Miller dictated to Mr. Schwindt the tasks that needed to be performed to use the device, including the correct sequence in which those tasks were required to be performed, as well as other related technical requirements that Mr. Schwindt was unfamiliar with. Id.

Mr. Schwindt's responsibility for the project was to fabricate a circuit board and console that would perform the specific medical procedure tasks that Mr. Mark and Mr.

Miller provided to him, in the correct sequence, which was also dictated to him by Mr. Mark and Mr. Miller. Id. Further, Mr. Schwindt was also instructed to use off-the-shelf components for the circuit board and to charge Mr. Mark and Mr. Miller's company for his time spent on the project and the expenses he incurred in building the circuit board. Exhibit B, ¶10; Exhibit C, ¶10. However, Mr. Schwindt had no involvement, at all, with respect to the development of the biopsy device. Exhibit B, ¶¶9, 18-19, 21-23; Exhibit C, ¶¶9, 18-19, 21-23. Indeed, as stated above, and as evidenced by the many issued patents (see, Exhibit B, ¶3; Exhibit C, ¶3) in which Mr. Mark and Mr. Miller are listed as inventors, it is Mr. Mark and Mr. Miller who developed the design for the biopsy device, long before ever meeting Mr. Schwindt.

On or about March 21, 2000, as part of his assignment on the project, Mr. Schwindt provided Mr. Mark and Mr. Miller with a draft flow chart for the proposed circuit board. Exhibit B, ¶11; Exhibit C, ¶11. After reviewing the flow chart, Mr. Mark and Mr. Miller provided Mr. Schwindt with several revisions to be incorporated into the flow chart. Id. Mr. Schwindt then built the first circuit board according to Mr. Mark's and Mr. Miller's specifications, including using the designated off-the-shelf components. Id.

The first circuit board was tested by Mr. Mark and Mr. Miller who determined that additional changes to the design were required for the product to work as required. Id. Mr. Mark and Mr. Miller instructed Mr. Schwindt to make their changes to the circuit, which involved having Mr. Schwindt document the proposed revisions from Mr. Mark and Mr. Miller in a series of flow charts. Id. Mr. Mark and Mr. Miller reviewed

the flow charts and again provided additional changes to timing, sequence and events for the tasks to be performed by the circuit. Id.

While the changes for the circuit board primarily consisted of changes effecting timing (i.e. speed) of the handpiece blade and the pressure to be applied, Mr. Mark and Mr. Miller also instructed Mr. Schwindt on other changes to be made to the console for the pneumatic drive, before the end of 2000. Exhibit B, ¶12; Exhibit C, ¶12. For example, one of the instructions specified that a pinch valve should be added to the console to control the timing of the introduction of saline solution to the secondary lumen of the biopsy device and to eliminate the use of air. Id. This proposed addition was made by Mr. Mark and Mr. Miller to provide necessary lubrication to the biopsy device and to allow tissue to pass consistently through the device. Id. When Mr. Mark and Mr. Miller provided Mr. Schwindt with the instruction to add the pinch valve, they also provided Mr. Schwindt with several examples of electric pinch valves that Mr. Mark and Mr. Miller had used in other medical devices. Id.

ASE and Mr. Schwindt completed and sold the circuit board and console to Promex, Inc. no later than September 20, 2000, well over a year before Mr. Schwindt filed his first patent application. Exhibit B, ¶14; Exhibit C, ¶14; See also, Sect. II below. By the end of 2000, following several procedures during which Mr. Mark and Mr. Miller's biopsy device and circuit board were tested and additional modifications were made, Mr. Mark and Miller approached Mr. Schwindt for the purpose of having ASE build several more consoles to use with their biopsy device. Exhibit B, ¶15; Exhibit C, ¶15. These consoles also included the circuit board made from off-the-shelf components, pursuant to Mr. Mark and Mr. Miller's instructions. Id.

5

As set forth above, it was Mr. Mark and Mr. Miller, *and not* Mr. Schwindt, who developed the idea of using an air motor to rotate and reciprocate the cutting blade of the biopsy device. This air motor drive system innovation, which made the device compatible for use in MRI procedures, was conceived by Mr. Mark and Mr. Miller long before they ever met Mr. Schwindt. Indeed, Mr. Mark and Mr. Miller's conception was before Mr. Schwindt had any knowledge of their biopsy device. Accordingly, the only thing that Mr. Schwindt did was to implement the functional requirements that were provided to him by Mr. Mark and Mr. Miller.

## II.   Mr. Schwindt's Patent Applications

Mr. Schwindt has filed at least four patent applications, including the present application. U.S. Appl. Serial Nos. 10/420,197; 10/420,212; 10/420,296; and 10/461,315, were filed on either April 22, 2003 or June 13, 2003 (collectively, "the Schwindt Applications"). All of these applications are related to provisional application serial no. 60/374,952, filed on April 23, 2002, well over a year after Mr. Schwindt sold Mr. Mark and Mr. Miller a console that incorporated the limitations of the pending claims of the Schwindt Applications. Exhibit B, ¶14; Exhibit C, ¶14.

Notably, all four of the Schwindt Applications list Mr. Schwindt as the *sole* inventor. In addition, Mr. Schwindt never informed either Mr. Mark or Mr. Miller that he had filed the Schwindt Applications, nor did he discuss with Mr. Mark or Mr. Miller whether they should be listed as co-inventors on any of the Schwindt Applications. Exhibit B, ¶17; Exhibit C, ¶17. Mr. Schwindt's intentional exclusion of Mr. Mark and Mr. Miller as inventors on the Schwindt Applications is fraudulent under the circumstances present here where Mr. Schwindt did not invent the biopsy device that he

6

has claimed nor did he invent any of the procedures for operating the device. Indeed, Mr.
Schwindt merely replicated and implemented Mr. Miller's and Mr. Mark's instructions
by arranging off-the-shelf components on a circuit board to perform the tasks, in a
particular sequence and at a particular speed as communicated to Mr. Schwindt by Mr.
Mark and Mr. Miller.

On September 8, 2004, after Mr. Mark and Mr. Miller alerted Mr. Schwindt
regarding his improper claim of inventorship, Mr. Schwindt filed another application,
U.S. Appl. Serial No. 10/936,395 ("the '395 application"). Exhibit D. The '395
application was filed as a continuation of U.S. Patent Application No. 10/639,569, and
claiming priority to U.S. Patent No. 6,638,235 and U.S. Patent No. 6,758,824. The '569
application and the '235 and '824 patents are all assigned to Suros (collectively, "the
Suros Applications") and claim the inventive biopsy device developed by Mr. Mark and
Mr. Miller. In filing the '395 application, Mr. Schwindt copied the claims from the Suros
Applications and named himself a co-inventor of the claims, thereby admitting that he
was not a sole inventor of the subject matter of the claims which overlap with certain
claims of the Schwindt Applications.

## ARGUMENT

## III.    Mr. Schwindt Is Not the Inventor of the Schwindt Applications

Examiners are required to reject applications under 35 U.S.C. § 102(f) on the
basis of improper inventorship. See Manual of Patent Examining Procedure § 2137.01
(hereinafter "MPEP"). Accordingly, the MPEP details the "rules" of inventorship to be
used by examiners, see id., and specifically notes that information about inventorship is
material under 37 C.F.R. § 1.56, see MPEP § 2001.06(c) (inventorship disputes are

7

material information); and MPEP § 2004 (suggesting that applicants carefully consider

inventorship in the duty to disclose context). Because Mr. Mark and Mr. Miller are the

true inventors of the claims in the Schwindt Applications, the Patent Office must consider

the foregoing information and reject the Schwindt Applications under 35 U.S.C. § 102(f).

The creation of an invention involves three stages: (1) conception; (2) reducing

the invention to practice (e.g., building a working prototype or filing a patent application

on the invention); and (3) interim activity directed toward reducing the invention to

practice. Fina Oil & Chemical Co. v. Ewen, 123 F.3d 1466, 1473 (Fed. Cir. 1997). The

threshold question in inventorship disputes is a determination of who conceived the

invention. Indeed, "[c]onception is the touchstone of inventorship, the completion of the

mental part of the invention." Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d

1223, 1227-28 (Fed. Cir. 1994). Unless a person contributes to the conception of the

invention, he is not an inventor. Complete conception of an invention has long been

defined as:

> "The conception of the invention consists in the complete
> performance of the mental part of the inventive act. All
> that remains to be accomplished in order to perfect the act
> or instrument belongs to the department of construction,
> not invention. It is, therefore, the formation in the mind of
> the inventor to a definite and permanent idea of the
> complete and operative invention as it is thereafter to be
> applied in practice that constitutes an available conception
> within the meaning of patent law." Mergerthaler v.
> Scudder, 11 App.D.C. 264, 1897 C.D. 724, 731 (D.C. Cir.
> 1897).

Turning to the particular facts of this case, as set forth in detail above, Mr.

Schwindt clearly cannot be the inventor in the Schwindt Applications because he did not

conceive any of the inventions claimed in the Schwindt Applications. Mr. Mark and Mr.

8

Miller conceived the inventions claimed by Mr. Schwindt. As such, the claims of the Schwindt Applications must be rejected.

## A.    The '315 Application

Specifically focusing on claim 1 of the '315 application, Mr. Schwindt's application claims "a biopsy device" that includes "a cannula with an orifice, the cannula being configured for insertion into a body to a point such that the orifice is adjacent to a tissue mass to be biopsied." The cannula design (as evidenced by Mr. Mark's and Mr. Miller's prior issued patents) was invented by Mr. Mark and Mr. Miller long before Mr. Schwindt met Mr. Mark and Mr. Miller. Exhibit B, ¶19; Exhibit C, ¶19. In fact, Mr. Schwindt had had no experience with minimally invasive tissue removal medical devices, and especially no experience with biopsy devices, until Mr. Mark and Mr. Miller spent many hours educating him on various features of the their innovative biopsy device. Exhibit B, ¶9; Exhibit C, ¶9. Nor did Mr. Schwindt invent a pneumatic motor having a hollow shaft disposed within the cannula, the pneumatic motor shaft having a cutter end configured to rotate relative to the orifice to selectively cut tissue from the mass. Exhibit B, ¶19; Exhibit C, ¶19. Again, it was Mr. Mark and Mr. Miller who invented this feature. And Mr. Schwindt also did not invent drawing the tissue cut from the mass through the hollow shaft and through the pneumatic motor during operation of the biopsy device. Id. This feature was also invented by Mr. Mark and Mr. Miller. Accordingly, Mr. Schwindt is not an inventor (sole or joint) with respect to the subject matter claimed in the '315 application. Accordingly, the pending claims of the '315 application must be rejected under 35 U.S.C. § 102(f), as only a true and original inventor may obtain a patent.

9

Moreover, Mr. Schwindt's own actions demonstrate that Mr. Schwindt was not a sole inventor of the Schwindt Applications. Indeed, by filing his most recent application that involuntarily names Mr. Mark and Mr. Miller (and others) as co-inventors of claims that allegedly overlap with those present in the Schwindt Applications, Mr. Schwindt has admitted that he is not a sole inventor of the Schwindt Applications. For this reason alone, Mr. Schwindt's claims should be rejected under § 102(f).

**B.    The '296 Application**

The '296 application was filed on April 22, 2003. And, similar to the '315 application, Mr. Schwindt also intentionally and improperly omitted Mr. Mark and Mr. Miller as inventors on the '296 Application. For example, the claims of the '296 application claim a medical device that is a biopsy device having a pneumatic motor. Mr. Schwindt did not conceive of this limitation and therefore, did not invent this limitation in accordance with U.S. patent law. Indeed, it was Mr. Mark and Mr. Miller who invented the biopsy device using a pneumatic motor. In fact, Mr. Mark and Mr. Miller tested their invention *before ever meeting Mr. Schwindt*. Exhibit B, ¶5; Exhibit C, ¶5. Nor did Mr. Schwindt conceive of constructing a biopsy device of non-magnetic components. Again, it was Mr. Mark and Mr. Miller who invented these claimed features. Exhibit B, ¶6; Exhibit C, ¶6.

Moreover, it is well settled that one does not become an inventor by merely following the instructions of the person or persons who conceive the solution. Ethicon, Inc. v. United States Surgical Corp., 45 USPQ2d 1545, 1548 (Fed. Cir. 1998) (citing, Sewall v. Walters, 21 F.3d 411, 415 (Fed. Cir. 1997); Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed. Cir. 1985) ("An inventor 'may use the services,

10

ideas and aid of others in the process of perfecting his invention without losing his right

to a patent.'"). Accordingly, Mr. Schwindt, who was approached by Mr. Mark and Miller

to develop the pneumatic circuit in accordance with *their* instructions and specifications,

is also not an inventor of the claims of the '296 application.

In addition, Mr. Schwindt has admitted that he is not a sole inventor by filing the

'395 application on similar, overlapping claims, that specifically names, albeit

involuntarily, Mr. Mark and Mr. Miller as co-inventors. Thus, the claims of the '296

application should also be rejected under 35 U.S.C. § 102(f).

### C.    The '212 Application

The claims of the '212 application are directed to a pinch valve and to a medical

device using a pinch valve. However, it was Mr. Mark and Mr. Miller who instructed

Mr. Schwindt to incorporate a pinch valve into the biopsy system to control the timing for

the flow of saline solution to the biopsy device. Exhibit B, ¶12; Exhibit C, ¶12. Indeed,

Mr. Mark and Mr. Miller had to explain to Mr. Schwindt the function of the pinch valve,

as well as its importance in the biopsy device with respect to tissue movement within the

device and the need for the pathway to be sterile. Id. In addition, Mr. Mark and Mr.

Miller provided Mr. Schwindt with several examples of known, prior art pinch valves

that Mr. Mark and Mr. Miller had used in the past in their previous medical devices to

provide Mr. Schwindt with an understanding of their conception of their pneumatic pinch

valve invention. Id. Thus, it is clear that it was only after Mr. Schwindt had received Mr.

Mark's and Mr. Miller's instructions that he was able to reduce Mr. Mark's and Mr.

Miller's invention of a pneumatic pinch valve to practice. However, one who simply

reduces the inventor's idea (like Mr. Schwindt) to practice is not necessarily a joint

inventor. Sewall, 21 F.3d at 416. In any event, even assuming that Mr. Schwindt is a joint inventor to certain claims of the '212 application, Mr. Schwindt still failed to properly list Mr. Mark and Mr. Miller as inventors and therefore, the claims of the '212 application must also be rejected under 35 U.S.C. § 102(f).

## D. The '197 Application

The '197 application was filed on April 22, 2003. This application is the parent application for the '315 application. The '197 application claims a "medical device" including a "cannula" and a "cutter housed within the cannula" with a "pneumatic cylinder coupled to the cutter" and a "pneumatic circuit" for controlling the pneumatic cylinder. For the reasons set forth previously, the claims of the '197 application must be rejected under 35 U.S.C. § 102(f).

## IV. Inventorship of the Schwindt Applications Cannot Be Corrected Under 35 U.S.C. § 116 and/or 37 C.F.R. § 1.48

When Suros learned of the Schwindt Applications, Suros, through their attorneys, contacted Mr. Schwindt informing him that it was Suros' belief that Mr. Schwindt was not the original and true inventor of the Schwindt Applications because it was Mr. Mark and Mr. Miller who conceived the inventions claimed in the Schwindt Applications. Exhibit E, May 17, 2004 Ltr. to J. Schwindt. Mr. Schwindt's attorneys, Barnes & Thornburg, who, also represent Promex in several matters, including patent matters regarding biopsy devices invented by Mr. Mark and Mr. Miller and assigned to Promex,[1] suggested that the inventorship of the Schwindt Applications could be corrected under 37 C.F.R. § 1.48. Exhibit F, June 4, 2004 Ltr. to B. Diedrich.

---

[1] Exhibit B, ¶20; Exhibit C, ¶20.

While 35 U.S.C. § 116 and 37 C.F.R. § 1.48 do provide for correcting inventorship of pending patent applications, these provisions are not applicable in the present situation. Omitted from the June 4, 2004 letter is the requirement that corrections of inventorship under both 35 U.S.C. § 116 and 37 C.F.R. § 1.48 must meet strict legal requirements. One specific requirement provides that the error in designating the inventorship of the application was done "without any deceptive intent" on the part of the applicant. Because Mr. Schwindt clearly knew that he did not "invent" the claimed features of the Schwindt Applications, he knowingly signed a false declaration and therefore he cannot meet the threshold "lack of deceptive intent" requirement. See, PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315 (Fed. Cir. 2000) (misrepresentations and omissions concerning whether unnamed persons should have been named as inventors constituted inequitable conduct rendering a patent unenforceable). Indeed, it is also quite significant that over 7 months have passed since Suros brought this issue to Mr. Schwindt and he has not attempted to correct the inventorship of the Schwindt Applications. Instead he has responded by filing another application, attempting to copy the claims of the Suros Applications, and naming himself as a co-inventor. This alone speaks volumes about Mr. Schwindt's fraudulent intent. Accordingly, the Schwindt Applications must be rejected.

13

## CONCLUSION

Suros respectfully requests that the United States Patent Office reject the claims of the Schwindt Applications under 35 U.S.C. § 102(f) because Mr. Schwindt is not the sole inventor of the filed claims. Suros further requests that Schwindt be precluded from copying claims in the '395 application and that an order be entered in the '395 application requiring Schwindt to abandon the '395 application because of his fraudulent misrepresentations on inventorship in the Schwindt Applications.

Respectfully submitted,

Dated: February 4, 2005

R. Terrance Rader, Esq. (Reg. No. 28,772)
Kristin L. Murphy, Esq. (Reg. No. 41,212)
Rader, Fishman & Grauer PLLC
39533 Woodward Ave., Suite 140
Bloomfield Hills, Michigan 48304
(248) 594-0600

*Attorneys for Suros Surgical Systems, Inc.*

R0280325.DOC

App. No. 10/420,197

## **PROOF OF SERVICE**

I hereby certify that on February 4, 2005 a true and correct copy of the foregoing

Protest Under 37 C.F.R. § 1.291 was served via first class mail on the following:

James R. Sweeney II
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204-3535

R. Terrance Rader
Reg. No. 28,772
Rader, Fishman & Grauer PLLC
39533 Woodward Ave., Suite 140
Bloomfield Hills, Michigan 48304
(248) 594-0600

R0280325.DOC

15






| About Suros | ▶ |
| Product Line | ▶ |
| Imaging Modalities | ▶ |
| Home | ▶ |

## **Company** overview

### About Suros Surgical Systems, Inc.

Suros Surgical Systems, Inc. is an award winning Indiana-based medical device manufacturer setting new industry standards for minimally invasive methods of tissue excision and biopsy within multiple surgical specialties. Our patented surgical platform technology allows us to remove tissue or biopsy samples in the most compassionate, effective and efficient manner possible.

Our initial product launch -- the patented ATEC® (Automated Tissue Excision and Collection) breast biopsy and excision system -- has made exciting new clinical advancements in the areas of vacuum assisted diagnostic breast biopsy. Suros is proud to be the only company in the world with a commercially available MRI-guided vacuum assisted breast biopsy system that allows women in a high-risk population the opportunity for early diagnosis without going to surgery. For the more than 1.2 million women who undergo breast biopsy every year, this is good news. Suros also offers the first and only 9 gauge petite needle for women with small breasts and a true 12 gauge needle – giving physicians the world's smallest needle to perform the world's fastest breast biopsy.

At Suros, we believe patients are better served with a minimally invasive approach to biopsy or surgery. The ATEC® system offers measurable improvements in speed, reliability, clinical capabilities, safety, economic return, and ease of use. Simply stated, the ATEC® is the choice both physicians and women have been waiting for – a breast biopsy system compatible under any imaging modality and first-ever technology that allows women a chance at outpatient breast biopsy methods with reduced pain and trauma, and with no scarring or post-op recovery time.

Suros never stops improving its technology and is always looking for new, innovative ways of providing the most compassionate patient care on many clinical levels. Stay tuned as Suros grows and continues to take the lead in developing new capabilities for minimally invasive tissue excision in even the most delicate surgical applications.

### The Suros Mission
It is the mission of Suros Surgical Systems, Inc. to design, develop, manufacture and market innovative Compassionate Technologies in a wide variety of surgical platform specialties. We believe patients are better served with a minimally invasive approach to biopsy or surgery. To make a minimally invasive approach successful, it must benefit the patient, physician, medical institution, and society. The patented ATEC® breast biopsy and excision system accomplishes this by offering measurable and qualitative improvements in speed, reliability, clinical capabilities, safety, economic return, and ease of use.

### Code of Conduct
Suros Surgical Systems, Inc. is committed to complete customer and employee satisfaction through the operation of an organization that is built on ethics, quality, service and value with the highest regard for our customers, partners and the patient. A visionary organization is built by keeping its core values as each new

employee or customer is added. As such, the Suros Code of Business Conduct recognizes that the unshakable foundation of corporate integrity is the personal integrity of each individual.

Suros is dedicated to creating compassionate technology that improves the odds of early detection of breast disease and provides the physician with an advanced clinical tool for better diagnosis. Suros is committed to value, and we appreciate your visit to our Web site.

return to top

Suros Surgical Systems, Inc | Northwest Technology Center
6100 Technology Center Drive | Indianapolis, IN 46278
p. 800.650.2169 (toll free) | f: 317.344.7600 | info@surossurgical.com



DECLARATION OF JOSEPH L. MARK

I, Joseph L. Mark, being duly warned of the penalties for perjury under 18 U.S.C. § 1001, hereby declare as follows:

1.    I am competent to testify from personal knowledge as to all matters set forth in this declaration unless otherwise indicated.

2.    I am Co-Founder, Vice President of Product Development, and an employee of Suros Surgical Systems, Inc. with offices at Northwest Technology Center, 6100 Technology Center Drive, Indianapolis, Indiana 46278.

3.    I am a named inventor on several United States patents which are directed to a surgical cutting instrument for use in tissue removal. Those patents include U.S. Patent Nos. 5,403,276; 5,575,293; 5,643,304; 5,669,876; 5,685,840; 6,120,518; 6,245,084; 6,358,263; 6,638,235; and 6,758,824. I am also one of the named inventors on pending patent applications which are also directed to tissue removal using a rotating cutting element which is mounted to a handpiece.

4.    In the 1990's, I worked with Michael E. Miller to develop a high speed rotary blade for cutting small pieces of tissue which would then be removed and collected by using a vacuum generator. At the time, Mr. Miller and I were principals of Promex, Inc., an Indiana company. From our research and development, Mr. Miller and I conceived of the idea of applying this technology to the removal of breast tissue.

5.    At least as early as March 6, 1998, we conceived the idea of a biopsy device including a cannula that was configured for insertion into a body to a point such that the orifice was adjacent to a tissue mass to be biopsied. We also conceived the idea of using a pneumatic

1

motor for rotating a cutter which was disposed within the cannula. As the cutter rotated, tissue would be selectively cut and drawn out of the rear of the inner cannula of the cutter.

6.      In 1998 and continuing into 1999, Mr. Miller and I had conversations with Dr. Timothy A. Goedde with respect to further developing this technology for use in breast biopsies and tissue removal. Before February, 2000, Mr. Miller and I had decided that we would use a pneumatic motor for powering the cutting element of the handheld device so that the device could be used in an MRI environment.

7.      Mr. Miller and I conducted experiments in early 2000 which showed that a handheld cutting needle, which was pneumatically driven, could be used successfully on human tissue.

8.      After Mr. Miller and I determined that a pneumatic drive system should be used to power the handpiece, we contacted Karl Fancher regarding the development of a pneumatic drive for our handpiece. Mr. Fancher introduced us to Jeffrey Schwindt and Air Systems Engineering, Inc. (ASE). We were told that ASE was engaged in the business of combining pneumatics and electronic consoles and designing pneumatic control circuits.

9.      Because Jeffrey Schwindt had never worked in the field of medicine or medical devices, Mr. Miller and I spent many hours educating Mr. Schwindt with respect to our tissue extraction device and the medical procedures to be formed in using the device. We told Mr. Schwindt the tasks that needed to be performed to use the device and the correct sequence in which those tasks should be performed and other related technical requirements. Mr. Schwindt's responsibility was to develop a circuit board that would perform the medical procedure tasks we outlined to him in the correct sequence. Mr. Schwindt had no involvement whatsoever in the

2

development or use of the biopsy device, since, as set forth previously, Mr. Miller and I invented and developed the design for the biopsy device long before we met Mr. Schwindt.

10.    Mr. Schwindt was also specifically instructed to use off-the-shelf components for the circuit board. He was instructed to charge our company, Promex, Inc., the expenses he incurred in building the circuit board as well as the time he spent in laying it out pursuant to our instructions as to the tasks to be performed and the correct sequence for performing those tasks.

11.    On or about March 21, 2000, Mr. Schwindt provided Mr. Miller and me with a rough flow chart for the circuit board. We gave Mr. Schwindt revisions that we wanted incorporated into the flow chart and he built the first circuit board based upon our instructions. The circuit board was made using off-the-shelf components. After testing, we determined that various changes needed to be made, and following our testing, we would instruct Mr. Schwindt to redesign the circuit board based upon the changes we made to the inputs and outputs. After Mr. Schwindt documented these requests in a flow chart, we provided Mr. Schwindt with changes to the flow charts to incorporate further changes to timing, sequence or events. During this entire process, Mr. Miller and I discussed with Mr. Schwindt the functions that the circuit board needed to accomplish and we discussed with him the methods to be employed to achieve those functions.

12.    While the changes made by Mr. Schwindt to the circuit board primarily consisted of changes affecting the timing (speed) of the handpiece blade and the pressure to be applied, we instructed other changes to be made to the console before the end of calendar year 2000. One change we requested was to add a pinch valve to control the timing of saline solution to the secondary lumen, and eliminate the use of air, to assist in the lubrication and to allow the tissue to pass consistently. Mr. Miller and I showed Mr. Schwindt several examples of electric pinch

3

valves which we had used previously in medical devices. We then instructed Mr. Schwindt to fabricate a pneumatic pinch valve to do the same.

13.     We also made the decision to commence using an air motor to both rotate and reciprocate the cutting blade. As set forth previously, Mr. Miller and I conceived the idea of using an air motor drive system, which would allow for MRI compatibility, before we met Mr. Schwindt and before Mr. Schwindt had any knowledge with respect to our biopsy device.

14.     ASE and Jeffrey Schwindt sold the completed circuit board and console to Promex, Inc. no later than September 20, 2000. Exemplary invoices from ASE to Promex regarding the circuit board and air motor are attached hereto as Exhibits 1 and 2.

15.     By the end of the year 2000, following several procedures during which our biopsy device and circuit board were tested and modifications were made, Mr. Miller and I discussed with Mr. Schwindt the building of several more six consoles. These consoles included the circuit board which was made from off-the-shelf items pursuant to our instructions.

16.     I am informed that Mr. Schwindt has filed at least three patent applications where he is listed as the sole inventor. Those applications (Nos. 10/420,212; 10/420,296; and 10/461,315) were filed on either April 22, 2003 or June 13, 2003. These applications are related to a provisional application no. 60/374,952, which was filed on April 23, 2002. With respect to application no. 10/461,315, it is a continuation of application no. 10/420,197, which was filed on April 22, 2003.

17.     I did not become aware of the applications filed by Mr. Schwindt until earlier this year. At no time did Mr. Schwindt provide me with any notice that he had filed the above-identified patent applications or discuss with me whether I should be listed as an inventor or co-inventor on any of the patent applications.

4

18. Mr. Schwindt did not invent the biopsy device nor did he invent any procedures for operating the device. Pursuant to the instructions given to him by Mr. Miller and myself, he arranged off-the-shelf components on a circuit board to perform those tasks which we instructed him needed to be performed in a particular sequence and at a particular speed. Thus, Mr. Schwindt merely implemented the functional requirements that we provided to him.

19. I have reviewed published patent application no. 10/461,315, which was filed on June 13, 2003, in which Jeffrey Schwindt is listed as the sole inventor. I have reviewed the patent claims in this patent application. Mr. Schwindt is not a sole or joint inventor with respect to the subject matter that is claimed in this application. For example, Mr. Schwindt did not invent a biopsy device having a cannula with an orifice, the cannula being configured for insertion into a body to a point such that the orifice is adjacent to a tissue mass to be biopsied. Further, Mr. Schwindt did not invent a pneumatic motor having a hollow shaft disposed within the cannula, the pneumatic motor shaft having a cutter end configured to rotate relative to the orifice to selectively cut tissue from the mass. Moreover, Mr. Schwindt did not invent drawing the tissue cut from the mass through the hollow shaft and through the pneumatic motor during operation of the biopsy device. Since Mr. Schwindt is neither a sole inventor nor a joint inventor with respect to the subject matter claimed in this application, Mr. Schwindt has signed a false oath regarding inventorship.

20. The three Schwindt patent applications identified herein were prepared by the Barnes & Thornburg law firm. A member of that same law firm currently represents Promex, Inc., on similar matters. Barnes & Thornburg knew or should have known that Mr. Miller and I had invented and developed a biopsy device having the basic construction that is claimed in the three Schwindt patent applications. Nevertheless, the Barnes & Thornburg law firm submitted

5

and continues to prosecute patent claims in these three patent applications which claim the biopsy device that only Mr. Miller and I invented. As a principal of Promex, Inc., I object to the conflict of interests in their prosecution of the three patent applications for Jeffrey Schwindt while they continue to represent Promex, Inc.

21.     With respect to Schwindt application no. 10/420,296, which was filed on April 22, 2003, it also claims a biopsy device having structural and functional characteristics that only Mr. Miller and I invented. Further, as set forth in Exhibits 1-2, Mr. Schwindt sold the claimed pneumatic circuit more than one year before the filing date of the provisional patent application.

22.     With respect to Schwindt application no. 10/420,212, which was filed on April 22, 2003, the claimed pinch valve and saline supply line were not solely invented by Mr. Schwindt. Instead, as set forth previously, we instructed Mr. Schwindt on the need for the pinch valve and the saline supply line, and showed him sample pinch valves to aid in its construction.

23.     In summary, Mr. Schwindt was contacted by myself and Mr. Miller about March of 2000. We provided Mr. Schwindt with information regarding the requested output of the pneumatic system for the biopsy device we invented, and, in accordance with our instructions, he fabricated a pneumatic system prototype using off-the-shelf components. Each of the elements of the claims recited in the three Schwindt patent applications were disclosed to Mr. Schwindt for the sole purpose of fabricating prototypes for testing and ultimately for sale. A system having the features claimed by Mr. Schwindt in his patent claims was sold at least as early as December of 2000. Further, a system having the features claimed by Mr. Schwindt in his patent claims was publicly used to conduct test biopsies at least as early as December of 2000.

24.     I am also aware of prior art uses of air motors for rotating a cutting tip in a medical device. For example, U.S. Patent No. 3,976,077 discloses a cutting tool which is rotated

6

by an air motor for use as an ophthalmic surgical device. (Exhibit 3). Similarly, U.S. Patent No.
6,361,504 discloses a biopsy needle wherein an air motor rotates the cutting blade for the
purpose of acquiring tissue samples. (Exhibit 4).

I declare under penalty of perjury that the foregoing statements are true and accurate to
the best of my knowledge and belief.

Date: __14 | 1 | 04__

Joseph L. Mark

7



** PURCHASE ORDER COPY                     PAGE:  1

PROMEX, INC.                           P.O. NUMBER:  0004852
3049 Hudson Street                     ORDER DATE:  09/20/00
Franklin, IN  46131

(317) 736-0128
(317) 736-0793  FAX                    VENDOR NO:  0000808

VENDOR:                                SHIP TO:
Air Systems Engineering, Inc.          PROMEX, INC.
P.O. Box 20308                         3049 Hudson Street
Indianapolis        IN 46220           Franklin          IN 46131

CONFIRM TO:  Jeff Schwindt
(317)842-7888    (317)842-7980    X

---------------------------------------------------------------------
        SHIP VIA        F.O.B          TERMS
        UPS GROUND      FRANKLIN       NO TERMS
---------------------------------------------------------------------
ITEM NO.          UNIT  ORDERED  RECEIVED  BACK ORD   UNIT COST   AMOUNT
---------------------------------------------------------------------
*ASE-1420         EACH   2.00      0.00      0.00    1,465.500   2,931.00
  CONTROL SYSTEM                    ** REQUIRED BY:   10/04/00
            ASE-1420 CONTROL SYSTEM INCLUDES:
            VALVE LOGIC CIRCUIT WITH UPDATES
            ASSEMBLED INTO 13X10X6 NON-METALLIC ENCLOSURE
            HINGED
            ALL CONNECTIONS MADE THRU BULKHEAD FITTINGS
            FLOW CONTROLS MOUNTED ON SIDE OF PANEL
            ASSUMES THAT WE ARE USING THE ELECTRIC MOTOR


       PER QUOTE DATED 9/20/00
       PLEASE FAX ORDER CONFIRMATION & DELIVERY DATE.
       THANK YOU.  JANE MCNEILL, PURCHASING COORDINATOR


                                            complete per
                                            mike   11/24/0

                                            FAXED
                                            9/20/0

                                          ----------
                              NET ORDER:    2,931.00
                              SALES TAX;         .00
                              FREIGHT:           .00
                                          ----------
Signature:                    ORDER TOTAL:   2,931.00



** PURCHASE ORDER **                                          PAGE: 1


PROMEX, INC.                                P.O. NUMBER;  0004865
3049 Hudson Street                          ORDER DATE:   09/22/00
Franklin, IN  46131

(317) 736-0128
(317) 736-0793  FAX                         VENDOR NO:    0000808


VENDOR:                          SHIP TO:
Air Systems Engineering, Inc.    PROMEX, INC.
P.O.Box 20308                    3049 Hudson Street
Indianapolis      IN 46220       Franklin            IN 46131

CONFIRM TO:  Jeff Schwindt
(317)842-7888    (317)842-7980      X

---

|                | SHIP VIA   | F.O.B    | TERMS       |           |           |
|                | UPS GROUND | FRANKLIN | Net 30 Days |           |           |

---

| ITEM NO.        | UNIT | ORDERED | RECEIVED | BACK ORD | UNIT COST | AMOUNT   |
|-----------------|------|---------|----------|----------|-----------|----------|
| *ASE-1420-AM    | EACH | 1.00    | 0.00     | 0.00     | 1,250.000 | 1,250.00 |
| AIR MOTOR PROTOTYPE | | | ** REQUIRED BY: | | 10/06/00 | |

```
            INCLUDES:
                DESIGN AND FABRICATION OF TWO AIR MOTOR
                PROTOTYPES
                AN ALUMINUM HOUSING AND A FABRICATED IMPELLER


            PER QUOTE DATED 9/22/00
            PLEASE SHIP AS SOON AS POSSIBLE
            THANK YOU.  JANE MCNEILL, PURCHASING COORDINATOR
```

RECEIVED
JAN 2 5 2001
Complete

FAXED
con 9/22/0

*Karen- This has
already been taken
out of our system,
I believe it was
SUROS related.*

Signature:

| NET ORDER:  | 1,250.00 |
|-------------|----------|
| SALES TAX:  | .00      |
| FREIGHT:    | .00      |
| ORDER TOTAL: | 1,250.00 |




directories     »     »     »


All suppliers



**article search**
All magazines

**GO**

Advanced Search
Powered by Google

**member services**
(Register | Login)

**in this section**

add a company
research
industry links
tradeshows
in print
bookstore
web gallery

**browse MDL**

directories
industry
PressCenter
community
CareerCenter
customercare
search

about us

## North American Suppliers Directory Index

# Micro Motors Inc.

151 E. Columbine
Santa Ana, CA 92707 USA
Tel: 800/562-6204
Fax: 714/546-1109

E-mail: patjoh@micromotorsinc.com

**Update this company's information**
(Free member registration required to use this feature)

**Description:**
Manufactures precision miniature air motors and air drills for both OEM and production applications. Standard models feature speed ranges from 1 to 50,000 rpm. Gearboxes offer gear reductions from 4:1 to 4100:1. Private label products manufactured include electronic controllers, low- and high-speed drills, attachments, fluid delivery systems, dental implantology units, and custom medical devices.

**Categories this company is listed under in the North American Suppliers Directory:**

- Hardware and Accessories: Pneumatic components *(63 companies)*
- Motors and Motion Control Products: Motion Control: Drives/Controllers *(145 companies)*
- Motors and Motion Control Products: Motion Control: Gearheads *(76 companies)*
- Motors and Motion Control Products: Motors: Brush dc *(80 companies)*
- Motors and Motion Control Products: Motors: Gear *(79 companies)*
- Motors and Motion Control Products: Motors: Pneumatic *(23 companies)*
- Motors and Motion Control Products: Motors: Torque *(62 companies)*
- Pumps and Valves: Pumps: Peristaltic *(31 companies)*

Welcome Micro Motors, Inc. Website







**Miniature air motors & drill for exacting high performance applications**

**Pioneer & Leader 29 years MINIATURE AIR MOTORS**

Options you may elect to fit your needs



Welcome Micro Motors, Inc. Website

## How our miniature air motor benefits a designer or user

- Operates on compressed air, nitrogen, or other inert gases at pressure up to *160 PSI*
- Precision air motor of *stainless* and *alloy* steel construction provides reliable power and long service life.
- Advanced rotor blade design and a highly polished cylinder permit continuous operation
- Balanced rotor positioned between precision ball bearings virtually eliminates friction and wear.
- Motors remain cool, even when operated under continuous load.
- Repeated stalling, instant reversing will not harm the motor.
- Spark free operation allows use in contaminated, wet or explosive environments.
- Instant on...instant off...no wind up or coasting.
- Hardened planetary gear system provides increased torque transmission capabilities and long life
- Lower air consumption than larger motors conserves energy.

## Exact dimensions may be modified for special industrial or medical applications



| AIR DRILL | | AIR MOTOR | | FREE SPEED | STALL TORQUE | "L" LENGTH | APPROXIMATE |
|---|---|---|---|---|---|---|---|
| RIGHT HAND | REVERSIBLE | RIGHT HAND | REVERSIBLE | | INCH OUNCES | INCHES | WEIGHT OUNCES |
| M3MR-5000 | M3MDR-5000 | M3MF-5220 | D3MR-5220 | 55,000 | .38 | 2.25 | 3-1/4 |
| M3MD-2500 | M3MDR-2500 | M3MF-2500 | M3MR-2500 | 28,000 | 7.2 | 2.50 | 3-1/4 |
| M3MD-8700 | M3MDR-8700 | M3MF-8700 | M3MR-8700 | 9,100 | 24 | 2.55 | 3-1/4 |
| | | | | | | | |
| M3RD-0014 | M3MDR-0014 | M3MF-0014 | M3MR-0014 | 1,750** | 110 | 3.14 | 4-1/4 |
| M3RD-0014 | M3MDR-0014 | M3MF-0004 | M3MR-0004 | 420** | 440 | 3.31 | 4-1/4 |
| | | M3MF-0002 | M3MR-0002 | 225** | 850 | 3.71 | 4-1/4 |
| | | | | | | | |
| | | M3MF-0001 | M3MR-0001 | 410** | 1750 | 4.44 | 5-1/2 |
| | | M3MF-5001 | M3MR-5001 | 205** | 1750* | 5.09 | 4-1/2 |
| | | M3MF-5007 | D3MR-5007 | 7** | 1360 | 5.87 | 7 |

## OUR MOTORS' PERFORMANCE

### FREE SPEED vs. AIR PRESSURE



## TORQUE vs. SPEED

90 P.S.I.

60 P.S.I.

TORQUE (IN. OZ.)

SPEED

- Charts are based on MMR or MMDR reversing models. On MMF or MMD models, a 10% torque and speed reduction should be allowed for.

- Caution: Torque loads above 1750 inch ounces may cause gears to slip and result in damage. Do not stall MMR, MMF 0001, 5001 & 6001 Motors.

*Rapid Innovation... Extraordinary Results*



# United States Patent [19]

**Kerfoot, Jr.**

BEST AVAILABLE COPY

[11]    **3,976,077**

[45]    **Aug. 24, 1976**

[54]    **EYE SURGERY DEVICE**

[76]    Inventor:    **Franklin W. Kerfoot, Jr.,** 678 Andover Road, Newtown Square, Pa. 19073

[22]    Filed:    **Feb. 3, 1975**

[21]    Appl. No.: **546,591**

[52]    U.S. Cl. .................................. **128/305; 308/121**
[51]    Int. Cl.² ........................ A61B 17/32; A61F 9/00
[58]    Field of Search ................ 128/305; 308/9, 121, 308/122, 140, 141, 149, 168, 170, 187, 246, DIG. 1

[56]    **References Cited**

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 908,539 | 1/1909 | Beutler | 308/141 X |
| 2,584,770 | 2/1952 | Wilcock | 308/9 |
| 3,639,074 | 2/1972 | Killick | 308/DIG. 1 |
| 3,736,938 | 6/1973 | Evvard et al. | 128/305 |
| 3,835,858 | 9/1974 | Hagen | 128/305 |

*Primary Examiner*—Channing L. Pace
*Attorney, Agent, or Firm*—Caesar, Rivise, Bernstein & Cohen, Ltd.

[57]    **ABSTRACT**

An ophthalmic surgical device including a housing having an extension sleeve projecting from one end thereof. A rotary shaft, having helical threads at one end thereof, which threads terminate in a cutting tip, is disposed within the extension sleeve with the tip being exposed at the free end of the sleeve. The shaft is mounted within three fluid-lubricated sleeve bearings. One of the bearings is mounted within the sleeve adjacent to the tip thereof with its central axis offset and slightly angled with respect to the axes of the other bearings to effect the bending and slight loading of the shaft. The bearings are lubricated by water provided under pressure thereto and serve to enable the shaft to rotate at a high rate of speed under the force provided by an air turbine. Means are provided for supplying a working fluid to the cutting tip of the device to aid in the maceration of the material to be removed by the tool. The macerated material and the working fluid are withdrawn from the operative site by the pumping action of the rotating helical threads of the shaft. The water pressure on the bearings not only lubricates the bearings but also precludes the macerated material and working fluid from being pumped into the interior of the housing.

**25 Claims, 7 Drawing Figures**





FIG.1



U.S. Patent    Aug. 24, 1976    Sheet 3 of 3    3,976,077



FIG.4

FIG.5

FIG.6

FIG.7

3,976,077

1

## EYE SURGERY DEVICE

This invention relates generally to surgical devices and more particularly to ophthalmic surgery devices.

A recent development in ophthalmic surgery has obviated the use of conventional cutting instruments, e.g., scalpels, for effecting the removal of unwanted tissue, such as lens opacities. To that end, macerating type surgical devices are now used in cataract surgery to effect the removal of lens opacities by the use of a rotary bur which grinds away the opacities. Such devices also serve to withdraw the ground or macerated material from the operating site via suction means. For example, in U.S. Pat. No. 3,736,938. (Evvard et al.) a surgical device is disclosed which supplies a working liquid to the cutting site while a high speed rotary cutter effects the maceration of the material thereat. At the same time a tube disposed about the cutter vibrates ultrasonically to coact with the cutter in macerating the lens. The cutter includes spiral grooves which effect the evacuation of the liquid and the macerated lens material.

In U.S. patent application Ser. No. 397,478, filed on Sept. 14, 1973 and assigned to National Aeronautics and Space Administration, there is disclosed a macerating surgical device which overcomes various disadvantages of the prior art in effecting the removal of the macerated lens material and yet does not utilize ultrasonic energy (whose effects on the eye are not fully known).

To that end, that device comprises a housing having an extension including a sleeve through which the free end of a rotary shaft extends. The free end includes helical threads terminating in a cutting tip. The shaft is connected to an air turbine motor to effect its rotation within the extension at an extremely high speed. Plural conduits are provided to carry treatment fluid. e.g., saline solution, to the operative site. The rotation of the cutting tip serves to grind up the eye tissue to be removed with the helical threads on the shaft act as a pump to pump the macerated tissue and treatment fluid away from the operative site through communicating passageways in the extension and into a collector.

As a result of the high speed rotation of the shaft and the close tolerance between the shaft and the sleeve in the extension, macerated material and liquid is pumped up into the space therebetween. In order to preclude the ingress of such material between the shaft and sleeve extension, a counter flow pump is provided. The pump is formed by a second screw thread on the shaft. The second threaded portion also has spiral grooves but their pitch is opposite to the pitch of the screw portion at the tip of the shaft. Accordingly, the rotation of the shaft and the concomitant rotation of the second threaded portion effects a reverse pumping action to cause the treatment fluid and macerated material to flow between the shaft and the extension and back toward the screw portion at the tip thereof. This action flushes any macerated material from the space between the shaft and the extension.

While the counter action pump technique used in the aforenoted patent application is generally effective to preclude the ingress of the macerated material and treatment fluid into the space between the rotating shaft and the sleeve in which it rotates, some material may nevertheless gain access to such space, with the deleterious effect of hardening therein to cause the shaft to bind. In addition, the use of a counter action

2

pump results in a rather complex and hence expensive surgical device.

Accordingly, it is a general object of this invention to provide a device which overcomes the disadvantages of the prior art.

It is a further object of this invention to provide a surgical cutting device suitable for high speed cutting in very small openings in the body.

It is still a further object of this invention to provide a surgical device for removing cut or macerated material by a pumping action, while precluding the ingress of such material into the interior of the device in a simple and expeditious manner.

It is still a further object of this invention to provide a surgical device utilizing a rotary tool mounted in fluid-lubricated bearings.

It is yet a further object of this invention to provide a stable bearing and shaft system for high speed rotary cutting or pumping devices utilizing fluid-lubricated sleeve bearings.

These and other objects of the invention are achieved by providing a surgical device comprising a housing and a sleeve having an open free end and connected to the housing. A shaft is positioned within the housing and the sleeve, with the shaft having a free end disposed adjacent the free end of the sleeve. The free end of the shaft is in the form of a tool adapted to operate in conjunction with a working fluid at the free end of the sleeve. The shaft is rotatably mounted within a first fluid-lubricated sleeve bearing and second fluid-lubricated bearings means. The first bearing is positioned within the elongated sleeve. Means are provided for supplying a liquid under pressure to the first bearing and the second means, with the liquid under pressure in the elongated sleeve lubricating the first bearing within the sleeve and precluding the ingress of the working fluid through the elongated sleeve and into the housing.

Other objects and many of the attendant advantages of this invention will be readily appreciated as the same becomes better understood by reference to the following detailed description when considered in connection with the accompanying drawings wherein:

FIG. 1 is a side elevational view, partially in section, of a portion of the surgical device in accordance with this invention;

FIG. 2 is a top elevational view, partially in section, of a portion of the device shown in FIG. 1 when operating on an eye;

FIG. 3 is an enlarged sectional view of a portion of the working tip of the device shown in FIGS. 1 and 2;

FIG. 4 is a sectional view taken along line 4—4 of FIG. 1;

FIG. 5 is a sectional view taken along line 5—5 of FIG. 1;

FIG. 6 is a sectional view taken along line 6—6 of FIG. 1; and

FIG. 7 is a sectional view taken along line 7—7 of FIG. 1.

Referring now to the various figures of the drawing wherein like reference characters refer to like parts, there is in FIG. 1 an improved surgical device 20. The device 20 is arranged for cutting away bodily material through very small openings in the body and has particular utility in opthamalic surgery applications, such as cataract removal.

As can be seen in FIG. 1 the device 20 basically comprises a housing 22 terminating in an extending sleeve 24 having an open free end 26. A shaft or rotor

3,976,077

3

28 is disposed within the housing 22 and the sleeve 24 and includes a tool 30 at its free end disposed adjacent opening 26. The tool 30 is adapted to be rotated at a high speed, e.g. 300,000 rpm, to grind or otherwise macerate bodily material (tissue or bone) upon contact therewith. The tool is rotated at the high speed by motor means 32 disposed within the housing and connected to one end of the shaft 28.

In order to aid in the maceration of the bodily material a working fluid 126 (FIG. 3), such as a sterile saline solution is supplied to the cutting site via passageways 36 attached to sleeve 24. The fluid 126 also serves as the vehicle for carrying away the ground or macerated material from the cutting site.

The shaft 28 is mounted for high speed rotation within a fluid-lubricated bearing system including three spaced sleeve bearings 40, 42 and 44. As is known fluid-lubricated sleeve bearings serve to support rotary shafts therein on a film of lubricated fluid interposed between the sleeve and the shaft to enable the shaft to rotate with very little friction.

In accordance with the preferred embodiment of this invention, the bearings 40, 42 and 44 are lubricated by sterile water provided thereto under high pressure, e.g., 30 psi, from means (not shown). This construction eliminates the need for oil or grease lubrication to provide a readily sterilizable and hygienic surgical device. In addition, the water lubricated bearings run quieter than ball bearings.

The sterile water provided to the bearing system for lubrication, by virtue of the high pressure on the water, also serves to preclude the ingress of foreign material, e.g., macerated tissue, dust, etc., into the interior of the housing through the space between the sleeve and the shaft. Accordingly, the device of this invention eliminates the need for complex sealing techniques, such as the counter flow pump technique disclosed in the aforenoted patent application.

As is known, lightly loaded bearings or bearings lubricated with a low viscosity fluid and operated at high speeds are particularly susceptible to entering the unstable rotary condition, commonly known as half frequency whirl or spin. In such a condition, the central axis of the shaft orbits around the central axis of the bearings as the shaft rotates and the minimum thickness of the lubricating film falls to zero, whereupon the load carrying capacity of the bearing vanishes and the shaft binds.

Since the surgical device 20 of this invention utilizes a high speed shaft mounted in water (a low viscosity fluid) lubricated bearings and since, as will be described in detail later, the shaft is of very small diameter and lightly loaded during the delicate surgical operation, the prevention of half frequency whirl is of utmost importance.

Heretofore, half frequency whirl has been prevented through the use of various complex techniques, such as the use of the elliptical sleeve bearings, rotatable pressure pads, etc. In the instant invention such complex techniques are obviated by the inventive expedient of misaligning the bearings. To that end, as will be described in considerable detail later, the bearings 40, 42 and 44 of the bearing system are misaligned to produce a calculated load therein and a concommitant stress in the shaft. It has been found that such action effectively precludes the lightly loaded, high speed, water lubricated shaft from commencing half speed whirl.

4

A more detailed description of the device 20 follows. As can be seen in FIG. 1 the housing 22 is formed of a cylindrical member 46 (only a portion of which is shown), which serves as the portion to be gripped by the operator and in this regard is referred to as the handpiece of the device. The handpiece 46 terminates in a threaded portion 48 for mating engagement with a threaded portion 50 of a housing tube assembly 52. An O-ring 54 is disposed within a recess 56 cut in the periphery of portion 50 and is interposed between portions 48 and 50 to prevent the egress of liquid through the interface.

The housing tube assembly 52 is a conically shaped member defining a hollow spaced interior 58 therein and terminates at its pointed end in an opening 60. One end of the elongated sleeve 24 is mounted within the opening 60 and is secured in place as by soldering.

As can be seen in FIGS. 1 and 2 the sleeve 24 is an elongated tubular member having a central passageway 62 extending through its entire length and communicating with the interior 58 in the assembly 52.

A sleeve and bearing assembly 64 is mounted within the hollow interior 58 of the assembly 52 and is secured in place therein via a set screw 66 extending through a threaded opening 68 in the assembly 52. The assembly 64 is of generally cylindrical shape and substantially conforms to the shape of the interior 58 of the assembly 52. The assembly 64 includes a central passageway 70 extending through its entire length and coaxial with the passageway 62 in the sleeve 24 to enable the rotary shaft 28 in the sleeve 24 to extend therethrough.

A stepped annular recess 72 is provided about the exterior of assembly 64 and O-ring 74 is disposed therein and interposed between the recess and the wall of the interior of assembly 52. The O-ring 74 serves as a liquid seal to preclude the high pressure water from gaining access to the interior of the housing past the seal.

As can be seen in FIG. 1, the housing tube assembly 52 includes a passageway 76 therein for carrying high pressure water. As noted heretofore, such water serves as the lubrication for the bearings and acts as a seal to prevent the ingress of foreign matter into the interior of the housing. The passageway 76 communicates with the portion of the stepped annular recess 72 forward of the O-ring seal 74. A recess 80 is cut longitudinally along the surface of the assembly 64 to provide a passageway communicating with passageway 76 to carry the water therefrom and into the interior space 58 within assembly 52. Another passageway 82 is provided within the housing tube assembly 52 and extends longitudinally therethrough and into communication with a tube (not shown) for carrying the high pressure water from a source (not shown) to the passageway 76.

The sleeve and bearing assembly 64 serve to mount two of the three bearings of the system therein, those being bearings 42 and 44. To that end, assembly 64 includes a pair of recesses 83 and 84 cut into the central passageway 70 contiguous with the ends of the assembly. The recess 83, see FIG. 1, serves to hold sleeve bearing 42 while the recess 84 holds sleeve bearing 44.

The bearings are formed of tungsten carbide, with the area of bearing 42 being larger than the area of bearing 44 but with the inside diameter of the bearings being the same. The recesses 82 and 84 are disposed in such a manner that the central axes of the respective bearings 42 and 44 mounted therein are coaxial.

3,976,077

5

The sleeve bearing 40 is also formed of tungsten carbide and is mounted within the central passageway 62 of the sleeve 24 adjacent the open free end 26 thereof.

As will be described in detail later, sleeve 24 is bent along its central axis so that the axis of sleeve bearing 40 mounted therein is slightly offset and angled from the coaxial central axes of the bearings 42 and 44 in the housing 22.

The shaft 28 is an elongated rod-like member formed of tungsten carbide and includes two different diameter portions, a larger or major diameter portion 86 and a smaller or minor diameter portion 88. The interface of the major and minor diameter portions is defined by a curved surface 87. The minor diameter portion includes a portion 89 which is undercut to enhance flexibility. The shaft is mounted within the bearings with the major diameter portion 86 extending through the coaxial bearings 42 and 44, hereinafter referred to as the middle and rear bearings, respectively, and with the minor diameter portion 88 extending through bearing 40, hereinafter referred to as the front bearing.

The offsetting of the front bearing with respect to the middle and rear bearings have the effect of bending the shaft slightly such that respective portions of the shaft 28 make contact with respective interior peripheral portions of the bearings through which the shaft passes when the shaft is stationary. This characteristic can be seen clearly in the cross-sectional views of FIGS. 5, 6 and 7. For example, as can be seen in the cross-sectional view of FIG. 5, the shaft 28 is bent such that the top peripheral surface of the major diameter portion 86 of the shaft passing therethrough (i.e., the journal), contacts the upper peripheral edge of the interior of the rear bearing 44 while the clearance between the bottom periphery of the journal and the bottom periphery of the bearing is increased. In a similar manner, as can be seen in the sectional view of FIG. 7, the upper periphery of the minor diameter portion 88 of the shaft passing through the front bearing 40 abuts the upper periphery of said bearing while the clearance between the lower periphery of the shaft and the corresponding portion of the bearing is increased. The upward displacement of the shaft with respect to the central axis of the front and rear bearings as described with respect to FIGS. 5 and 7 is accompanied by the downward displacement of the major diameter portion 86 of the shaft with respect to the middle bearing 42. For example, as can be seen in FIG. 6, the bottom periphery of the major diameter portion of the shaft 86 extending through middle bearing 42 contacts the corresponding interior periphery of said bearing while the clearance between the upper portion of the periphery of the shaft and the corresponding interior periphery of the bearing is increased.

The bending of the shaft has the effect of loading the bearing sufficiently to preclude the production of half speed whirl as the shaft is rotated within the bearing.

As the shaft begins rotating the journal portion of the shaft move out of contact with the associated peripheral portions of the bearings and a thin film of lubricating fluid, i.e., water, is formed between the closely adjacent portions, whereupon the shaft is able to rotate freely and stably.

The bending of the shaft to misalign the bearings is accomplished as follows for a device whose nominal major shaft diameter is 0.062 inch (1.58 mm), whose nominal minor shaft diameter is 0.040 inch (1.02 mm),

6

whose front bearing is spaced from the middle bearing by 0.813 inch (20.7 mm), whose middle bearing is spaced from the rear bearing by 0.577 inch (14.6 mm), whose nominal front, rear and middle bearing lengths are 0.04 inch (1.02 mm), 0.044 inch (1.12 mm) and 0.025 inch (0.635 mm), respectively, and whose nominal front, middle and rear bearing diameters are 0.04 inch (1.02 mm), 0.062 inch (1.58 mm) and 0.062 inch (1.58 mm), respectively. The first step in the bending operation occurs with the shaft removed wherein the front bearing is bent downward to offset its center by 0.00085 inch (0.022 mm) nominally from the center line of the middle and rear bearings. The front bearing is then lapped to size in line with a point approximately at the mid point between the middle and rear bearings. The shaft is then bent downward again until the total eccentricity; that is the eccentricity between the center point on the central axis of the front bearing 40 and the coaxial central axis of the middle and rear bearings 42 and 44, is approximately 0.0026 inch to 0.0029 inch (0.066 mm to 0.074 mm) with the bending being accomplished at an area approximately 0.5 inch (12.7 mm) nominally from the center point of the front bearing 40. The shaft is then inserted in the bearing system.

Assuming that the shaft is rotated at about 300,000 rpm on a film of water in the bearings the following is noted; the combined action of the dynamic effects of the rotating shaft coupled with the resiliency of the shaft against the force created by the misaligned bearings, has the effect of bending the front end of the shaft downward to be eccentric with the rear of the shaft by approximately 0.0012 to 0.0018 inch (0.031 to 0.046 mm) nominally. This eccentricity produces a bearing load in the front bearing equivalent to approximately 40 to 60 psi (2.81 to 4.22 kg/cm²) and somewhat higher load in pressure on the rear bearings, with an average water film thickness of 0.00025 inch (0.0064 mm) and a minimum film thickness of approximately 0.00005 inch (0.0013 mm) in each bearing when running at 300,000 rpm. In addition, the shaft is bent such that the journal thereof in the front bearing remains essentially parallel to the front bearing.

The rotation of the shaft at the high speed is effected via motor means 32. In accordance with the preferred embodiment of this invention the motor comprises an air turbine rotor 90 having six fins or vanes 91 projecting therefrom (see FIG. 4). The rotor is connected to the rear end of the shaft 28 in a manner so as to provide a small clearance 92 between it and the end face of bearing 44. The clearance enables the longitudinal positioning of the shaft to be manually adjusted by means, to be described later, that is sufficiently small to prevent excessive forward travel. The rotor 90 is disposed within a circular cavity 94 within assembly 52. High pressure air is provided to the interior of the cavity for effecting the rotation of the rotor 90 therein. To that end, as can be seen in FIG. 4, a passageway 96 is provided in assembly 52 and extends at an anle to the shaft. High pressure air is provided through the passageway to impact the vanes of the rotor at an angle having a component tangential to the axis of rotation of the rotor to cause the rotation thereof. A longitudinally extending passageway 98 is provided within assembly 52 and communicates with passageway 96. The passageway 98 is coupled to a high pressure air line (not shown) and serves to carry high pressure air provided therethrough from a source (not shown).

3,976,077

7

The longitudinal positioning of the shaft 28 and hence the cutter 30 is effected by a finger control (not shown) and associated components, only a portion of which are shown. Such components include a sliding member 100 adapted to be moved, under the control of a finger switch, lonitudinally within the housing 22. A threaded insert 102 is mounted within the member 100. A jeweled thrust bearing 104, such as a ruby bearing, is mounted within insert 102 and coaxial with the axis of the shaft 28. The bearing is arranged to abut the flat rear end 106 of the shaft to apply pressure thereto and effect the movement thereof through the distance established by the clearance 92.

As will be appreciated by those skilled in the art, the high pressure water in interior 58 operates against the major diameter portion and minor diameter portion therein to produce a net longitudinal thrust force in the rearward direction and thereby precludes the accidental extension of the tip 30 out of the open end 26 of the sleeve 24. The thrust bearing 104 serves to take up the rearward thrust produced on the shaft.

As noted heretofore, passage means 36 are provided to carry a working liquid, such as a saline solution, to the operating site, which liquid serves as the vehicle for carrying the macerated material away from the site. To that end, the device includes outlet passage means 38 which serve to carry the macerated material and the liquid vehicle from the operating site to collections means. As can be seen in FIG. 3, the passageway 36 comprises a tubular line lying along one side of the sleeve 24. The line terminates immediately adjacent the open end of the sleeve and includes a pair of outlet ports 106 therein. The line also extends along the conical housing tube assembly 52, and terminates at its other end in a longitudinally extending communicating passageway 108 within assembly 52. A line (not shown) is provided connected to passageway 108 for providing a saline solution from the means (not shown) to line 108 and from there through passageway 36, and outlet ports 106 to the operating site. The return passage 38 is constructed in a similar manner to passage 36 and lies on the opposite side of the sleeve and the conical portion of the housing tube assembly 52. An opening 110, hereinafter referred to as a return port, is provided in the wall of sleeve 24 immediately in front of bearing 40. The return port 110 serves to carry macerated material and its carrier liquid from the operating site under the pumping force produced by the rotating tool 30 and into the passageway 38. The passageway 38 is connected to a longitudinally extending passage 112 provided within housing tube assembly 52 and in communication therewith for providing the macerated material and liquid carrier into passageway 112. A return line (not shown) is provided coupled to line 112 to carry the macerated material and liquid carrier to collection means (not shown).

In accordance with the preferred embodiment of this invention, the tool 30 serves as both a cutting implement for effecting the grinding or maceration of bodily material as well as a pump for carrying such material away from the operating site. To that end, as can be seen in FIG. 3, the tool 30 is in the form of a helical screw having helical threads 114 extending thereabout. The free end of the tool terminates in a cutting tip 116. As will be appreciated, the rotation of the shaft and the concomitant rotation of the screw threads 114 results in the creation of a pumping action by the tool, whereupon particulate material at the operating site is carried

8

by the rotating threads through the opening 26 in the tip of the sleeve and downward through the sleeve to communicating return port 110 to enable the material to pass therethrough and into passageway 38. The pressure produced by such pumping action is of the order of 5 psi (0.33 kg/cm²) and considerably less than the fluid bearing pressure. Since the bearing water pressure is substantially higher than the pressure produced by the pumping action of the rotating tool, a positive flow of water occurs from the interior 58 of the housing tube assembly 52, downward through the space between the shaft 28 and the sleeve 24 and through front bearing 40 to the front end of the sleeve from whence it enters return port 110. Accordingly, foreign matter is prevented from gaining access to the interior of the device by the utilization of the high pressure water which serves as the lubricating and cooling means for the bearing system. Such an arrangement obviates the need of complex sealing systems which have characterized prior art devices.

Water leaking rearwardly through the rear bearing 44 and into cavity 94 is atomized by the high speed rotation of the rotor 90 therein. The spent air and atomized water within the cavity escapes through passage means (not shown) for release to the atmosphere.

In FIGS. 2 and 3 there is shown the use of the device in operation during the removal of opacities in the crystalline lens in an eye. To that end, the sleeve of the device is inserted within a small opening 120 in the limbus cornea of the eye and is extended therethrough until the free end of the sleeve contacts the opacity to be removed from lens 124. The finger control is then moved to cause the thrust bearing 104 to apply an axial force in the forward direction to the shaft to effect the extension of the cutting tip 116 slightly out of the open end 26 of the sleeve. In accordance with the preferred embodiment of this invention, the primary functions in cataract surgery of grinding and pumping the lens out can be accomplished with the shaft 116 protruding slightly, e.g. 0.01 inch (0.25 mm), as shown in FIG. 3. Since the crystalline lens of the eye is convex, the tip 116 of the tool 30 can even be slightly retracted within the open end of the sleeve and still effect the grinding or maceration of the lens portion 124.

The turbine is turned on to effect the rotation of the shaft while the saline solution, denoted by the reference numeral 126, is forced outward through passageway 36 and ports 116 in the direction of arrows 128. The macerated lens material produced at the operating site is denoted by the reference numeral 130 and is carried by the saline solution under the influence of the pumping action of the rotating tool 30 into the sleeve and from there through port 110 in the direction of arrow 132 into return line 38. Lubricating water at a higher pressure passes through bearing 40 in the direction of arrows 134 and into port 110 for removal along with the saline solution and the macerated lens material. Accordingly, all liquids and solid material are drawn away from the operating site during the operation of device 20.

It should be pointed out at this juncture that while the device as described heretofore is particularly suitable for ophthalmic surgical applications, it is to be understood that the device can be dimensioned and configured in various other ways for use in other surgical applications as either a cutting and grinding device, a pumping device or a combined grinding and pumping device.

3,976,077

9

As should be appreciated from the foregoing, the instant invention provides a surgical device enabling the quick, safe and efficient removal of bodily material via the use of a high speed rotary tool mounted within a fluid-lubricated stable and unsealed bearing system.

Without further elaboration, the foregoing will so fully illustrate my invention that others may, by applying current or future knowledge, readily adapt the same for use under various conditions of service.

What is claimed as the invention is:

1. Eye surgery apparatus comprising a shaft having a free end in the form of a tool, means for rotating said shaft at a high rate of speed at which half frequency whirl could occur and a bearing system including a first fluid-lubricated sleeve bearing and second fluid-lubricated sleeve bearing means, said first bearing being mounted with its central axis offset and slightly angled with respect to the central axis of said second bearing means, said shaft extending through said first bearing and said second bearing means, said shaft being bent slightly and loaded by said offset first bearing, whereby respective portions of said shaft make contact with respective portions of the interior periphery of said first bearing and second bearing means when said shaft is stationary and move out of contact therewith to ride with very little friction on a layer of lubricating fluid interposed between the shaft and the interior periphery of the first bearing and second bearing means when the shaft is rotating at a high speed, to preclude the shaft from entering the unstable condition wherein its central axis orbits around the central axis of said first bearing or said second bearing means as the shaft rotates.

2. The apparatus of claim 1 wherein said second bearing means comprise second and third fluid-lubricated sleeve bearings.

3. The apparatus of claim 2 wherein said second and third bearings are spaced from each other with their central axes being coaxial.

4. The apparatus of claim 3 wherein said lubricating fluid is water.

5. The apparatus of claim 4 wherein said apparatus also includes a housing and a sleeve extending therefrom and including an open free end, and said shaft and bearing system being mounted within said housing and said sleeve, with said shaft passing through said sleeve such that the free end of the shaft is disposed adjacent the free end of the sleeve, and at least one of said bearings being mounted within said sleeve.

6. The apparatus of claim 5 wherein said sleeve is bent slightly to therby offset the bearing mounted therein from the remaining bearings of the apparatus.

7. The apparatus of claim 6 wherein the water is provided in the housing under pressure to lubricate the bearings and to prevent the ingress of foreign matter through the sleeve and bearing mounted therein into the interior of the housing.

8. The apparatus of claim 6 wherein the tool includes helical threads.

9. The apparatus of claim 8 wherein said tool is a cutting bit.

10. The apparatus of claim 6 wherein said second and third bearings are mounted within said housing and wherein said first bearing is mounted within said bent sleeve adjacent the free end thereof.

11. The apparatus of claim 6 wherein the means for rotating said shaft comprises a turbine, said turine being connected to said shaft and being air driven.

10

12. The apparatus of claim 11 wherein the shaft is longitudinally slidable within said sleeve to expose the tool at the free end thereof.

13. The apparatus of claim 12 wherein the tool includes helical threads.

14. The apparatus of claim 13 wherein said tool is a cutting bit.

15. The apparatus of claim 14 wherein said shaft includes an increased diameter portion within said housing and against which said water pressure operates to produce a longitudinal force on said shaft in the direction of said housing.

16. The apparatus of claim 15 wherein said housing includes a thrust bearing in contact with said shaft.

17. The apparatus of claim 7 additionally comprising first means carrying a working liquid to the free turbine of the sleeve and second means carrying said liquid, any foreign matter picked up thereby and lubricating fluid away from said free end.

18. The apparatus of claim 17 wherein the means for rotating said shaft comprise a turbine, said turgine being connected to said shaft and being air driven.

19. The apparatus of claim 18 wherein said shaft is longitudinally slidable within said sleeve to expose said tool at the free end thereof.

20. The apparatus of claim 17 wherein said tool includes helical threads which act as a pump when said shaft is rotating.

21. The apparatus of claim 20 wherein an opening is provided in said sleeve adjacent said helical thread and communicating with said second passageway, whereupon the working liquid, foreign matter and lubricating fluid at the free end of the sleeve are pumped by the rotation of the shaft into the sleeve, through the opening therein and into said second passageway.

22. The apparatus of claim 20 wherein said tool is a cutting bit.

23. The apparatus of claim 21 wherein said bearing system includes three sleeve bearings, with two of said bearings being mounted within said housing and with the remaining bearing being mounted within said sleeve adjacent the free end thereof.

24. A surgical device comprising a housing, a sleeve connected to said housing, said sleeve having an open free end, a shaft positioned within said housing in said sleeve, said shaft having a free end disposed adjacent the free end of the elongated sleeve, the free end of the shaft being in the form of a helical thread cutting bit operating in conjunction with a working liquid at the free end of the elongated sleeve, said shaft being rotatably mounted within a first fluid-lubricated sleeve bearing and second fluid-lubricated sleeve bearing means, with said first bearing being positioned within said elongated sleeve, means for supplying the liquid under pressure to said first bearing and said second bearing means, said liquid under pressure in said elongated sleeve lubricating said first bearing within said elongated sleeve and precluding the ingress of said working fluid through said elongated sleeve and into said housing, first passage means carrying said working liquid to the free end of the elongated sleeve and second means carrying said liquid, any foreign matter picked up thereby and lubricating fluid away from said free end, said shaft being rotated by an air driven turbine connected thereto.

25. The device of claim 24 wherein said shaft is longitudinally slidable within said sleeve to expose said tool at the free end thereof.

*  *  *  *  *



US006361504B1

(12) **United States Patent**
Shin

(10) Patent No.: **US 6,361,504 B1**
(45) **Date of Patent:** **Mar. 26, 2002**

(54) **BIOPSY NEEDLE, METHOD FOR FABRICATING, AND APPARATUS FOR OPERATING THE SAME**

(76) Inventor: **Myoung Chul Shin**, Samik Beach Town 202-1202, 148, Namcheon 2 dong, Suyoung-ku, Pusan (KR), 613-012

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/402,280**

(22) PCT Filed: **Mar. 31, 1998**

(86) PCT No.: **PCT/KR98/00074**

§ 371 Date: **Dec. 3, 1999**

§ 102(e) Date: **Dec. 3, 1999**

(87) PCT Pub. No.: **WO98/43541**

PCT Pub. Date: **Oct. 8, 1998**

(30) **Foreign Application Priority Data**

Mar. 31, 1997    (KR) ............................................. 97-11616

(51) Int. Cl.$^7$ ................................................ **A61B 10/00**

(52) U.S. Cl. ........................ 600/562; 600/567; 600/568; 606/167; 606/181

(58) Field of Search ................................. 600/562, 564, 600/566, 567, 568; 606/167, 170, 180, 181, 182, 185

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,403,437 | A | * | 9/1983 | Shuman | 43/36 |
| 5,177,759 | A | * | 1/1993 | Marable et al. | 372/61 |
| 5,575,780 | A | * | 11/1996 | Saito | 604/272 |
| 5,590,655 | A | * | 1/1997 | Hussman | 600/426 |
| 5,733,266 | A | * | 3/1998 | Gravlee, Jr. | 604/272 |
| 5,788,679 | A | * | 8/1998 | Gravlee, Jr. | 604/272 |
| 5,810,834 | A | * | 9/1998 | Heyman | 606/107 |
| 5,830,219 | A | * | 11/1998 | Bird et al. | 606/130 |
| 5,871,495 | A | * | 2/1999 | Mueller | 606/185 |
| 5,971,939 | A | * | 10/1999 | DeSantis et al. | 600/562 |
| 5,976,164 | A | * | 11/1999 | Bencini et al. | 606/170 |
| 5,980,469 | A | * | 11/1999 | Burbank et al. | 600/567 |

* cited by examiner

*Primary Examiner*—Eric F. Winakur
*Assistant Examiner*—Charles Marmor, II
(74) *Attorney, Agent, or Firm*—Paul & Paul

(57) **ABSTRACT**

The present invention provides a hollow tubular shaped biopsy needle having a hollow elliptical cross section shaped lumen therethrough, and the method for fabricating the needle and the apparatus for operating the same. The structure of the biopsy needle of this invention is simple and easy to fabricate, and thus the production cost can be reduced. In comparison of the smaller diameter of this invented biopsy needle to the diameter of the other biopsy needles, the size of the extracted sample will be bigger and wounds of the patient can be less. The apparatus of this invention will help to reduce the operating force during extracting tissue samples, and helps rotation and straight movements of the needle.

**10 Claims, 12 Drawing Sheets**



## FIG. 1



## FIG. 2



## FIG. 3



# FIG. 4



# FIG. 5



## FIG. 6



## FIG. 7



## FIG. 8



## FIG. 9



## FIG. 10



## FIG. 11



## FIG. 12



## FIG. 13



## FIG. 14



## FIG. 15



Case 1:08-cv-00140    Document 23-2    Filed 04/09/2008    Page 54 of 78



*FIG. 16*

FIG. 17





FIG. 18

*FIG. 19*





*FIG. 20*

## FIG. 21



US 6,361,504 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# BIOPSY NEEDLE, METHOD FOR FABRICATING, AND APPARATUS FOR OPERATING THE SAME

## FIELD OF THE INVENTION

This invention relates to a biopsy needle for extracting tissue samples, the method for fabricating the same, and the apparatus for operating the same.

## BACKGROUND OF THE INVENTION

The most widely used biopsy needles are a Silverman Needle and a Core Needle, which are generally called names in the field, The Silverman needle, as shown in FIG. 1, has an outer cannula 1 whose vertical hollow cross section is a circle, and a split needle 3 whose distal end is split to extract tissue samples. When using the needle of FIG. 1, the outer cannula 1 is forcibly inserted to an aimed internal organ or a tumor, and then the split needle 3 moves forward out of the cannula 1 into the organ. At that time, the split distal ends of the needle 3 become wide open due to elasticity of the needle and resistance of the tissue of the organ. When the cannula 1 reaches to an aimed organ, the split needle 3 retracts and grips the tissue, as shown in FIG. 2. In this state, rotating the outer cannula 1 and the split needle 3 about its longitudinal axis once or twice separates the gripped sample from the tissue.

FIG. 3 shows a Core Needle having an outer needle 5 whose vertical hollow cross section is circle-shaped, and an inner needle 7 for gripping the tissue inside the outer needle 5. The inner needle 7 is a solid tubular body not to admit unnecessary tissue to enter the outer needle, and has a groove 7a about 4 or 5 mm distant from the distal end for acquiring sample.

When using the Core needle, the outer needle 5 advances into the aimed internal organ with the inner needle 7, which firstly moves forward into the tissue and the groove 7a of which accommodates samples of the aimed tissue, after that the outer needle 5 moves more into the tissue to remove the samples contained in the groove 7a from the tissue.

In case of the Silverman needle explained above, to extract enough samples, the outer cannula should be of a larger diameter, since the samples are acquired by the split needle inside the outer cannula. Also, it has been used only in soft organs, since the hardness of the split needle is not strong enough to penetrate into a hard tissue.

In case of Core needle, it can not extract enough samples either, since the samples are acquired by a groove of the inner needle. Thus, to get the enough samples, most users uses a big diameter Core needle or extracts samples several times. Also, since the groove is located about 4 to 5 mm away from the dismal end, it is difficult to acquire an aimed positioned sample and the inner needle should move forward more deeply than the position of the aimed tissue, which may hurt adjacent organs without intention.

Also, this kind of needle can not be mounted on an auto biopsy gun, since the gun generally shoots needles only to a fixed determined depth. Thus, the needle should be handled by hand, which needs more than 20 kgf in some cases.

That is to say, since the needles of the types explained above uses an outer needle for penetrating and an inner needle for acquiring samples, the size of acquired samples are small comparing thickness of the outer needle, thus the size of the outer needle needs to be larger for enough samples, or the operation should be done several times, both of which may wound organs in many points.

Also, both the needles cannot acquire liquid or gaseous phased samples. And since both Silverman and Core needles can be used in a somewhat deep organs, it is inconvenient to extract samples from cuticle or pathological tissues.

Other biopsy needles are disclosed in U.S. Pat. Nos. 5,251,641, 4,926,877, and 5,526,821, which are not being used in the field. The 877' patent has the same problem as the above two needles in that the whole cross section area of the outer needle is not contributed to acquire samples.

It is therefore an overall object of present invention to provide a biopsy needle with a small size (diameter) which can enlarge the size of the acquired samples by the needle.

It is an another object of the invention to provide a method for fabricating the above needle.

It is still another object of the invention to provide an apparatus for operating the biopsy needle.

Other objects and advantages will be more fully apparent from the following disclosure and appended claims.

## SUMMARY OF THE INVENTION

The invention discloses a needle which can be used to acquire samples without an inner needle, thus it can acquire relatively bigger sample than the needle assembly having an inner needle and an outer needle.

The needle of this invention is hollow tubular shaped, and the cross section of the hollow section taken vertically to the longitudinal direction is elliptical shaped.

The samples captured in the needle are extracted by twisting the needle, which is possible since the hollow section of the needle is not circle-shaped.

Separating the samples from the aimed tissue may be accomplished by a needle with a twisting rectangular or triangular or any polygonal shaped hollow section, but, it is preferable to make the hollow section of the needle elliptical regarding convenience of manufacturing, impact of twisting tissue, size of samples acquired.

Furthermore, the needle of the invention has an inwardly beveled distal end to acquire bigger size of the samples.

Though the needle is basically structured to have an elliptical hollow section and an inwardly beveled distal end, to improve the separation of samples a portion of the distal end of the needle is outwardly beveled, whereas the other portion is inwardly beveled.

Meanwhile, the method for manufacturing the biopsy needle of the invention has providing a hollow tube, drawing the hollow tube so that the hollow section of the tube becomes elliptical shaped, cutting the tube in a predetermined length, and machining an distal end of the tube to be inwardly beveled.

To improve penetrating, the method may further comprise machining the outer circumferential portion of the distal end of the tube to be outwardly beveled after machining the distal end to be inwardly beveled.

Alternatively, another method of the invention has a step of machining the distal end of the tube so that a portion of the distal end is outwardly beveled and that the other portion is inwardly beveled.

According to the invention, to make the inner hollow section of the needle elliptical, pressing the tube to make whole tube elliptical may be adapted instead of drawing the tube. This method is useful, when the diameter of the tube is so small that drawing the tube to have a hollow elliptical cross section is difficult.

This invention also discloses the apparatus for handling the biopsy needle, which has an acting part where the needle

US 6,361,504 B1

3

is mounted and the needle is translated and rotated, and a driving part for transmitting translation force and rotation force to the acting part. The apparatus further comprises a handling part for easy handling of the driving part. When the structure of the aimed tissue is hard and requires a big force, the acting part may be divided as a translation acting part and a rotating acting part.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a partial horizontal cross section of a Silverman Needle.

FIG. 2 is a view similar to FIG. 1 showing the operating condition of the needle of FIG. 1.

FIG. 3 is a partial horizontal cross section of a Core Needle.

FIG. 4 is a vertical cross section of a needle according to the first embodiment of the invention.

FIG. 5 is a partial horizontal cross section of a needle according to the first embodiment of the invention.

FIG. 6 is a partial horizontal cross section of a needle with an outwardly beveled leading edge and a sample acquired by this needle.

FIG. 7 is a view similar to FIG. 6 showing a needle with an inwardly beveled leading edge and a sample acquired by this needle.

FIG. 8 is a partial perspective view showing a needle according to the second embodiment of the invention.

FIG. 9 is a partial cross section taken A—A line of FIG. 8.

FIG. 10 is a view viewed in B direction of the FIG. 8.

FIGS. 11 and 12 are partial horizontal cross sections of a needle according to the third embodiment of the invention, each of which has a different stylet from each other.

FIG. 13 is an enlarged partial horizontal view of the needle according to 4th embodiment of the invention.

FIG. 14 is a partial view in order to show the method for making the needle, according to the 5th embodiment of the invention.

FIG. 15 is a view similar to FIG. 14 showing a cutter 430 to cut the protruded or enlarged portion of the needle N.

FIG. 16 is a perspective view of an apparatus according to 6th embodiment of the invention, showing all the components as disassembled.

FIG. 17 is a horizontal cross section of the apparatus of FIG. 16.

FIG. 18 is a horizontal cross section of the apparatus according to the 7th embodiment of the invention.

FIG. 19 is an enlarged view of some major components of FIG. 18.

FIG. 20 is a horizontal cross section of the apparatus according to the 8th embodiment of the invention.

FIG. 21 is a horizontal cross section of the apparatus according to the 9th embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

Now the embodiments of the invention will be explained in detail with reference to the attached drawings, where the distal ends of the needles are mainly shown, but the other end of the needle, or proximal end where user's hand or any apparatus for operating the needle acts is omitted for simplicity.

4

(1st Embodiment)

The biopsy needle of this embodiment has an elliptical hollow cross section when viewed in its longitudinal direction, as shown in FIG. 4.

The outer surface 17 of the needle N is circular shaped, and the inner surface 13 which defines lumen is elliptical shaped.

Elliptical or race-track shape of this invention means not a mathematically defined ellipse which requires a certain formula, but a commonly or generally meant ellipse which only requires a long diameter and a short diameter comparing a circle having only diameter.

The ratio of the long diameter and the short diameter is not so larger than 1, since the cross section area of the needle N for extracting the samples becomes smaller and the rotating resistance rises, as the ratio becomes larger. Thus it is preferable that the ratio between the long diameter and the short diameter of the hollow cross section is between 1.6:1 and 2.0:1 regarding rotating resistance and size of the extracted sample.

While the biopsy needle N of this invention is moving to an aimed position of tissue, a portion of the tissue is cut and enters the elliptical hollow section tightly. At the same time, as the needle N is rotated once or twice, the sample in the hollow section is separated from the original tissue due to the shape of the hollow section. The sample in the lumen is finally extracted by pulling back the needle.

U.S. Pat. No. 4,926,877 also discloses a race-track shaped hollow tubular needle, but the needle has an additional separating means for separating samples from the tissue, which is not necessary in this invention. Also all the samples captured in the racetrack shaped hollow section are not extracted because of the separating means.

The distal end 19 of the needle N is preferably tapered by an acute angle α relative to the needle's longitudinal axis to improve the ease with which the biopsy needle may be inserted into the patient, as shown in FIG. 5. The tapered edge 19 of the needle is cut inwardly to increase the size of the tissue entered in the lumen during proceeding the needle to the aimed tissue. The angle between the longitudinal axis of outer surface 17 of the needle N and cut beveled surface is acute angle β.

Referring to FIGS. 6 and 7, according to an experiment with two needles having same diameter as each other the sample S' extracted by the biopsy needle having an outwardly beveled leading edge 19a looks a cone. The base portion of which is an outer portion of the sample, which means that as the needle with an outwardly beveled edge 19a is inserted to the patient, the tissue is cut by an inner surface 13 of the needle, thus the size of the captured sample becomes smaller and finally the sample becomes cut.

The sample S extracted by the biopsy needle N of this embodiment which has an inwardly beveled leading edge 19 also looks a bigger cone than the biopsy needle with outwardly beveled leading edge 19a, but the base portion of which is an inner portion of the tissue sample, which means that as the needle is inserted to the patient, the tissue is cut by an outer surface 17 of the needle, thus the size of the captured sample becomes larger.

The beveled angle β can be determined properly considering thickness and outer diameter of the needle.

According to this embodiment, since the needle N has an elliptical hollow lumen, the sample can easily be separated from the tissue and does not need any other means for separating samples such as inner cannula, which means that the size of the sample by the needle of this invention is bigger than any needle of prior art.

US 6,361,504 B1

5

6

Also since the sample can be captured in the direction of longitudinal axis of the needle, the operation for extracting sample can be more accurately done. That is, when the aimed tissue is near the tissue not to be touched for patient's safety, operator can easily escape from the danger.

Since the size of the sample to be extracted depends on the depth of the inserted needle, the amount can be determined properly by the operator. And when the needle is mounted to an injector, the liquid phased or gaseous samples can be easily obtained, whereas they can not be obtained by a Silverman needle or a Core needle, since neither of them can be removed of the inner needle only.

Though this embodiment discloses a needle of elliptical cross section and inwardly beveled leading edge, the needle having inwardly beveled leading edge only or the needle only having a hollow elliptical cross sectioned lumen can be a useful biopsy needle.

(2nd embodiment)

The needle of this embodiment is similar to that of the first embodiment since most portion of the tapered leading edge 19 of the needle is beveled inwardly and can extract large size of sample, but about quarter portion of the leading edge is outwardly beveled, as shown in FIG. 8. FIG. 9 explicitly shows that the outwardly beveled portion 17a make an acute angle with the longitudinal axis of the inner surface of the needle.

Partially outwardly beveled leading edge 17a of the needle aims to improve the case with which the sample captured in the lumen can be separated from the tissue. The sample captured by the needle of this embodiment is cut to be separated from the tissue since the inwardly beveled portion 13a and the outwardly beveled portion act as a pair scissors while the sample captured by the needle of the first embodiment is torn to be separated from the tissue.

The position of the outwardly beveled portion 17a shown in FIG. 9 is for example, and its portion is about quarter of the leading edge. If more portion for example, half portion of the leading edge is outwardly beveled, the size of the sample will be smaller due to the outwardly beveled leading edge.

Though to adopt this embodiment the cross section of the needle can be elliptical or circular, it is preferable that the cross section of the needle is elliptical shaped.

(3rd embodiment)

This embodiment aims to provide a needle with a stylet 45 for acquiring sample positioned deep under the skin.

As explained regarding the first embodiment, the needle with inwardly beveled edge can extract much bigger sized sample than the Silverman needle or Core needle both of which has an inner and an outer cannula especially for the aimed samples are the outer skins.

By the way, when the aimed position of the needle is deep under the skin, a stylet 100 is necessary for preventing unnecessary tumor such as outer skin from entering the needle and for releasing resistance of outer tumor. The stylets 100 shown in FIGS. 11 and 12 are just examples.

Since the needle of the invention is inserted to the aimed position with the stylet therein but the sample is acquired only by the needle without stylet 100, the size of the sample acquired by this embodiment is larger than by the Silverman or Core needle.

While the needle with the stylet 100 advances into the internal organs, the inwardly beveled portion 13a of the needle of above embodiments will experience resistance, which may result in damage of the surrounded organs.

This embodiment aims to improve this problem, and discloses a needle with inwardly beveled in the inner cir-

cumferential portion of the leading edge and the outwardly beveled portion 17a of the outer circumferential portion of the leading edge. The outwardly beveled portion 17a of the leading edge is for reducing resistance of the organs, and the inwardly beveled portion 13a of the leading edge is for increasing size of the samples acquired.

The angle of outwardly bevel is similar to the beveled angle of the stylet 100 to make easy inserting and the angle of the inward bevel is preferably gentle, as shown in FIGS. 11 and 12. That is, the outwardly beveled angle γ is slightly smaller than the inwardly beveled angle ω.

The shape of stylet is not limited to what FIGS. 11 and 12 show, but may be variable.

(4th embodiment)

U.S. Pat. No. 5,526,821 discloses a needle which increases in diameter from a distal end to a proximal end to aid in acquiring a tissue sample and retaining it within the lumen of the needle, which can be incorporated to the above embodiments.

FIG. 13 is an enlarged partially shown cross sectional view of the needle according to this embodiment, which increases in diameter from a distal end to proximal end and has inwardly beveled leading edge 19.

This shape of the needle helps inserting the needle into the patient and the sample by the needle N can be retained in the lumen of the needle during the withdrawing of the needle.

(5th embodiment)

The needle of the inwardly beveled leading edge can be manufactured by the method explained below.

First, a hollow tube of steel is provided, and the hollow tube is drawn so that the hollow portion of lumen of the tube becomes to have an elliptical shaped vertical cross section, but the cross section of the outer surface of the tube is preferably circle shaped.

After than one end of the tube is cut in a predetermined length in acute angle α, as shown in FIG. 5. After that, the cut tube N is inserted into a frame 410 which is a hollow member having inner diameter similar to the outer diameter of the tube N and having inwardly beveled leading edge, which can be easily machined since the diameter of the frame 410 is much larger than that of the of the biopsy needle.

Next, to enlarge diameter of the leading edge, a solid member 420 which has a conical shaped leading portion is pressed to insert into the tube. The conical angle of the solid member 420 is same as beveled angle of the frame 410. The leading edge of the tube N becomes enlarged with the same angle of the slope of the frame 410 and the solid member 420 though this process and is withdrawn from the frame 410.

And the enlarged leading edge of the tube N is cut by the cutter 430 having inner diameter same as the inner diameter of the frame 410 or outer diameter of the unchanged portion of the tube N, as shown in FIG. 15.

The needle manufactured by the above method has a lumen which has elliptical cross section as shown in FIGS. 4 and 5 and has an inwardly beveled leading edge.

To make the cross section of the lumen of the needle elliptical, the drawing is adopted so that the cross section of the outer surface of the needle maintain circular shape. In case of small sized needle, since it is difficult to draw a tube to have an elliptical hollow section, the tube may be pressed with a predetermined force in the perpendicular direction of the longitudinal axis of the tube, which may cause entire tube including outer surface is shaped elliptically. Pressing tube cannot be applied to a relatively big tube, for example over 2 mm diameter, since the elliptical cross section of the needle increases rotating resistance, which may hurt organs.

US 6,361,504 B1

7

**(6th embodiment)**

The apparatus or assembly for handling the biopsy needle of the invention is means for inserting and rotating the needle having a lumen with elliptically shaped cross section, and has an acting part where the needle is mounted and the needle is inserted and rotated, and a driving part for transmitting translation force and rotation force to the acting part. The apparatus further comprises a manipulating part for handling of the driving part.

The apparatus shown in FIG. 16 is characterized in that the acting part has a spring.

An end of the piston or hollow pipe 10 having a long-diameter portion 11 and a short-diameter portion 12 has a screw 14 to engage cap 20 for mounting and fixing or removing the biopsy needle N, the other end of the piston 10 has another screw 16 to engage handle 22, and in one side of the outer circumference of the long-diameter portion 11, a stopper 18 is formed protruded.

The short diameter portion 12 of the piston 10 is inserted into the inner case 30 with a spring 26.

The inner case 30 has a guide slot 32 through which the stopper 18 of the piston 10 can pass, and which has a plurality of fixing recesses 32a formed in regular intervals for stopping the stopper 18 temporally in a predetermined position.

The inner case 30 has a supporting wall 34 which has a hole with similar diameter to the outer diameter of the short diameter portion 12 of the piston 10, and which fixes one end of the inserted spring 26 and prevents it from shaking. The other end of the spring 26 is secured by the piston 10, thus the spring 26 provides both compressive elasticity along the longitudinal axis of the piston 10 and twisting elasticity in the rotating direction around the longitudinal axis of the piston 10.

The inner case 30 is inserted loosely into the outer case 40 so that it can rotates freely without any external action, and is prevented from being disassembled by a ring-shaped release 42 and a locking pin 44.

The slot 40a formed in the longitudinal direction of the outer case 40 is for the stopper 18 to move, and through the slot 40a the position of the stopper 18 can be confirmed.

Unexplained member 46 is a guide member screwed to the proximal end of the inner case 30, which guides the piston 10.

The operation of the apparatus having a structure explained above will be explained with reference to FIG. 17.

For operation, at first the needle N having elliptical cross sectioned lumen should be engaged to the leading end of the piston 10 and fixed by the cap 20.

Next, the piston 10 should be rotated once or twice while the stopper 18 does not inserted into the slot 32, and be withdrawn to compress the spring 26 until one of the recesses 32a is chosen for the stopper 18 to be temporally fixed while the stopper 18 is introduced through the guide slot 32. In this state the spring 26 has twisting load and compressive load.

Finally, while the leading edge of the needle N is being aimed to a patient, releasing the stopper 18 from the recess 32a by rotating the release 42 causes the compressed spring 26 to expand. While the stopper 18 is moving along the guide slot 32, the spring 26 can't rotate, but just expands to reach an aimed position of tumor. After passing the end 32b of the slot 32, the stopper 18 can rotate with the piston 10 once or twice. The sample is acquired by the rotating of the needle N with an elliptical cross sectional lumen.

**(7th embodiment)**

Generally it requires more than 20 kgf force to insert a biopsy needle into a patient, which can be done by enlarging

8

spring constant of the spring 26 of FIGS. 16 and 17. However, since to manipulate a spring with a big spring constant requires also big compressing force in proportion, to relieve the handling force is required.

The apparatus of this embodiment, which is shown in FIG. 18, is an application of the sixth embodiment of the invention, but has two separated elastic means, one for moving the acting part straightly, the other for rotating it, in order to minimize handling force.

A compression spring 120 for translating the piston 110 is mounted on the inner case 130 near the proximal end of the piston 110, is compressed as the piston 110 withdraws, and is supported by a supporting portion 112 of the piston 110 and the proximal end wall 132 of the inner case 130.

In the inner case 130 is formed a guide slot 134 so that the stopper 114 protruded from the piston 110 can pass, and a plurality of recesses for temporally fixing the stopper 114 in a predetermined position, which is similar to those of the previous embodiment, though they are not shown in FIG. 18.

The inner case 130 is inserted loosely into the outer case 140 so that it can rotates freely without any external action, and is prevented from being disassembled by a ring-shaped release 142 and a locking pin 144 penetrating the inner case 130.

To confirm the action of the stopper 114, a slot 146 is formed in the outer case 140.

The rotation movement of the piston 110 is accomplished by a spiral spring 150, and a locker 160 and a striker 170 for temporally fixing the compresses spiral spring 150, which is shown in FIG. 19. The locker 160 is a circular plate having a rectangular passage in the central position and 4 one-way holes 162 disposed around the passage.

The striker 170 is a hollow circular plate having four fixing hooks 172 each end of which matches the one way hole 162 of the locker 160.

The locker 160 and striker 170 is splined to the piston 110, and the fixing hooks 172 are inserted into the slot 182 of the guide member 180 to move in a predetermined distance, and the locker 160 is supported by the compression spring 190 inserted in the piston 110 in order for the oneway holes 162 to be engaged with the fixing hooks 172, as shown in FIG. 18.

One end of the spiral spring 150 is fixed to the outer surface of the locker 160, and the other end of the spring 150 is fixed to the guide member 180.

Of the outer surface of the piston 110 there is a rectangular cross sectioned portion for being engaged with the rectangular passage tightly, whereas, the piston 110 is tubular shaped with hollow circular cross section to absorb liquid phased or gaseous tissue samples.

The operation of the apparatus having a structure explained above will be explained with reference to FIG. 18.

Rotating the piston 110 in a predetermined angle rotates the locker 160 splined to the piston 110, which compresses the spiral spring 150. In this state, the fixing hooks 172 matches one-way hole (not shown) temporally by the compression spring 190 supporting the locker 160.

Next, withdrawing the piston 110 lets the compression spring 190 be compressed and the stopper 114 protruded from the supporting portion 112 of the piston 110 pass the guide slot 134.

During the withdrawing of the piston 110, to temporally fix the movement of the piston 110 the stopper 114 must be inserted to one of the fixing recesses (not shown) by rotating the piston 110 slightly in the direction of the recesses.

Finally, while the leading edge of the needle N is being aimed to a patient, releasing the stopper 114 from the recess

9

10

by rotating the release 142 causes the compressed spring 120 to expand. While the stopper 18 is moving along the guide slot 32, the spring 26 cannot rotate, but just expands to move the needle N into the skin. At this time, the supporting 112 portion of the piston 110 strikes the base of the striker 170 to compress the compression spring 190 and moves the striker 170 in a predetermined distance, which release the fixing hooks 172 from the one-way holes of the locker 160, which permits the piston 110 and the needle fixed thereto to rotate by the restoring force of the spiral spring 150.

That is, this embodiments provides a spiral spring for rotation movement and a compression spring for a straight movement, which means that the handling force can be much reduced, since the elastic force of the previous embodiment is divided.

(8th embodiment)

The apparatus of this embodiment utilize pneumatic pressure for straight movement and rotation movement of the needle, as shown in FIG. 20.

The cylinder 210 of this embodiment has a spinning wheel shaped blade portion 230 dividing inner portion of the cylinder 210.

The piston 220 in the cylinder 210 of this embodiment has a plate 222 fixed to the circumferential surface of the piston 220, dividing two chambers A and B defined by the surrounding cylinder 210 and the plate 220, each volume of which varies in accordance with the movement of the piston 220.

The cylinder 210 has two ports for absorbing compressed air in a predetermined interval, one port 211 of which is formed in the chamber A, and the other port 213 of which is formed in the chamber B.

On the opposite side (upper sided when viewed in FIG. 20) of the two ports 211 and 213 there is formed a third port 215 for the compressed air entered through either of the ports 211 and 213 to pass and for communicating with a 4th port 217 which is formed in the blade portion 230.

The piston 220 is splined to the inner surface of the blade portion 230, and rotates as the blade 230 rotates.

The operation of the apparatus having a structure explained above will be explained with reference to FIG. 20.

Compressed air applied to the first port 211 of the chamber A expands volume of the chamber A, which causes the needle N to be inserted to the organs.

The expansion of the volume of the chamber A and 45 movement of the piston 220 opens the third port 215, through which the compressed air passes to the fourth port 217 to rotate the blade 230, which rotates the piston 220 to separate the samples from the tissue.

The pneumatic pressure for this apparatus can be adjusted regarding density of the aimed tissue, and can control straight and rotation movement of the piston.

(9th embodiment)

The apparatus of this embodiment utilizes a motor for straight and rotation movements of the piston, which is shown in FIG. 21.

A rack 322 is formed on a side surface of the piston 320, and the pinion 332 which meshes the rack 322 is driven by a first motor 340 which is mounted on the cylinder 310.

In the circumferential surface of the piston 310 distant from the rack 322 is mounted a ring gear 324 which meshes a driving gear 334 which is driven by the second motor 350.

The operation of the apparatus having a structure explained above will be explained with reference to FIG. 21.

The first motor 340 drives the pinion 332 to move the piston 320 due to the rack 322 engaged with the pinion 332, to push the needle N to enter the patient.

After that, the second motor 350 drives the driving gear 334 to rotate the meshed ring gear 324 of the piston 320, which makes the needle N rotate and the sample acquired be separated from the tissue.

The motors 340 and 350 for this apparatus can be adjusted regarding density of the aimed tissue, and can control straight and rotation movement of the piston.

According to the above embodiments the needle is fixed to a cap screwed to the piston, but also the needle can be fixed by being forcibly fitted.

Since the structure of the biopsy needle of the invention is simple and easy to manufacture, the production cost may be reduced.

Since the size of the sample can be enlarged with the needle of this invention, the diameter of the biopsy needle can be smaller and wounds of the patient can be less.

Since the sample is extracted through the distal end of the needle, it is easy to control the penetrating depth and to avoid dangerous organs, and it helps to increase the accuracy of the operation.

The liquid-phased or gaseous tissue can be easily acquired by adapting the piston to which fixes the needle, therefore a cystic tumor can be examined and needle-aspiration biopsy can be done by the needle.

Since the needle of the invention is small, and it can be used without anesthesia or under local anesthesia, any harmful disease can be early found.

Still according to the invention, the needle is easy to carry and to sterilize.

It is to be understood that the present invention may be embodied in other specific forms without departing from the spirit or special attributes hereof, and it is therefore desired that present embodiments be considered in all respects as illustrative and therefore not restrictive, reference being made to the appended Claims rather than the foregoing description to indicate the scope of the invention.

I claim:

1. A hollow tubular shaped biopsy needle with a hollow elliptical cross section, comprising:

  a proximal end where manipulating means is applied; and

  a tapered distal end relative to a longitudinal direction, said distal end being inwardly beveled wherein an inner circumferential portion of said distal end is inwardly beveled, and an outer circumferential portion of said distal end is outwardly beveled.

2. The biopsy needle according to claim 1, wherein said needle increases in diameter from said distal end to said proximal end.

3. A method for manufacturing a biopsy needle with an inwardly beveled leading edge, comprising:

  a step of providing a hollow tube;

  a step of drawing the tube so that the tube has a hollow elliptical cross section;

  a step of cutting the tube so that the tube has a predetermined length;

  a step of inserting a solid member having a tapered leading edge into the tube in order to enlarge an elliptically shaped hollow end of the tube; and

  a step of cutting the hollow end of the tube that was enlarged so that the tube has a uniform outer diameter.

4. The method for manufacturing a biopsy needle with an inwardly beveled leading edge according to claim 3, further comprising:

  a step of inserting the tube into a hollow frame having same a similar taper angle before the step of inserting a solid member; and

11

a step of withdrawing the tube from the frame after the step of inserting a solid member.

5. An apparatus for operating a biopsy needle with an elliptical hollow cross section, comprising:

acting means for mounting said needle, moving straight and rotating;

driving means for providing elasticity for the straight movement and the rotational movement; and

handling means for controlling said driving means, p2 wherein said acting means comprises a piston having a cap for mounting said needle, and said driving means comprises guiding means surrounding a circumferential surface of said piston for guiding the straight movement and the rotational movement of said piston, and an elastic member located in said guiding means, and said handling means comprises a stopper, a plurality of fixing recesses disposed in a predetermined interval in said guiding means for temporarily fixing said stopper.

6. The apparatus for operating a biopsy needle with an elliptical hollow cross section according to claim 5, wherein said guiding means comprises an inner case and a guiding member screwed to said inner case, said plurality of recesses are formed in said inner case.

7. The apparatus for operating a biopsy needle with an elliptical hollow cross section according to claim 5,

wherein said elastic member is a compression spring.

8. The apparatus for operating a biopsy needle with an elliptical hollow cross section according to claim 5, wherein said driving means comprises a first elastic means for driving a straight movement of said piston and a second elastic means for driving a rotational movement of said piston, said first elastic means experiences a translational

12

elastic movement in an inner case near a handling portion of said piston, and said second elastic means is mounted slidably on to a circumferential surface of said piston and experiences a rotational elastic movement.

9. The apparatus for operating a biopsy needle with an elliptical hollow cross section according to claim 8, wherein said second elastic means comprises a locker, splined to said piston, having a plurality of one way holes, a striker which has a plurality of fixing hooks with which mesh said plurality of one way holes of said locker, and which is stricken by a supporting portion of said piston, and which is incorporated to said piston to rotate freely, and a spring which is disposed between said locker and said striker to enable said holes of said locker to be engaged to said hooks.

10. An apparatus for operating a biopsy needle with an elliptical hollow cross section, comprising:

a cylinder having a first port and a second port for receiving compressed air, a third port, and a fourth port, said third and fourth ports communicating with each other;

a rotation blade, which has a central hollow axis, driven by compression air passing from said third port to said fourth port;

a piston, which is splined to said central hollow axis, for a straight movement and rotation movement in said cylinder; and

a plate which is fixed to said piston, defines two separated chambers of said cylinder, and moves between said first port and said second port as said piston moves, thereby selectively opens said third port.

\* \* \* \* \*



DECLARATION OF MICHAEL E. MILLER

I, Michael E. Miller, being duly warned of the penalties for perjury under 18 U.S.C. § 1001, hereby declare as follows:

1.    I am competent to testify from personal knowledge as to all matters set forth in this declaration unless otherwise indicated.

2.    I am Co-Founder, Vice President of Engineering, and an employee of Suros Surgical Systems, Inc. with offices at Northwest Technology Center, 6100 Technology Center Drive, Indianapolis, Indiana 46278.

3.    I am a named inventor on several United States patents which are directed to a surgical cutting instrument for use in tissue removal. Those patents include U.S. Patent Nos. 5,411,513; 5,423,844; 5,575,293; 5,782,849; 5,911,701; 5,997,560; 6,120,518; 6,245,084; 6,358,263; 6,638,235; and 6,758,824. I am also one of the named inventors on pending patent applications which are also directed to tissue removal using a rotating cutting element which is mounted to a handpiece.

4.    In the 1990's, I worked with Joseph L. Mark to develop a high speed rotary blade for cutting small pieces of tissue which would then be removed and collected by using a vacuum generator. At the time, Mr. Mark and I were principals of Promex, Inc., an Indiana company. From our research and development, Mr. Mark and I conceived of the idea of applying this technology to the removal of breast tissue.

5.    At least as early as March 6, 1998, we conceived the idea of a biopsy device including a cannula that was configured for insertion into a body to a point such that the orifice was adjacent to a tissue mass to be biopsied. We also conceived the idea of using a pneumatic

1

motor for rotating a cutter which was disposed within the cannula. As the cutter rotated, tissue would be selectively cut and drawn out of the rear of the inner cannula of the cutter.

6.     In 1998 and continuing into 1999, Mr. Mark and I had conversations with Dr. Timothy A. Goedde with respect to further developing this technology for use in breast biopsies and tissue removal. Before February, 2000, Mr. Mark and I had decided that we would use a pneumatic motor for powering the cutting element of the handheld device so that the device could be used in an MRI environment.

7.     Mr. Mark and I conducted experiments in early 2000 which showed that a handheld cutting needle, which was pneumatically driven, could be used successfully on human tissue.

8.     After Mr. Mark and I determined that a pneumatic drive system should be used to power the handpiece, we contacted Karl Fancher regarding the development of a pneumatic drive for our handpiece. Mr. Fancher introduced us to Jeffrey Schwindt and Air Systems Engineering, Inc. (ASE). We were told that ASE was engaged in the business of combining pneumatics and electronic consoles and designing pneumatic control circuits.

9.     Because Jeffrey Schwindt had never worked in the field of medicine or medical devices, Mr. Mark and I spent many hours educating Mr. Schwindt with respect to our tissue extraction device and the medical procedures to be formed in using the device. We told Mr. Schwindt the tasks that needed to be performed to use the device and the correct sequence in which those tasks should be performed and other related technical requirements. Mr. Schwindt's responsibility was to develop a circuit board that would perform the medical procedure tasks we outlined to him in the correct sequence. Mr. Schwindt had no involvement whatsoever in the

2

development or use of the biopsy device, since, as set forth previously, Mr. Mark and I invented and developed the design for the biopsy device long before we met Mr. Schwindt.

10.    Mr. Schwindt was also specifically instructed to use off-the-shelf components for the circuit board. He was instructed to charge our company, Promex, Inc., the expenses he incurred in building the circuit board as well as the time he spent in laying it out pursuant to our instructions as to the tasks to be performed and the correct sequence for performing those tasks.

11.    On or about March 21, 2000, Mr. Schwindt provided Mr. Mark and me with a rough flow chart for the circuit board. We gave Mr. Schwindt revisions that we wanted incorporated into the flow chart and he built the first circuit board based upon our instructions. The circuit board was made using off-the-shelf components. After testing, we determined that various changes needed to be made, and following our testing, we would instruct Mr. Schwindt to redesign the circuit board based upon the changes we made to the inputs and outputs. After Mr. Schwindt documented these requests in a flow chart, we provided Mr. Schwindt with changes to the flow charts to incorporate further changes to timing, sequence or events. During this entire process, Mr. Mark and I discussed with Mr. Schwindt the functions that the circuit board needed to accomplish and we discussed with him the methods to be employed to achieve those functions.

12.    While the changes made by Mr. Schwindt to the circuit board primarily consisted of changes affecting the timing (speed) of the handpiece blade and the pressure to be applied, we instructed other changes to be made to the console before the end of calendar year 2000. One change we requested was to add a pinch valve to control the timing of saline solution to the secondary lumen, and eliminate the use of air, to assist in the lubrication and to allow the tissue to pass consistently. Mr. Mark and I showed Mr. Schwindt several examples of electric pinch

3

valves which we had used previously in medical devices. We then instructed Mr. Schwindt to fabricate a pneumatic pinch valve to do the same.

13.     We also made the decision to commence using an air motor to both rotate and reciprocate the cutting blade. As set forth previously, Mr. Mark and I conceived the idea of using an air motor drive system, which would allow for MRI compatibility, before we met Mr. Schwindt and before Mr. Schwindt had any knowledge with respect to our biopsy device.

14.     ASE and Jeffrey Schwindt sold the completed circuit board and console to Promex, Inc. no later than September 20, 2000. Exemplary invoices from ASE to Promex regarding the circuit board and air motor are attached hereto as Exhibits 1 and 2.

15.     By the end of the year 2000, following several procedures during which our biopsy device and circuit board were tested and modifications were made, Mr. Mark and I discussed with Mr. Schwindt the building of several more consoles. These consoles included the circuit board which was made from off-the-shelf items pursuant to our instructions.

16.     I am informed that Mr. Schwindt has filed at least three patent applications where he is listed as the sole inventor. Those applications (Nos. 10/420,212; 10/420,296; and 10/461,315) were filed on either April 22, 2003 or June 13, 2003. These applications are related to a provisional application no. 60/374,952, which was filed on April 23, 2002. With respect to application no. 10/461,315, it is a continuation of application no. 10/420,197, which was filed on April 22, 2003.

17.     I did not become aware of the applications filed by Mr. Schwindt until earlier this year. At no time did Mr. Schwindt provide me with any notice that he had filed the above-identified patent applications or discuss with me whether I should be listed as an inventor or co-inventor on any of the patent applications.

4

18.      Mr. Schwindt did not invent the biopsy device nor did he invent any procedures for operating the device. Pursuant to the instructions given to him by Mr. Mark and myself, he arranged off-the-shelf components on a circuit board to perform those tasks which we instructed him needed to be performed in a particular sequence and at a particular speed. Thus, Mr. Schwindt merely implemented the functional requirements that we provided to him.

19.      I have reviewed published patent application no. 10/461,315, which was filed on June 13, 2003, in which Jeffrey Schwindt is listed as the sole inventor. I have reviewed the patent claims in this patent application. Mr. Schwindt is not a sole or joint inventor with respect to the subject matter that is claimed in this application. For example, Mr. Schwindt did not invent a biopsy device having a cannula with an orifice, the cannula being configured for insertion into a body to a point such that the orifice is adjacent to a tissue mass to be biopsied. Further, Mr. Schwindt did not invent a pneumatic motor having a hollow shaft disposed within the cannula, the pneumatic motor shaft having a cutter end configured to rotate relative to the orifice to selectively cut tissue from the mass. Moreover, Mr. Schwindt did not invent drawing the tissue cut from the mass through the hollow shaft and through the pneumatic motor during operation of the biopsy device. Since Mr. Schwindt is neither a sole inventor nor a joint inventor with respect to the subject matter claimed in this application, Mr. Schwindt has signed a false oath regarding inventorship.

20.      The three Schwindt patent applications identified herein were prepared by the Barnes & Thornburg law firm. A member of that same law firm currently represents Promex, Inc., on similar matters. Barnes & Thornburg knew or should have known that Mr. Mark and I had invented and developed a biopsy device having the basic construction that is claimed in the three Schwindt patent applications. Nevertheless, the Barnes & Thornburg law firm submitted

5

and continues to prosecute patent claims in these three patent applications which claim the biopsy device that only Mr. Mark and I invented. As a principal of Promex, Inc., I object to the conflict of interests in their prosecution of the three patent applications for Jeffrey Schwindt while they continue to represent Promex, Inc.

21.     With respect to Schwindt application no. 10/420,296, which was filed on April 22, 2003, it also claims a biopsy device having structural and functional characteristics that only Mr. Mark and I invented. Further, as set forth in Exhibits 1-2, Mr. Schwindt sold the claimed pneumatic circuit more than one year before the filing date of the provisional patent application.

22.     With respect to Schwindt application no. 10/420,212, which was filed on April 22, 2003, the claimed pinch valve and saline supply line were not solely invented by Mr. Schwindt. Instead, as set forth previously, we instructed Mr. Schwindt on the need for the pinch valve and the saline supply line, and showed him sample pinch valves to aid in its construction.

23.     In summary, Mr. Schwindt was contacted by myself and Mr. Mark about March of 2000. We provided Mr. Schwindt with information regarding the requested output of the pneumatic system for the biopsy device we invented, and, in accordance with our instructions, he fabricated a pneumatic system prototype using off-the-shelf components. Each of the elements of the claims recited in the three Schwindt patent applications were disclosed to Mr. Schwindt for the sole purpose of fabricating prototypes for testing and ultimately for sale. A system having the features claimed by Mr. Schwindt in his patent claims was sold at least as early as December of 2000. Further, a system having the features claimed by Mr. Schwindt in his patent claims was publicly used to conduct test biopsies at least as early as December of 2000.

24.     I am also aware of prior art uses of air motors for rotating a cutting tip in a medical device. For example, U.S. Patent No. 3,976,077 discloses a cutting tool which is rotated

6

by an air motor for use as an ophthalmic surgical device. (Exhibit 3). Similarly, U.S. Patent No.
6,361,504 discloses a biopsy needle wherein an air motor rotates the cutting blade for the
purpose of acquiring tissue samples. (Exhibit 4).

I declare under penalty of perjury that the foregoing statements are true and accurate to
the best of my knowledge and belief.

Date: 12/01/04

Michael E. Miller

7

146287



** PURCHASE ORDER COPY                          PAGE:  1

PROMEX, INC.                          P.O. NUMBER:   0004852
3049 Hudson Street                    ORDER DATE:    09/20/00
Franklin, IN  46131

(317) 736-0128
(317) 736-0793  FAX                   VENDOR NO:     0000808

VENDOR:                               SHIP TO:
Air Systems Engineering, Inc.         PROMEX, INC.
P.O. Box 20308                        3049 Hudson Street
Indianapolis         IN 46220         Franklin              IN 46131

CONFIRM TO:  Jeff Schwindt
(317) 842-7888    (317) 842-7980      X
-----------------------------------------------------------------------------
              SHIP VIA        F.O.B         TERMS
              UPS GROUND      FRANKLIN      NO TERMS
-----------------------------------------------------------------------------
ITEM NO.          UNIT  ORDERED  RECEIVED  BACK ORD   UNIT COST      AMOUNT
-----------------------------------------------------------------------------
*ASE-1420         EACH   2.00     0.00      0.00    1,465.500     2,931.00
 CONTROL SYSTEM                  ** REQUIRED BY:    10/04/00
              ASE-1420 CONTROL SYSTEM INCLUDES:
              VALVE LOGIC CIRCUIT WITH UPDATES
              ASSEMBLED INTO 13X10X6 NON-METALLIC ENCLOSURE
              HINGED
              ALL CONNECTIONS MADE THRU BULKHEAD FITTINGS
              FLOW CONTROLS MOUNTED ON SIDE OF PANEL
              ASSUMES THAT WE ARE USING THE ELECTRIC MOTOR


              PER QUOTE DATED 9/20/00
              PLEASE FAX ORDER CONFIRMATION & DELIVERY DATE.
              THANK YOU.  JANE MCNEILL, PURCHASING COORDINATOR


                              complete priler
                                  mike  11/24/00

                                            FAXED
                                            on 9/20/00

                                         ------------
                              NET ORDER:     2,931.00
                              SALES TAX:          .00
                              FREIGHT:            .00
                                         ------------
Signature: M M Miller         ORDER TOTAL:    2,931.00



```
                    ** PURCHASE ORDER **                         PAGE:  1


PROMEX, INC.                            P.O. NUMBER:  0004865
3049 Hudson Street                        ORDER DATE:  09/22/00
Franklin, IN  46131

(317) 736-0128
(317) 736-0793  FAX                     VENDOR NO:   00.00808


VENDOR:                         SHIP TO:
Air Systems Engineering, Inc.   PROMEX, INC.
P.O.Box 20308                   3049 Hudson Street
Indianapolis        IN 46220    Franklin          IN 46131

CONFIRM TO:  Jeff Schurndt
(317)842-7888   (317)842-7980   X
-----------------------------------------------------------------
          SHIP VIA       F.O.B        TERMS
          UPS GROUND     FRANKLIN     Net 30 Days
-----------------------------------------------------------------
ITEM NO.        UNIT  ORDERED  RECEIVED  BACK ORD   UNIT COST   AMOUNT
-----------------------------------------------------------------
*ASE-1420-AM    EACH    1.00     0.00      0.00   1,250.000   1,250.00
AIR MOTOR PROTOTYPE              ** REQUIRED BY:    10/06/00
        INCLUDES:
        DESIGN AND FABRICATION OF TWO AIR MOTOR
        PROTOTYPES
        AN ALUMINUM HOUSING AND A FABRICATED IMPELLER


        PER QUOTE DATED 9/22/00
        PLEASE SHIP AS SOON AS POSSIBLE
        THANK YOU.  JANE MCNEILL, PURCHASING COORDINATOR
```

RECEIVED
JAN 2 5 2001
Complete

FAXED
am 9/22/00

Karen- This po 4865
already been taken
out of our system.
I believe it was
SURO's related.

Jane

Signature: _____

```
                              NET ORDER:      1,250.00
                              SALES TAX:           .00
                              FREIGHT:             .00
                              ------------
                              ORDER TOTAL:    1,250.00
```

 

directories



supplier search

All suppliers

GO

article search

All magazines

GO

Advanced Search
Powered by Google

member services
[Register | Login]

In this section:
add a company
research
industry links
tradeshows
in print
bookstore
web gallery

browse MDL

directories
industry
PressCenter
community
CareerCenter
customercare
search

─────────

about us

### North American Suppliers Directory Index

# Micro Motors Inc.

151 E. Columbine
Santa Ana, CA 92707 USA
Tel: 800/562-6204
Fax: 714/546-1109

E-mail: patjoh@micromotorsinc.com

**Update this company's information**
(Free member registration required to use this feature)

**Description:**
Manufactures precision miniature air motors and air drills for both OEM
and production applications. Standard models feature speed ranges from
1 to 50,000 rpm. Gearboxes offer gear reductions from 4:1 to 4100;1.
Private label products manufactured include electronic controllers, low-
and high-speed drills, attachments, fluid delivery systems, dental
implantology units, and custom medical devices.

### Categories this company is listed under in the North American Suppliers Directory:

- Hardware and Accessories: Pneumatic components (63 companies)
- Motors and Motion Control Products: Motion Control: Drives/Controllers (145 companies)
- Motors and Motion Control Products: Motion Control: Gearheads (76 companies)
- Motors and Motion Control Products: Motors: Brush dc (80 companies)
- Motors and Motion Control Products: Motors: Gear (79 companies)
- Motors and Motion Control Products: Motors: Pneumatic (23 companies)
- Motors and Motion Control Products: Motors: Torque (62 companies)
- Pumps and Valves: Pumps: Peristaltic (31 companies)