Welcome Micro Motors, Inc. Website





**Miniature air motors & drill for exacting high performance applications**



**Pioneer & Leader 29 years MINIATURE AIR MOTORS**

## Options you may elect to fit your needs



Welcome Micro Motors, Inc. Website

## How our miniature air motor benefits a designer or user

- Operates on compressed air, nitrogen, or other inert gases at pressure up to *160 PSI*
- Precision air motor of *stainless* and *alloy* steel construction provides reliable power and long service life.
- Advanced rotor blade design and a highly polished cylinder permit continuous operation
- Balanced rotor positioned between precision ball bearings virtually eliminates friction and wear.
- Motors remain cool, even when operated under continuous load.
- Repeated stalling, instant reversing will not harm the motor.
- Spark free operation allows use in contaminated, wet or explosive environments
- Instant on...instant off...no wind up or coasting.
- Hardened planetary gear system provides increased torque transmission capabilities and long life
- Lower air consumption than larger motors conserves energy.

## Exact dimensions may be modified for special industrial or medical applications



| AIR DRILL | | AIR MOTOR | | FREE SPEED | STALL TORQUE INCH OUNCES | LENGTH INCHES | APPROXIMATE WEIGHT OUNCES |
|---|---|---|---|---|---|---|---|
| RIGHT HAND | REVERSIBLE | RIGHT HAND | REVERSIBLE | | | | |
| MMDR-5000 | MMDR-5500 | MMR-5000 | MMR-5500 | 50,000 | 3.3 | 2.55 | 3-1/4 |
| MMD-2600 | MMDR-2600 | MMR-2600 | MMR-2600 | 28,000 | 7.2 | 2.55 | 3-1/4 |
| MMDR-0700 | MMDR-0700 | MMR-0700 | MMR-0700 | 9,000 | 24 | 2.55 | 3-1/4 |
| | | | | | | | |
| MMD-6014 | MMDR-6014 | MMP-6014 | MMP-6014 | 1,750** | 150 | 3-1/4 | 4-1/4 |
| MMD-0004 | MMDR-0004 | MMR-0004 | MMR-0004 | 450** | 440 | 3-3/4 | 4-3/4 |
| | | MMR-6002 | MMR-6002 | 225** | 350 | 3-3/4 | 4-3/4 |
| | | | | | | | |
| | | PGMR-7001 | PGMR-7001 | 140** | 1750 | 4.43 | 5-1/2 |
| | | MMR-5001 | PGMR-5001 | 28** | 1750* | 5.45 | 6-1/2 |
| | | PGMR-6001 | PGMR-6001 | 7** | 1750* | 5.99 | 7 |

Welcome Micro Motors, Inc. Website

# OUR MOTORS' PERFORMANCE

## FREE SPEED vs. AIR PRESSURE





## TORQUE vs. SPEED

- Charts are based on MMR or MMDR reversing models. On MMF or MMD models, a 10% torque and speed reduction should be allowed for.

- Caution: Torque loads above 1750 inch ounces may cause gears to slip and result in damage. Do not stall MMR MMF 0001, 5001 & 6001 Motors.

*Rabid Innovation... Extraordinary Results*



# United States Patent [19]

## Kerfoot, Jr.

BEST AVAILABLE COPY

[11]  **3,976,077**

[45]  Aug. 24, 1976

[54]  **EYE SURGERY DEVICE**

[76]  Inventor:  Franklin W. Kerfoot, Jr., 678 Andover Road, Newtown Square, Pa. 19073

[22]  Filed:  **Feb. 3, 1975**

[21]  Appl. No.: **546,591**

[52]  U.S. Cl. ................................. **128/305;** 308/121
[51]  Int. Cl.² ....................... A61B 17/32; A61F 9/00
[58]  Field of Search ................ 128/305; 308/9, 121, 308/122, 140, 141, 149, 168, 170, 187, 246, DIG. 1

[56]  **References Cited**

### UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 908,539 | 1/1909 | Beutler | 308/141 X |
| 2,584,770 | 2/1952 | Wilcock | 308/9 |
| 3,639,074 | 2/1972 | Killick | 308/DIG. 1 |
| 3,736,938 | 6/1973 | Evvard et al. | 128/305 |
| 3,835,858 | 9/1974 | Hagen | 128/305 |

*Primary Examiner*—Channing L. Pace
*Attorney, Agent, or Firm*—Caesar, Rivise, Bernstein & Cohen, Ltd.

[57]  **ABSTRACT**

An ophthalmic surgical device including a housing having an extension sleeve projecting from one end thereof. A rotary shaft, having helical threads at one end thereof, which threads terminate in a cutting tip, is disposed within the extension sleeve with the tip being exposed at the free end of the sleeve. The shaft is mounted within three fluid-lubricated sleeve bearings. One of the bearings is mounted within the sleeve adjacent to the tip thereof with its central axis offset and slightly angled with respect to the axes of the other bearings to effect the bending and slight loading of the shaft. The bearings are lubricated by water provided under pressure thereto and serve to enable the shaft to rotate at a high rate of speed under the force provided by an air turbine. Means are provided for supplying a working fluid to the cutting tip of the device to aid in the maceration of the material to be removed by the tool. The macerated material and the working fluid are withdrawn from the operative site by the pumping action of the rotating helical threads of the shaft. The water pressure on the bearings not only lubricates the bearings but also precludes the macerated material and working fluid from being pumped into the interior of the housing.

**25 Claims, 7 Drawing Figures**





FIG.1



FIG.2

FIG.3



3,976,077

1

## EYE SURGERY DEVICE

This invention relates generally to surgical devices and more particularly to ophthalmic surgery devices.

A recent development in ophthalmic surgery has obviated the use of conventional cutting instruments, e.g., scalpels, for effecting the removal of unwanted tissue, such as lens opacities. To that end, macerating type surgical devices are now used in cataract surgery to effect the removal of lens opacities by the use of a rotary bur which grinds away the opacities. Such devices also serve to withdraw the ground or macerated material from the operating site via suction means. For example, in U.S. Pat. No. 3,736,938 (Evvard et al) a surgical device is disclosed which supplies a working liquid to the cutting site while a high speed rotary cutter effects the maceration of the material thereat. At the same time a tube disposed about the cutter vibrates ultrasonically to coact with the cutter in macerating the lens. The cutter includes spiral grooves which effect the evacuation of the liquid and the macerated lens material.

In U.S. patent application Ser. No. 397,478, filed on Sept. 14, 1973 and assigned to National Aeronautics and Space Administration, there is disclosed a macerating surgical device which overcomes various disadvantages of the prior art in effecting the removal of the macerated lens material and yet does not utilize ultrasonic energy (whose effects on the eye are not fully known).

To that end, that device comprises a housing having an extension including a sleeve through which the free end of a rotary shaft extends. The free end includes helical threads terminating in a cutting tip. The shaft is connected to an air turbine motor to effect its rotation within the extension at an extremely high speed. Plural conduits are provided to carry treatment fluid. e.g., saline solution, to the operative site. The rotation of the cutting tip serves to grind up the eye tissue to be removed with the helical threads on the shaft act as a pump to pump the macerated tissue and treatment fluid away from the operative site through communicating passageways in the extension and into a collector.

As a result of the high speed rotation of the shaft and the close tolerance between the shaft and the sleeve in the extension, macerated material and liquid is pumped up into the space therebetween. In order to preclude the ingress of such material between the shaft and sleeve extension, a counter flow pump is provided. The pump is formed by a second screw thread on the shaft. The second threaded portion also has spiral grooves but their pitch is opposite to the pitch of the screw portion at the tip of the shaft. Accordingly, the rotation of the shaft and the concomitant rotation of the second threaded portion effects a reverse pumping action to cause the treatment fluid and macerated material to flow between the shaft and the extension and back toward the screw portion at the tip thereof. This action flushes any macerated material from the space between the shaft and the extension.

While the counter action pump technique used in the aforenoted patent application is generally effective to preclude the ingress of the macerated material and treatment fluid into the space between the rotating shaft and the sleeve in which it rotates, some material may nevertheless gain access to such space, with the deleterious effect of hardening therein to cause the shaft to bind. In addition, the use of a counter action

2

pump results in a rather complex and hence expensive surgical device.

Accordingly, it is a general object of this invention to provide a device which overcomes the disadvantages of the prior art.

It is a further object of this invention to provide a surgical cutting device suitable for high speed cutting in very small openings in the body.

It is still a further object of this invention to provide a surgical device for removing cut or macerated material by a pumping action, while precluding the ingress of such material into the interior of the device in a simple and expeditious manner.

It is still a further object of this invention to provide a surgical device utilizing a rotary tool mounted in fluid-lubricated bearings.

It is a further object of this invention to provide a stable bearing and shaft system for high speed rotary cutting or pumping devices utilizing fluid-lubricated sleeve bearings.

These and other objects of the invention are achieved by providing a surgical device comprising a housing and a sleeve having an open free end and connected to the housing. A shaft is positioned within the housing and the sleeve, with the shaft having a free end disposed adjacent the free end of the sleeve. The free end of the shaft is in the form of a tool adapted to operate in conjunction with a working fluid at the free end of the sleeve. The shaft is rotatably mounted within a first fluid-lubricated sleeve bearing and second fluid-lubricated bearings means. The first bearing is positioned within the elongated sleeve. Means are provided for supplying a liquid under pressure to the first bearing and the second means, with the liquid under pressure in the elongated sleeve lubricating the first bearing within the sleeve and precluding the ingress of the working fluid through the elongated sleeve and into the housing.

Other objects and many of the attendant advantages of this invention will be readily appreciated as the same becomes better understood by reference to the following detailed description when considered in connection with the accompanying drawings wherein:

FIG. 1 is a side elevational view, partially in section, of a portion of the surgical device in accordance with this invention;

FIG. 2 is a top elevational view, partially in section, of a portion of the device shown in FIG. 1 when operating on an eye;

FIG. 3 is an enlarged sectional view of a portion of the working tip of the device shown in FIGS. 1 and 2;

FIG. 4 is a sectional view taken along line 4—4 of FIG. 1;

FIG. 5 is a sectional view taken along line 5—5 of FIG. 1;

FIG. 6 is a sectional view taken along line 6—6 of FIG. 1; and

FIG. 7 is a sectional view taken along line 7—7 of FIG. 1.

Referring now to the various figures of the drawing wherein like reference characters refer to like parts, there is in FIG. 1 an improved surgical device 20. The device 20 is arranged for cutting away bodily material through very small openings in the body and has particular utility in opthamalic surgery applications, such as cataract removal.

As can be seen in FIG. 1 the device 20 basically comprises a housing 22 terminating in an extending sleeve 24 having an open free end 26. A shaft or rotor

3,976,077

3

28 is disposed within the housing 22 and the sleeve 24 and includes a tool 30 at its free end disposed adjacent opening 26. The tool 30 is adapted to be rotated at a high speed, e.g. 300,000 rpm, to grind or otherwise macerate bodily material (tissue or bone) upon contact therewith. The tool is rotated at the high speed by motor means 32 disposed within the housing and connected to one end of the shaft 28.

In order to aid in the maceration of the bodily material a working fluid 126 (FIG. 3), such as a sterile saline solution is supplied to the cutting site via passageways 36 attached to sleeve 24. The fluid 126 also serves as the vehicle for carrying away the ground or macerated material from the cutting site.

The shaft 28 is mounted for high speed rotation within a fluid-lubricated bearing system including three spaced sleeve bearings 40, 42 and 44. As is known fluid-lubricated sleeve bearings serve to support rotary shafts therein on a film of lubricated fluid interposed between the sleeve and the shaft to enable the shaft to rotate with very little friction.

In accordance with the preferred embodiment of this invention, the bearings 40, 42 and 44 are lubricated by sterile water provided thereto under high pressure, e.g., 30 psi, from means (not shown). This construction eliminates the need for oil or grease lubrication to provide a readily sterilizable and hygienic surgical device. In addition, the water lubricated bearings run quieter than ball bearings.

The sterile water provided to the bearing system for lubrication, by virtue of the high pressure on the water, also serves to preclude the ingress of foreign material, e.g., macerated tissue, dust, etc., into the interior of the housing through the space between the sleeve and the shaft. Accordingly, the device of this invention eliminates the need for complex sealing techniques, such as the counter flow pump technique disclosed in the aforenoted patent application.

As is known, lightly loaded bearings or bearings lubricated with a low viscosity fluid and operated at high speeds are particularly susceptible to entering the unstable rotary condition, commonly known as half frequency whirl or spin. In such a condition, the central axis of the shaft orbits around the central axis of the bearings as the shaft rotates and the minimum thickness of the lubricating film falls to zero, whereupon the load carrying capacity of the bearing vanishes and the shaft binds.

Since the surgical device 20 of this invention utilizes a high speed shaft mounted in water (a low viscosity fluid) lubricated bearings and since, as will be described in detail later, the shaft is of very small diameter and lightly loaded during the delicate surgical operation, the prevention of half frequency whirl is of utmost importance.

Heretofore, half frequency whirl has been prevented through the use of various complex techniques, such as the use of the elliptical sleeve bearings, rotatable pressure pads, etc. In the instant invention such complex techniques are obviated by the inventive expedient of misaligning the bearings. To that end, as will be described in considerable detail later, the bearings 40, 42 and 44 of the bearing system are misaligned to produce a calculated load therein and a concommitant stress in the shaft. It has been found that such action effectively precludes the lightly loaded, high speed, water lubricated shaft from commencing half speed whirl.

4

A more detailed description of the device 20 follows. As can be seen in FIG. 1 the housing 22 is formed of a cylindrical member 46 (only a portion of which is shown), which serves as the portion to be gripped by the operator and in this regard is referred to as the handpiece of the device. The handpiece 46 terminates in a threaded portion 48 for mating engagement with a threaded portion 50 of a housing tube assembly 52. An O-ring 54 is disposed within a recess 56 cut in the periphery of portion 50 and is interposed between portions 48 and 50 to prevent the egress of liquid through the interface.

The housing tube assembly 52 is a conically shaped member defining a hollow spaced interior 58 therein and terminates at its pointed end in an opening 60. One end of the elongated sleeve 24 is mounted within the opening 60 and is secured in place as by soldering.

As can be seen in FIGS. 1 and 2 the sleeve 24 is an elongated tubular member having a central passageway 62 extending through its entire length and communicating with the interior 58 in the assembly 52.

A sleeve and bearing assembly 64 is mounted within the hollow interior 58 of the assembly 52 and is secured in place therein via a set screw 66 extending through a threaded opening 68 in the assembly 52. The assembly 64 is of generally cylindrical shape and substantially conforms to the shape of the interior 58 of the assembly 52. The assembly 64 includes a central passageway 70 extending through its entire length and coaxial with the passageway 62 in the sleeve 24 to enable the rotary shaft 28 to extend therethrough.

A stepped annular recess 72 is provided about the exterior of assembly 64 and O-ring 74 is disposed therein and interposed between the recess and the wall of the interior of assembly 52. The O-ring 74 serves as a liquid seal to preclude the high pressure water from gaining access to the interior of the housing past the seal.

As can be seen in FIG. 1, the housing tube assembly 52 includes a passageway 76 therein for carrying high pressure water. As noted heretofore, such water serves as the lubrication for the bearings and acts as a seal to prevent the ingress of foreign matter into the interior of the housing. The passageway 76 communicates with the portion of the stepped annular recess 72 forward of the O-ring seal 74. A recess 80 is cut longitudinally along the surface of the assembly 64 to provide a passageway communicating with passageway 76 to carry the water therefrom and into the interior space 58 within assembly 52. Another passageway 82 is provided within the housing tube assembly 52 and extends longitudinally therethrough and into communication with a tube (not shown) for carrying the high pressure water from a source (not shown) to the passageway 76.

The sleeve and bearing assembly 64 serve to mount two of the three bearings of the system therein, those being bearings 42 and 44. To that end, assembly 64 includes a pair of recesses 83 and 84 cut into the central passageway 70 contiguous with the ends of the assembly. The recess 83, see FIG. 1, serves to hold sleeve bearing 42 while the recess 84 holds sleeve bearing 44.

The bearings are formed of tungsten carbide, with the area of bearing 42 being larger than the area of bearing 44 but with the inside diameter of the bearings being the same. The recesses 82 and 84 are disposed in such a manner that the central axes of the respective bearings 42 and 44 mounted therein are coaxial.

3,976,077

5

The sleeve bearing 40 is also formed of tungsten carbide and is mounted within the central passageway 62 of the sleeve 24 adjacent the open, free, end 26 thereof.

As will be described in detail later, sleeve 24 is bent along its central axis so that the axis of sleeve bearing 40 mounted therein is slightly offset and angled from the coaxial central axes of the bearings 42 and 44 in the housing 22.

The shaft 28 is an elongated rod-like member formed of tungsten carbide and includes two different diameter portions, a larger or major diameter portion 86 and a smaller or minor diameter portion 88. The interface of the major and minor diameter portions is defined by a curved surface 87. The minor diameter portion includes a portion 89 which is undercut to enhance flexibility. The shaft is mounted within the bearings with the major diameter portion 86 extending through the coaxial bearings 42 and 44, hereinafter referred to as the middle and rear bearings, respectively, and with the minor diameter portion 88 extending through bearing 40, hereinafter referred to as the front bearing.

The offsetting of the front bearing with respect to the middle and rear bearings have the effect of bending the shaft slightly such that respective portions of the shaft make contact with respective interior peripheral portions of the bearings through which the shaft passes when the shaft is stationary. This characteristic can be seen clearly in the cross-sectional views of FIGS. 5, 6 and 7. For example, as can be seen in the cross-sectional view of FIG. 5, the shaft 28 is bent such that the top peripheral surface of the major diameter portion 86 of the shaft passing therethrough (i.e., the journal), contacts the upper peripheral edge of the interior of the rear bearing 44 while the clearance between the bottom periphery of the journal and the bottom periphery of the bearing is increased. In a similar manner, as can be seen in the sectional view of FIG. 7, the upper periphery of the minor diameter portion 88 of the shaft passing through the front bearing 40 abuts the upper periphery of said bearing while the clearance between the lower periphery of the shaft and the corresponding portion of the bearing is increased. The upward displacement of the shaft with respect to the central axis of the front and rear bearings as described with respect to FIGS. 5 and 7 is accompanied by the downward displacement of the major diameter portion 86 of the shaft with respect to the middle bearing 42. For example, as can be seen in FIG. 6, the bottom periphery of the major diameter portion of the shaft 86 extending through middle bearing 42 contacts the corresponding interior periphery of said bearing while the clearance between the upper portion of the periphery of the shaft and the corresponding interior periphery of the bearing is increased.

The bending of the shaft has the effect of loading the bearing sufficiently to preclude the production of half speed whirl as the shaft is rotated within the bearing.

As the shaft begins rotating the journal portion of the shaft move out of contact with the associated peripheral portions of the bearings and a thin film of lubricating fluid, i.e., water, is formed between the closely adjacent portions, whereupon the shaft is able to rotate freely and stably.

The bending of the shaft to misalign the bearings is accomplished as follows: for a device whose nominal major shaft diameter is 0.062 inch (1.58 mm), whose nominal minor shaft diameter is 0.040 inch (1.02 mm),

6

whose front bearing is spaced from the middle bearing by 0.813 inch (20.7 mm), whose middle bearing is spaced from the rear bearing by 0.577 inch (14.6 mm), whose nominal front, rear and middle bearing lengths are 0.04 inch (1.02 mm), 0.044 inch (1.12 mm) and 0.025 inch (0.635 mm), respectively, and whose nominal front, middle and rear bearing diameters are 0.04 inch (1.02 mm), 0.062 inch (1.58 mm) and 0.062 inch (1.58 mm), respectively. The first step in the bending operation occurs with the shaft removed wherein the front bearing is bent downward to offset its center by 0.00085 inch (0.022 mm) nominally from the center line of the middle and rear bearings. The front bearing is then lapped to size in line with a point approximately at the mid point between the middle and rear bearings. The shaft is then bent downward again until the total eccentricity, that is the eccentricity between the center point on the central axis of the front bearing 40 and the coaxial central axis of the middle and rear bearings 42 and 44, is approximately 0.0026 inch to 0.0029 inch (0.066 mm to 0.074 mm) with the bending being accomplished at an area approximately 0.5 inch (12.7 mm) nominally from the center point of the front bearing 40. The shaft is then inserted in the bearing system.

Assuming that the shaft is rotated at about 300,000 rpm on a film of water in the bearings the following is noted, the combined action of the dynamic effects of the rotating shaft coupled with the resiliency of the shaft against the force created by the misaligned bearings, has the effect of bending the front end of the shaft downward to be eccentric with the rear of the shaft by approximately 0.0012 to 0.0018 inch (0.03 f to 0.046) mm) nominally. This eccentricity produces a bearing load in the front bearing equivalent to approximately 40 to 60 psi (2.81 to 4.22 kg/cm²) and somewhat higher load in pressure on the rear bearings, with an average water film thickness of 0.00025 inch (0.0064 mm) and a minimum film thickness of approximately 0.00005 inch (0.0013 mm) in each bearing when running at 300,000 rpm. In addition, the shaft is bent such that the journal thereof in the front bearing remains essentially parallel to the front bearing.

The rotation of the shaft at the high speed is effected via motor means 32. In accordance with the preferred embodiment of this invention the motor comprises an air turbine rotor 90 having six fins or vanes 91 projecting therefrom (see FIG. 4). The rotor is connected to the rear end of the shaft 28 in a manner so as to provide a small clearance 92 between it and the end face of bearing 44. The clearance enables the longitudinal positioning of the shaft to be manually adjusted by means, to be described later, yet is sufficiently small to prevent excessive forward travel. The rotor 90 is disposed within a circular cavity 94 within assembly 52. High pressure air is provided to the interior of the cavity for effecting the rotation of the rotor 90 therein. To that end, as can be seen in FIG. 4, a passageway 96 is provided in assembly 52 and extends at an anle to the shaft. High pressure air is provided through the passageway to impact the vanes of the rotor at an angle having a component tangential to the axis of rotation of the rotor to cause the rotation thereof. A longitudinally extending passageway 98 is provided within assembly 52 and communicates with passageway 96. The passageway 98 is coupled to a high pressure air line (not shown) and serves to carry high pressure air provided therethrough from a source (not shown).

3,976,077

7

The longitudinal positioning of the shaft 28 and hence the cutter 30 is effected by a finger control (not shown) and associated components, only a portion of which are shown. Such components include a sliding member 100 adapted to be moved, under the control of a finger switch, lonitudinally within the housing 22. A threaded insert 102 is mounted within the member 100. A jeweled thrust bearing 104, such as a ruby bearing, is mounted within insert 102 and coaxial with the axis of the shaft 28. The bearing is arranged to abut the flat rear end 106 of the shaft to apply pressure thereto and effect the movement thereof through the distance established by the clearance 92.

As will be appreciated by those skilled in the art, the high pressure water in interior 58 operates against the major diameter portion and minor diameter portion therein in opposite directions. The net result in the rearward direction and thereby precludes the accidental extension of the tip 30 out of the open end 26 of the sleeve 24. The thrust bearing 104 serves to take up the rearward thrust produced on the shaft.

As noted heretofore, passage means 36 are provided to carry a working liquid, such as a saline solution, to the operating site, which liquid serves as the vehicle for carrying the macerated material away from the site. To that end, the device includes outlet passage means 38 which serve to carry the macerated material and the liquid vehicle from the operating site to collections means. As can be seen in FIG. 3, the passageway 36 comprises a tubular line lying along one side of the sleeve 24. The line terminates immediately adjacent the open end of the sleeve and includes a pair of outlet ports 106 therein. The line also extends along the conical housing tube assembly 52 and terminates at its other end in a longitudinally extending communicating passageway 108 within assembly 52. A line (not shown) is provided connected to passageway 108 for providing a saline solution from the means (not shown) to line 108 and from there through passageway 36, and outlet ports 106 to the operating site. The return passage 38 is constructed in a similar manner to passage 36 and lies on the opposite side of the sleeve and the conical portion of the housing tube assembly 52. An opening 110, hereinafter referred to as a return port, is provided in the wall of sleeve 24 immediately in front 45 of bearing 40. The return port 110 serves to carry macerated material and its carrier liquid from the operating site under the pumping force produced by the rotating tool 30 and into the passageway 38. The passageway 38 is connected to a longitudinally extending passage 112 provided within housing tube assembly 52 and in communication therewith for providing the macerated material and liquid carrier into passageway 112. A return line (not shown) is provided coupled to line 112 to carry the macerated material and liquid carrier to collection means (not shown).

In accordance with the preferred embodiment of this invention, the tool 30 serves as both a cutting implement for effecting the grinding or maceration of bodily material as well as a pump for carrying such material away from the operating site. To that end, as can be seen in FIG. 3, the tool 30 is in the form of a helical screw having helical threads 114 extending thereabout. The free end of the tool terminates in a cutting tip 116. As will be appreciated, the rotation of the shaft and the concommitant rotation of the screw threads 114 results in the creation of a pumping action by the tool, whereupon particulate material at the operating site is carried

8

by the rotating threads through the opening 26 in the tip of the sleeve and downward through the sleeve to communicating return port 110 to enable the material to pass therethrough and into passageway 38. The pressure produced by such pumping action is of the order of 5 psi (0.33 kg/cm²) and considerably less than the fluid bearing pressure. Since the bearing water pressure is substantially higher than the pressure produced by the pumping action of the rotating tool, a positive flow of water occurs from the interior 58 of the housing tube assembly 52, downward through the space between the shaft 28 and the sleeve 24 and through front bearing 40 to the front end of the sleeve from whence it enters return port 110. Accordingly, foreign matter is prevented from gaining access to the interior of the device by the utilization of the high pressure water which serves as the lubricating and cooling means for the bearing system. Such an arrangement obviates the need of complex sealing systems which have characterized prior art devices.

Water leaking rearwardly through the rear bearing 44 and into cavity 94 is atomized by the high speed rotation of the rotor 90 therein. The spent air and atomized water within the cavity escapes through passage means (not shown) for release to the atmosphere.

In FIGS. 2 and 3 there is shown the use of the device in operation during the removal of opacities in the crystalline lens in an eye. To that end, the sleeve of the device is inserted within a small opening 120 in the limbus cornea of the eye and is extended therethrough until the free end of the sleeve contacts the opacity to be removed from lens 124. The finger control is then moved to cause the thrust bearing 104 to apply an axial force in the forward direction to the shaft to effect the extension of the cutting tip 116 slightly out of the open end 26 of the sleeve. In accordance with the preferred embodiment of this invention, the primary functions in cataract surgery of grinding and pumping the lens out can be accomplished with the shaft 116 protruding slightly, e.g. 0.01 inch (0.25 mm), as shown in FIG. 3. Since the crystalline lens of the eye is convex, the tip 116 of the tool 30 can even be slightly retracted within the open end of the sleeve and still effect the grinding or maceration of the lens portion 124.

The turbine is turned on to effect the rotation of the shaft while the saline solution, denoted by the reference numeral 126, is forced outward through passageway 36 and ports 116 in the direction of arrows 128. The macerated lens material produced at the operating site is denoted by the reference numeral 130 and is carried by the saline solution under the influence of the pumping action of the rotating tool 30 into the sleeve and from there through port 110 in the direction of arrow 132 into return line 38. Lubricating water at a higher pressure passes through bearing 40 in the direction of arrows 134 and into port 110 for removal along with the saline solution and the macerated lens material. Accordingly, all liquids and solid material are drawn away from the operating site during the operation of device 20.

It should be pointed out at this juncture that while the device as described heretofore is particularly suitable for ophthalmic surgical applications, it is to be understood that the device can be dimensioned and configured in various other ways for use in other surgical applications as either a cutting and grinding device, a pumping device or a combined grinding and pumping device.

3,976,077

**9**

As should be appreciated from the foregoing, the instant invention provides a surgical device enabling the quick, safe and efficient removal of bodily material via the use of a high speed rotary tool mounted within a fluid-lubricated stable and unsealed bearing system.

Without further elaboration, the foregoing will so fully illustrate my invention that others may, by applying current or future knowledge, readily adapt the same for use under various conditions of service.

What is claimed as the invention is:

1. Eye surgery apparatus comprising a shaft having a free end in the form of a tool, means for rotating said shaft at a high rate of speed at which half frequency whirl could occur and a bearing system including a first fluid-lubricated sleeve bearing and second fluid-lubricated sleeve bearing means, said first bearing being mounted with its central axis offset and slightly angled with respect to the central axis of said second bearing means, said shaft extending through said first bearing and said second bearing means, said shaft being bent slightly and loaded by said offset first bearing, whereby respective portions of said shaft make contact with respective portions of the interior periphery of said first bearing and second bearing means when said shaft is stationary and move out of contact therewith to ride with very little friction on a layer of lubricating fluid interposed between the shaft and the interior periphery of the first bearing and second bearing means when the shaft is rotating at a high speed, to preclude the shaft from entering the unstable condition wherein its central axis orbits around the central axis of said first bearing or said second bearing means as the shaft rotates.

2. The apparatus of claim 1 wherein said second bearing means comprise second and third fluid-lubricated sleeve bearings.

3. The apparatus of claim 2 wherein said second and third bearings are spaced from each other with their central axes being coaxial.

4. The apparatus of claim 3 wherein said lubricating fluid is water.

5. The apparatus of claim 4 wherein said apparatus also includes a housing and a sleeve extending therefrom and including an open free end, and said shaft and bearing system being mounted within said housing and said sleeve, with said shaft passing through said sleeve such that the free end of the shaft is disposed adjacent the free end of the sleeve, and at least one of said bearings being mounted within said sleeve.

6. The apparatus of claim 5 wherein said sleeve is bent slightly to therby offset the bearing mounted therein from the remaining bearings of the apparatus.

7. The apparatus of claim 6 wherein the water is provided in the housing under pressure to lubricate the bearings and to prevent the ingress of foreign matter through the sleeve and bearing mounted therein into the interior of the housing.

8. The apparatus of claim 6 wherein the tool includes helical threads.

9. The apparatus of claim 8 wherein said tool is a cutting bit.

10. The apparatus of claim 6 wherein said second and third bearings are mounted within said housing and wherein said first bearing is mounted within said bent sleeve adjacent the free end thereof.

11. The apparatus of claim 6 wherein the means for rotating said shaft comprises a turbine, said turine being connected to said shaft and being air driven.

**10**

12. The apparatus of claim 11 wherein the shaft is longitudinally slidable within said sleeve to expose the tool at the free end thereof.

13. The apparatus of claim 12 wherein the tool includes helical threads.

14. The apparatus of claim 13 wherein said tool is a cutting bit.

15. The apparatus of claim 14 wherein said shaft includes an increased diameter portion within said housing and against which said water pressure operates to produce a longitudinal force on said shaft in the direction of said housing.

16. The apparatus of claim 15 wherein said housing includes a thrust bearing in contact with said shaft.

17. The appapratus of claim 7 additionally comprising first means carrying a working liquid to the free turbine of the sleeve and second means carrying said liquid, any foreign matter picked up thereby and lubricating fluid away from said free end.

18. The apparatus of claim 17 wherein the means for rotating said shaft comprise a turbine, said turgine being connected to said shaft and being air driven.

19. The apparatus of claim 18 wherein said shaft is longitudinally slidable within said sleeve to expose said tool at the free end thereof.

20. The apparatus of claim 17 wherein said tool includes helical threads which act as a pump when said shaft is rotating.

21. The apparatus of claim 20 wherein an opening is provided in said sleeve adjacent said helical thread and communicating with said second passageway, whereupon the working liquid, foreign matter and lubricating fluid at the free end of the sleeve are pumped by the rotation of the shaft into the sleeve, through the opening therein and into said second passageway.

22. The apparatus of claim 20 wherein said tool is a cutting bit.

23. The apparatus of claim 21 wherein said bearing system includes three sleeve bearings, with two of said bearings being mounted within said housing and with the remaining bearing being mounted within said sleeve adjacent the free end thereof.

24. A surgical device comprising a housing, a sleeve connected to said housing, said sleeve having an open free end, a shaft positioned within said housing in said sleeve, said shaft having a free end disposed adjacent the free end of the elongated sleeve, the free end of the shaft being in the form of a helical thread cutting bit operating in conjunction with a working liquid at the free end of the elongated sleeve, said shaft being rotatably mounted within a first fluid-lubricated sleeve bearing and second fluid-lubricated sleeve bearing means, with said first bearing being positioned within said elongated sleeve, means for supplying the liquid under pressure to said first bearing and said second bearing means, with said liquid under pressure in said elongated sleeve lubricating said first bearing within said elongated sleeve and precluding the ingress of said working fluid through said elongated sleeve and into said housing, first passage means carrying said working liquid to the free end of the elongated sleeve and seconnd means carrying said liquid, any foreign matter picked up thereby and lubricating fluid away from said free end, said shaft being rotated by an air driven turbine connected thereto.

25. The device of claim 24 wherein said shaft is longitudinally slidable within said sleeve to expose said tool at the free end thereof.

*    *    *    *    *



US006361504B1

## (12) United States Patent
### Shin

(10) Patent No.:     **US 6,361,504 B1**
(45) Date of Patent:     **Mar. 26, 2002**

(54) **BIOPSY NEEDLE, METHOD FOR FABRICATING, AND APPARATUS FOR OPERATING THE SAME**

(76) Inventor: **Myoung Chul Shin**, Samik Beach Town 202-1202, 148, Namcheon 2 dong, Suyoung-ku, Pusan (KR), 613-012

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.:     **09/402,280**

(22) PCT Filed:     **Mar. 31, 1998**

(86) PCT No.:     **PCT/KR98/00074**

§ 371 Date:     **Dec. 3, 1999**

§ 102(e) Date:     **Dec. 3, 1999**

(87) PCT Pub. No.:     **WO98/43541**

PCT Pub. Date: **Oct. 8, 1998**

(30) **Foreign Application Priority Data**

Mar. 31, 1997     (KR) ............................................. 97-11616

(51) **Int. Cl.$^7$** ............................................... **A61B 10/00**

(52) **U.S. Cl.** ...................... **600/562**; 600/567; 600/568; 606/167; 606/181

(58) **Field of Search** ................................. 600/562, 564, 600/566, 567, 568; 606/167, 170, 180, 181, 182, 185

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,403,437 A | * | 9/1983 | Shuman ........................ | 43/36 |
| 5,177,759 A | * | 1/1993 | Marable et al. .............. | 372/61 |
| 5,575,780 A | * | 11/1996 | Saito .......................... | 604/272 |
| 5,590,655 A | * | 1/1997 | Hussman .................... | 600/426 |
| 5,733,266 A | * | 3/1998 | Gravlee, Jr. ................ | 604/272 |
| 5,788,679 A | * | 8/1998 | Gravlee, Jr. ................ | 604/272 |
| 5,810,834 A | * | 9/1998 | Heyman ...................... | 606/107 |
| 5,830,219 A | * | 11/1998 | Bird et al. .................. | 606/130 |
| 5,871,495 A | * | 2/1999 | Mueller ...................... | 606/185 |
| 5,971,939 A | * | 10/1999 | DeSantis et al. ........... | 600/562 |
| 5,976,164 A | * | 11/1999 | Bencini et al. ............. | 606/170 |
| 5,980,469 A | * | 11/1999 | Burbank et al. ............ | 600/567 |

* cited by examiner

*Primary Examiner*—Eric F. Winakur
*Assistant Examiner*—Charles Marmor, II
(74) *Attorney, Agent, or Firm*—Paul & Paul

(57)     **ABSTRACT**

The present invention provides a hollow tubular shaped biopsy needle having a hollow elliptical cross section shaped lumen therethrough, and the method for fabricating the needle and the apparatus for operating the needle. The structure of the biopsy needle of this invention is simple and easy to fabricate, and thus the production cost can be reduced. In comparison of the smaller diameter of this invented biopsy needle to the diameter of the other biopsy needles, the size of the extracted sample will be bigger and wounds of the patient can be less. The apparatus of this invention will help to reduce the operating force during extracting tissue samples, and helps rotation and straight movements of the needle.

**10 Claims, 12 Drawing Sheets**



**U.S. Patent**    Mar. 26, 2002    Sheet 1 of 12    US 6,361,504 B1

## FIG. 1



## FIG. 2



## FIG. 3



## *FIG. 4*



## *FIG. 5*



**U.S. Patent**    Mar. 26, 2002    Sheet 3 of 12    US 6,361,504 B1

## FIG. 6



## FIG. 7



## FIG. 8



## FIG. 9



## FIG. 10



U.S. Patent        Mar. 26, 2002        Sheet 5 of 12        US 6,361,504 B1

## FIG. 11



## FIG. 12



## FIG. 13



## *FIG. 14*



## *FIG. 15*





FIG. 16

*FIG. 17*





*FIG. 18*



FIG. 19

*FIG. 20*



*FIG. 21*



US 6,361,504 B1

1

## BIOPSY NEEDLE, METHOD FOR FABRICATING, AND APPARATUS FOR OPERATING THE SAME

### FIELD OF THE INVENTION

This invention relates to a biopsy needle for extracting tissue samples, the method for fabricating the same, and the apparatus for operating the needle.

### BACKGROUND OF THE INVENTION

The most widely used biopsy needles are a Silverman Needle and a Core Needle, which are generally called names in the field. The Silverman needle, as shown in FIG. 1, has an outer cannula 1 whose vertical hollow cross section is a circle, and a split needle 3 whose distal end is split to extract tissue samples. When using the needle of FIG. 1, the outer cannula 1 is forcibly inserted to an aimed internal organ or a tumor, and then the split needle 3 moves forward out of the cannula 1 into the organ. At that time, the split distal ends of the needle 3 become wide open due to elasticity of the needle 3 and resistance of the tissue of the organ. When the cannula 1 reaches to an aimed organ, the needle 3 retracts and grips the tissue, as shown in FIG. 2. In this state, rotating the outer cannula 1 and the split needle 3 about its longitudinal axis once or twice separates the gripped sample from the tissue.

FIG. 3 shows a Core Needle having an outer needle 5 whose vertical hollow cross section is circle-shaped, and an inner needle 7 for gripping the tissue inside the outer needle 5. The inner needle 7 is a solid tubular body not to admit unnecessary tissue to enter the outer needle, and has a groove 7a about 4 or 5 mm distant from the distal end for acquiring sample.

When using the Core needle, the outer needle 5 advances into the aimed internal organ with the inner needle 7, which firstly moves forward into the tissue and the groove 7a of which accommodates samples of the aimed tissue, after that the outer needle 5 moves more into the tissue to remove the samples contained in the groove 7a from the tissue.

In case of the Silverman needle explained above, to extract enough samples, the outer cannula should be of a larger diameter, since the samples are acquired by the split needle inside the outer cannula. Also, it has been used only in soft organs, since the hardness of the split needle is not strong enough to penetrate into a hard tissue.

In case of Core needle, it can not extract enough samples either, since the samples are acquired by a groove of the inner needle. Thus, to get the enough samples, most users uses a big diameter Core needle or extracts samples several times. Also, since the groove is located about 4 to 5 mm away from the dismal end, it is difficult to acquire an aimed positioned sample and the inner needle should move forward more deeply than the position of the aimed tissue, which may hurt adjacent organs without intention.

Also, this kind of needle can not be mounted on an auto biopsy gun, since the gun only shoots needles only to a fixed determined depth. Thus, the needle should be handled by hand, which needs more than 20 kgf in some cases.

That is to say, since the needles of the types explained above uses an outer needle for penetrating and an inner needle for acquiring samples, the size of acquired samples are small comparing thickness of the outer needle, thus the size of the outer needle needs to be larger for enough samples, or the operation should be done several times, both of which may wound organs in many points.

2

Also, both the needles cannot acquire liquid or gaseous phased samples. And since both Silverman and Core needles can be used in a somewhat deep organs, it is inconvenient to extract samples from cuticle or pathological tissues.

Other biopsy needles are disclosed in U.S. Pat. Nos. 5,251,641, 4,926,877, and 5,526,821, which are not being used in the field. The 877' patent has the same problem as the above two needles in that the whole cross section area of the outer needle is not contributed to acquire samples.

It is therefore an overall object of present invention to provide a biopsy needle with a small size (diameter) which can enlarge the size of the acquired samples by the needle.

It is an another object of the invention to provide a method for fabricating the above needle.

It is still another object of the invention to provide an apparatus for operating the biopsy needle.

Other objects and advantages will be more fully apparent from the following disclosure and appended claims.

### SUMMARY OF THE INVENTION

The invention discloses a needle which can be used to acquire samples without an inner needle, thus it can acquire relatively bigger than the needle assembly having an inner needle and an outer needle.

The needle of this invention is hollow tubular shaped, and the cross section of the hollow section taken vertically to the longitudinal direction is elliptical shaped.

The samples captured in the needle are extracted by twisting the needle, which is possible since the hollow section of the needle is not circle-shaped.

Separating the samples from the aimed tissue may be accomplished by a needle with a twisting rectangular or triangular or any polygonal shaped hollow section, but, it is preferable to make the hollow section of the needle elliptical regarding convenience of manufacturing, impact of twisting tissue, size of samples acquired.

Furthermore, the needle of the invention has an inwardly beveled distal end to acquire bigger size of the samples.

Though the needle is basically structured to have an elliptical hollow section and an inwardly beveled distal end, to improve the separation of samples a portion of the distal end of the needle is outwardly beveled, whereas the other portion is inwardly beveled.

Meanwhile, the method for manufacturing the biopsy needle of the invention has providing a hollow tube, drawing the hollow tube so that the hollow section of the tube becomes elliptical shaped, cutting the tube in a predetermined length, and machining a distal end of the tube to be inwardly beveled.

To improve penetrating, the method may further comprise machining the outer circumferential portion of the distal end of the tube to be outwardly beveled after machining the distal end to be inwardly beveled.

Alternatively, another method of the invention has a step of machining the distal end of the tube so that a portion of the distal end is outwardly beveled and that the other portion is inwardly beveled.

According to the invention, to make the inner hollow section of the needle elliptical, pressing the tube to make whole tube elliptical may be adapted instead of drawing the tube. This method is useful, when the diameter of the tube is so small that drawing the tube to have a hollow elliptical cross section is difficult.

This invention also discloses the apparatus for handling the biopsy needle, which has an acting part where the needle

3

is mounted and the needle is translated and rotated, and a driving part for transmitting translation force and rotation force to the acting part. The apparatus further comprises a handling part for easy handling of the driving part. When the structure of the aimed tissue is hard and requires a big force, the acting part may be divided into a translation acting part and a rotating acting part.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a partial horizontal cross section of a Silverman Needle.

FIG. 2 is a view similar to FIG. 1 showing the operating condition of the needle of FIG. 1.

FIG. 3 is a partial horizontal cross section of a Core Needle.

FIG. 4 is a vertical cross section of a needle according to the first embodiment of the invention.

FIG. 5 is a partial horizontal cross section of a needle according to the first embodiment of the invention.

FIG. 6 is a partial horizontal cross section of a needle with an outwardly beveled leading edge and a sample acquired by this needle.

FIG. 7 is a view similar to FIG. 6 showing a needle with an inwardly beveled leading edge and a sample acquired by this needle.

FIG. 8 is a partial perspective view showing a needle according to the second embodiment of the invention.

FIG. 9 is a partial cross section taken A—A line of FIG. 8.

FIG. 10 is a view viewed in B direction of the FIG. 8.

FIGS. 11 and 12 are partial horizontal cross sections of a needle according to the third embodiment of the invention, each of which has a different stylet from each other.

FIG. 13 is an enlarged partial horizontal view of the needle according to 4th embodiment of the invention.

FIG. 14 is a partial view in order to show the method for making the needle, according to the 5th embodiment of the invention.

FIG. 15 is a view similar to FIG. 14 showing a cutter 430 to cut the protruded or enlarged portion of the needle N.

FIG. 16 is a perspective view of an apparatus according to 6th embodiment of the invention, showing all the components are disassembled.

FIG. 17 is a horizontal cross section of the apparatus of FIG. 16.

FIG. 18 is a horizontal cross section of the apparatus according to the 7th embodiment of the invention.

FIG. 19 is an enlarged view of some major components of FIG. 18.

FIG. 20 is a horizontal cross section of the apparatus according to the 8th embodiment of the invention.

FIG. 21 is a horizontal cross section of the apparatus according to the 9th embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

Now the embodiments of the invention will be explained in detail with reference to the attached drawings, where the distal ends of the needles are mainly shown, but the other end of the needle, or proximal end where user's band or any apparatus for operating the needle acts is omitted for simplicity.

4

(1st Embodiment)

The biopsy needle of this embodiment has an elliptical hollow cross section when viewed in its longitudinal direction, as shown in FIG. 4.

The outer surface 17 of the needle N is circular shaped, and the inner surface 13 which defines lumen is elliptical shaped.

Elliptical or race-track shape of this invention means not a mathematically defined ellipse which requires a certain formula, but a commonly or generally meant ellipse which only requires a long diameter and a short diameter comparing a circle having only diameter.

The ratio of the long diameter and the short diameter is not so larger than 1, since the cross section area of the needle N for extracting the samples becomes smaller and the rotating resistance rises, as the ratio becomes larger. Thus it is preferable that the ratio between the long diameter and the short diameter of the hollow cross section is between 1.6:1 and 2.0:1 regarding rotating resistance and size of the extracted sample.

While the biopsy needle N of this invention is moving to an aimed position of tissue, a portion of the tissue is cut and enters the elliptical hollow section tightly. At the same time, as the needle N is rotated once or twice, the sample in the hollow section is separated from the original tissue due to the shape of the hollow section. The sample in the lumen is finally extracted by pulling back the needle.

U.S. Pat. No. 4,926,877 also discloses a race-track shaped hollow tubular needle, but the needle has an additional separating means for separating samples from the tissue, which is not necessary in this invention. Also all the samples captured in the racetrack shaped hollow section are not extracted because of the separating means.

The distal end 19 of the needle N is preferably tapered by an acute angle α relative to the needle's longitudinal axis to improve the ease with which the biopsy needle may be inserted into the patient, as shown in FIG. 5. The tapered edge 19 of the needle is cut inwardly to increase the size of the tissue entered in the lumen during proceeding the needle to the aimed tissue. The angle between the longitudinal axis of outer surface 17 of the needle N and cut beveled surface is acute angle β.

Referring to FIGS. 6 and 7, according to an experiment with two needles having same diameter as each other the sample S' extracted by the biopsy needle having an outwardly beveled leading edge 19a looks a cone. The base portion of which is an outer portion of the sample, which means that as the needle with an outwardly beveled edge 19a is inserted to the patient, the tissue is cut by an inner surface of the needle, thus the size of the captured sample becomes smaller and finally the sample becomes cut.

The sample S extracted by the biopsy needle N of this embodiment which has an inwardly beveled leading edge 19 also looks a bigger cone than the biopsy needle with outwardly beveled leading edge 19a, but the base portion of which is an inner portion of the tissue sample, which means that as the needle is inserted to the patient, the tissue is cut by an outer surface 17 of the needle, thus the size of the captured sample becomes larger.

The beveled angle β can be determined properly considering thickness and outer diameter of the needle.

According to this embodiment, since the needle N has an elliptical hollow lumen, the sample can easily be separated from the tissue and does not need any other means for separating samples such as inner cannula, which means that the size of the sample by the needle of this invention is bigger than any needle of prior art.

5

Also since the sample can be captured in the direction of longitudinal axis of the needle, the operation for extracting sample can be more accurately done. That is, when the aimed tissue is near the tissue not to be touched for patient's safety, operator can easily escape from the danger.

Since the size of the sample to be extracted depends on the depth of the inserted needle, the amount can be determined properly by the operator. And when the needle is mounted to an injector, the liquid phased or gaseous samples can be easily obtained, whereas they can not be obtained by a Silverman needle or a Core needle, since neither of them can be removed of the inner needle only.

Though this embodiment discloses a needle of elliptical cross section and inwardly beveled leading edge, the needle having inwardly beveled leading edge only or the needle only having a hollow elliptical cross sectioned lumen can be a useful biopsy needle.

(2nd embodiment)

The needle of this embodiment is similar to that of the first embodiment since most portion of the tapered leading edge 19 of the needle is beveled inwardly and can extract large size of sample, but about quarter portion of the leading edge is outwardly beveled, as shown in FIG. 8. FIG. 9 explicitly shows that the outwardly beveled portion 17a make an acute angle with the longitudinal axis of the inner surface of the needle.

Partially outwardly beveled leading edge 17a of the needle aims to improve the ease with which the sample captured in the lumen can be separated from the tissue. The sample captured by the needle of this embodiment is cut to be separated from the tissue since the inwardly beveled portion 13a and the outwardly beveled portion act as a pair scissors while the sample captured by the needle of the first embodiment is torn to be separated from the tissue.

The position of the outwardly beveled portion 17a shown in FIG. 9 is for example, and its portion is about quarter of the leading edge. If more portion for example, half portion of the leading edge is outwardly beveled, the size of the sample will be smaller due to the outwardly beveled leading edge.

Though to adopt this embodiment the cross section of the needle can be elliptical or circular, it is preferable that the cross section of the needle is elliptical shaped.

(3rd embodiment)

This embodiment aims to provide a needle with a stylet for acquiring sample positioned deep under the skin.

As explained regarding the first embodiment, the needle with inwardly beveled edge can extract much bigger sized sample than the Silverman needle or Core needle both of which has an inner and an outer cannula especially when the aimed samples are the outer skins.

By the way, when the aimed position of the needle is deep under the skin, a stylet 100 is necessary for preventing unnecessary tumor such as outer skin from entering the needle and for releasing resistance of outer tumor. The stylets 100 shown in FIGS. 11 and 12 are just examples.

Since the needle of the invention is inserted to the aimed position with the stylet therein but the sample is acquired only by the needle without stylet 100, the size of the sample acquired by this embodiment is larger than by the Silverman or Core needle.

While the needle with the stylet 100 advances into the internal organs, the inwardly beveled portion 13a of the needle of above embodiments will experience resistance, which may result in damage of the surrounded organs.

This embodiment aims to improve this problem, and discloses a needle with inwardly beveled in the inner cir-

6

cumferential portion of the leading edge and the outwardly beveled portion 17a of the outer circumferential portion of the leading edge. The outwardly beveled portion 17a of the leading edge is for reducing resistance of the organs, and the inwardly beveled portion 13a of the leading edge is for increasing size of the samples acquired.

The angle of outwardly bevel is similar to the beveled angle of the stylet 100 to make easy inserting and the angle of the inward bevel is preferably gentle, as shown in FIGS. 11 and 12. That is, the outwardly beveled angle γ is slightly smaller than the inwardly beveled angle ω.

The shape of stylet is not limited to what FIGS. 11 and 12 show, but may be variable.

(4th embodiment)

U.S. Pat. No. 5,526,821 discloses a needle which increases in diameter from a distal end to a proximal end to aid in acquiring a tissue sample and retaining it within the lumen of the needle, which can be incorporated to the above embodiments.

FIG. 13 is an enlarged partially shown cross sectional view of the needle according to this embodiment, which increases in diameter from a distal end to proximal end and has inwardly beveled leading edge 19.

This shape of the needle helps inserting the needle into the patient and the sample by the needle N can be retained in the lumen of the needle during the withdrawing of the needle.

(5th embodiment)

The needle of the inwardly beveled leading edge can be manufactured by the method explained below.

First, a hollow tube of steel is provided, and the hollow tube is drawn so that the hollow portion of lumen of the tube becomes to have an elliptical shaped vertical cross section, but the cross section of the outer surface of the tube is preferably circle shaped.

After than one end of the tube is cut in a predetermined length in acute angle α, as shown in FIG. 5. After that, the cut tube N is inserted into a frame 410 which is a hollow member having inner diameter similar to the outer diameter of the tube N and having inwardly beveled leading edge, which can be easily machined since the diameter of the frame 410 is much larger than that of the of the biopsy needle.

Next, to enlarge diameter of the leading edge, a solid member 420 which has a conical shaped leading portion is pressed to insert into the tube. The conical angle of the solid member 420 is same as beveled angle of the frame 410. The leading edge of the tube N becomes enlarged with the same angle of the slope of the frame 410 and the solid member 420 though this process and is withdrawn from the frame 410.

And the enlarged leading edge of the tube N is cut by the cutter 430 having inner diameter same as the inner diameter of the frame 410 or outer diameter of the unchanged portion of the tube N, as shown in FIG. 15.

The needle manufactured by the above method has a lumen which has elliptical cross section as shown in FIGS. 4 and 5 and has an inwardly beveled leading edge.

To make the cross section of the lumen of the needle elliptical, the drawing is adopted so that the cross section of the outer surface of the needle maintain circular shape. In case of small sized needle, since it is difficult to draw a tube to have an elliptical hollow section, the tube may be pressed with a predetermined force in the perpendicular direction of the longitudinal axis of the tube, which may cause entire tube including outer surface is shaped elliptically. Pressing tube cannot be applied to a relatively big tube, for example over 2 mm diameter, since the elliptical cross section of the needle increases rotating resistance, which may hurt organs.

7

(6th embodiment)

The apparatus or assembly for handling the biopsy needle of the invention is means for inserting and rotating the needle having a lumen with elliptically shaped cross section, and has an acting part where the needle is mounted and the needle is inserted and rotated, and a driving part for transmitting translation force and rotation force to the acting part. The apparatus further comprises a manipulating part for easy handling of the driving part.

The apparatus shown in FIG. 16 is characterized in that the acting part has a spring.

An end of the piston or hollow pipe 10 having a long-diameter portion 11 and a short-diameter portion 12 has a screw 14 to engage cap 20 for mounting and fixing or removing the biopsy needle N, the other end of the piston 10 has another screw 16 to engage handle 22, and in one side of the outer circumference of the long-diameter portion 11, a stopper 18 is formed protruded.

The short diameter portion 12 of the piston 10 is inserted into the inner case 30 with a spring 26.

The inner case 30 has a guide slot 32 through which the stopper 18 of the piston 10 can pass, and which has a plurality of fixing recesses 32a formed in regular intervals for stopping the stopper 18 temporally in a predetermined position.

The inner case 30 has a supporting wall 34 which has a hole with similar diameter to the short diameter of the short diameter portion 12 of the piston 10, and which fixes one end of the inserted spring 26 and prevents it from shaking. The other end of the spring 26 is secured by the piston 10, thus the spring 26 provides both compressive elasticity along the longitudinal axis of the piston 10 and twisting elasticity in the rotating direction around the longitudinal axis of the piston 10.

The inner case 30 is inserted loosely into the outer case 40 so that it can rotates freely without any external action, and is prevented from being disassembled by a ring-shaped release 42 and a locking pin 44.

The slot 40a formed in the longitudinal direction of the outer case 40 is for the stopper 18 to move, and through the slot 40a the position of the stopper 18 can be confirmed.

Unexplained member 46 is a guide member screwed to the proximal end of the inner case 30, which guides the piston 10.

The operation of the apparatus having a structure explained above will be explained with reference to FIG. 17.

For operation, at first the needle N having elliptical cross sectioned lumen should be engaged to the leading end of the piston 10 and fixed by the cap 20.

Next, the piston 10 should be rotated once or twice while the stopper 18 does not inserted into the slot 32, and be withdrawn to compress the spring 26 until one of the recesses 32a is chosen for the stopper 18 to be temporally fixed while the stopper 18 is introduced through the guide slot 32. In this state the spring 26 has twisting load and compressive load.

Finally, while the leading edge of the needle N is being aimed to a patient, releasing the stopper 18 from the recess 32a by rotating the release 42 causes the compressed spring 26 to expand. While the stopper 18 is moving along the guide slot 32, the spring 26 cannot rotate, but just expands to reach an aimed position of tumor. After passing the end 32b of the slot 32, the stopper 18 can rotate with the piston 10 once or twice. The sample is acquired by the rotating of the needle N with an elliptical cross sectional lumen.

(7th embodiment)

Generally it requires more than 20 kgf force to insert a biopsy needle into a patient, which can be done by enlarging

8

spring constant of the spring 26 of FIGS. 16 and 17. However, since to manipulate a spring with a big spring constant requires also big compressing force in proportion, to relieve the handling force is required.

The apparatus of this embodiment, which is shown in FIG. 18, is an application of the sixth embodiment of the invention, but has two separated elastic means, one for moving the acting part straightly, the other for rotating it, in order to minimize handling force.

A compression spring 120 for translating the piston 110 is mounted on the inner case 130 near the proximal end of the piston 110, is compressed as the piston 110 withdraws, and is supported by a supporting portion 112 of the piston 110 and the proximal end wall 132 of the inner case 130.

In the inner case 130 is formed a guide slot 134 so that the stopper 114 protruded from the piston 110 can pass, and a plurality of recesses for temporally fixing the stopper 114 in a predetermined position, which is similar to those of the previous embodiment, though they are not shown in FIG. 18.

The inner case 130 is inserted loosely into the outer case 140 so that it can rotates freely without any external action, and is prevented from being disassembled by a ring-shaped release 142 and a locking pin 144 penetrating the inner case 130.

To confirm the action of the stopper 114, a slot 146 is formed in the outer case 140.

The rotation movement of the piston 110 is accomplished by a spiral spring 150, and a locker 160 and a striker 170 for temporally fixing the compresses spiral spring 150, which is shown in FIG. 19. The locker 160 is a circular plate having a rectangular passage in the central position and 4 one-way holes 162 disposed around the passage.

The striker 170 is a hollow circular plate having four fixing hooks 172 each end of which matches the one way hole 162 of the locker 160.

The locker 160 and striker 170 is splined to the piston 110, and the fixing hooks 172 are inserted into the slot 182 of the guide member 180 to move in a predetermined distance, and the locker 160 is supported by the compression spring 190 inserted in the piston 110 in order for the oneway holes 162 to be engaged with the fixing hooks 172, as shown in FIG. 18.

One end of the spiral spring 150 is fixed to the outer surface of the locker 160, and the other end of the spring 150 is fixed to the guide member 180.

Of the outer surface of the piston 110 there is a rectangular cross sectioned portion for being engaged with the rectangular passage tightly, whereas, the piston 110 is tubular shaped with hollow circular cross section to absorb liquid phased or gaseous tissue samples.

The operation of the apparatus having a structure explained above will be explained with reference to FIG. 18.

Rotating the piston 110 in a predetermined angle rotates the locker 160 splined to the piston 110, which compresses the spiral spring 150. In this state, the fixing hooks 172 matches one-way hole (not shown) temporally by the compression spring 190 supporting the locker 160.

Next, withdrawing the piston 110 lets the compression spring 190 be compressed and the stopper 114 protruded from the supporting portion 112 of the piston 110 pass the guide slot 134.

During the withdrawing of the piston 110, to temporally fix the movement of the piston 110 the stopper 114 must be inserted to one of the fixing recesses (not shown) by rotating the piston 110 slightly in the direction of the recesses.

Finally, while the leading edge of the needle N is being aimed to a patient, releasing the stopper 114 from the recess

US 6,361,504 B1

9

by rotating the release 142 causes the compressed spring 120 to expand. While the stopper 18 is moving along the guide slot 32, the spring 26 cannot rotate, but just expands to move the needle N into the skin. At this time, the supporting 112 portion of the piston 110 strikes the base of the striker 170 to compress the compression spring 190 and moves the striker 170 in a predetermined distance, which release the fixing hooks 172 from the one-way holes of the locker 160, which permits the piston 110 and the needle fixed thereto to rotate by the restoring force of the spiral spring 150.

That is, this embodiments provides a spiral spring for rotation movement and a compression spring for a straight movement, which means that the handling force can be much reduced, since the elastic force of the previous embodiment is divided.

(8th embodiment)

The apparatus of this embodiment utilize pneumatic pressure for straight movement and rotation movement of the needle, as shown in FIG. 20.

The cylinder 210 of this embodiment has a spinning wheel shaped blade portion 230 dividing inner portion of the cylinder 210.

The piston 220 in the cylinder 210 of this embodiment has a plate 222 fixed to the circumferential surface of the piston 220, dividing two chambers A and B defined by the surrounding cylinder 210 and the plate 220, each volume of which varies in accordance with the movement of the piston 220.

The cylinder 210 has two ports for absorbing compressed air in a predetermined interval, one port 211 of which is formed in the chamber A, and the other port 213 of which is formed in the chamber B.

On the opposite side (upper sided when viewed in FIG. 20) of the two ports 211 and 213 there is formed a third port 215 for the compressed air entered through either of the ports 211 and 213 to pass and for communicating with a 4th port 217 which is formed in the blade portion 230.

The piston 220 is splined to the inner surface of the blade portion 230, and rotates as the blade 230 rotates.

The operation of the apparatus having a structure explained above will be explained with reference to FIG. 20.

Compressed air applied to the first port 211 of the chamber A expands volume of the chamber A, which causes the needle N to be inserted to the organs.

The expansion of the volume of the chamber A and movement of the piston 220 opens the third port 215, through which the compressed air passes to the fourth port 217 to rotate the blade 230, which rotates the piston 220 to separate the samples from the tissue.

The pneumatic pressure for this apparatus can be adjusted regarding density of the aimed tissue, and can control straight and rotation movement of the piston.

(9th embodiment)

The apparatus of this embodiment utilizes a motor for straight and rotation movements of the piston, which is shown in FIG. 21.

A rack 322 is formed on a side surface of the piston 320, and the pinion 332 which meshes the rack 322 is driven by a first motor 340 which is mounted on the cylinder 310.

In the circumferential surface of the piston 310 distant from the rack 322 is mounted a ring gear 324 which meshes a driving gear 334 which is driven by the second motor 350.

The operation of the apparatus having a structure explained above will be explained with reference to FIG. 21.

The first motor 340 drives the pinion 332 to move the piston 320 due to the rack 322 engaged with the pinion 332, to push the needle N to enter the patient.

10

After that, the second motor 350 drives the driving gear 334 to rotate the meshed ring gear 324 of the piston 320, which makes the needle N rotate and the sample acquired be separated from the tissue.

The motors 340 and 350 for this apparatus can be adjusted regarding density of the aimed tissue, and can control straight and rotation movement of the piston.

According to the above embodiments the needle is fixed to a cap screwed to the piston, but also the needle can be fixed by being forcibly fitted.

Since the structure of the biopsy needle of the invention is simple and easy to manufacture, the production cost may be reduced.

Since the size of the sample can be enlarged with the needle of this invention, the diameter of the biopsy needle can be smaller and wounds of the patient can be less.

Since the sample is extracted through the distal end of the needle, it is easy to control the penetrating depth and to avoid dangerous organs, and it helps to increase the accuracy of the operation.

The liquid-phased or gaseous tissue can be easily acquired by adapting the piston to which fixes the needle, therefore a cystic tumor can be examined and needle-aspiration biopsy can be done by the needle.

Since the needle of the invention is small, and it can be used without anesthesia or under local anesthesia, any harmful disease can be early found.

Still according to the invention, the needle is easy to carry and to sterilize.

It is to be understood that the present invention may be embodied in other specific forms without departing from the spirit or special attributes hereof, and it is therefore desired that present embodiments be considered in all respects as illustrative and therefore not restrictive, reference being made to the appended Claims rather than the foregoing description to indicate the scope of the invention.

I claim:

1. A hollow tubular shaped biopsy needle with a hollow elliptical cross section, comprising:

a proximal end where manipulating means is applied; and

a tapered distal end relative to a longitudinal direction, said distal end being inwardly beveled wherein an inner circumferential portion of said distal end is inwardly beveled, and an outer circumferential portion of said distal end is outwardly beveled.

2. The biopsy needle according to claim 1, wherein said needle increases in diameter from said distal end to said proximal end.

3. A method for manufacturing a biopsy needle with an inwardly beveled leading edge, comprising:

a step of providing a hollow tube;

a step of drawing the tube so that the tube has a hollow elliptical cross section;

a step of cutting the tube so that the tube has a predetermined length;

a step of inserting a solid member having a tapered leading edge into the tube in order to enlarge an elliptically shaped hollow end of the tube; and

a step of cutting the hollow end of the tube that was enlarged so that the tube has a uniform outer diameter.

4. The method for manufacturing a biopsy needle with an inwardly beveled leading edge according to claim 3, further comprising:

a step of inserting the tube into a hollow frame having same a similar taper angle before the step of inserting a solid member; and

11

12

a step of withdrawing the tube from the frame after the step of inserting a solid member.

5. An apparatus for operating a biopsy needle with an elliptical hollow cross section, comprising:

acting means for mounting said needle, moving straight and rotating;

driving means for providing elasticity for the straight movement and the rotational movement; and

handling means for controlling said driving means, p2 wherein said acting means comprises a piston having a cap for mounting said needle, and said driving means comprises guiding means surrounding a circumferential surface of said piston for guiding the straight movement and the rotational movement of said piston, and an elastic member located in said guiding means, and said handling means comprises a stopper, a plurality of fixing recesses disposed in a predetermined interval in said guiding means for temporarily fixing said stopper.

6. The apparatus for operating a biopsy needle with an elliptical hollow cross section according to claim 5, wherein said guiding means comprises an inner case and a guiding member screwed to said inner case, said plurality of recesses are formed in said inner case.

7. The apparatus for operating a biopsy needle with an elliptical hollow cross section according to claim 5,

wherein said elastic member is a compression spring.

8. The apparatus for operating a biopsy needle with an elliptical hollow cross section according to claim 5, wherein said driving means comprises a first elastic means for driving a straight movement of said piston and a second elastic means for driving a rotational movement of said piston, said first elastic means experiences a translational

elastic movement in an inner case near a handling portion of said piston, and said second elastic means is mounted slidably on to a circumferential surface of said piston and experiences a rotational elastic movement.

9. The apparatus for operating a biopsy needle with an elliptical hollow cross section according to claim 8, wherein said second elastic means comprises a locker, splined to said piston, having a plurality of one way holes, a striker which has a plurality of fixing hooks with which mesh said plurality of one way holes of said locker, and which is stricken by a supporting portion of said piston, and which is incorporated to said piston to rotate freely, and a spring which is disposed between said locker and said striker to enable said holes of said locker to be engaged to said hooks.

10. An apparatus for operating a biopsy needle with an elliptical hollow cross section, comprising:

a cylinder having a first port and a second port for receiving compressed air, a third port, and a fourth port, said third and fourth ports communicating with each other;

a rotation blade, which has a central hollow axis, driven by compression air passing from said third port to said fourth port;

a piston, which is splined to said central hollow axis, for a straight movement and rotation movement in said cylinder; and

a plate which is fixed to said piston, defines two separated chambers of said cylinder, and moves between said first port and said second port as said piston moves, thereby selectively opens said third port.

\* \* \* \* \*





# BARNES & THORNBURG

11 South Meridian Street
Indianapolis, Indiana 46204-3535 U.S.A.
(317) 236-1313
Fax (317) 231-7433

www.btlaw.com

James R. Sweeney II
(317) 231-7771
Email: jsweeney@btlaw.com

January 4, 2005

**VIA FACSIMILE AND FIRST CLASS MAIL**

R. Terrance Rader
Rader, Fishman & Grauer PLLC
39533 Woodward Ave., Ste 140
Bloomfield Hills, Michigan 48304

> Re:  U.S. Patent Application Serial No. 10/936,395
> Title: BIOPSY APPARATUS
> Inventors: Jeffrey Schwindt, Michael E. Miller, Joseph L. Mark
> John P. Hancock and Charles Butcher
> Our Matter: 15452- 75957

Dear Mr. Rader:

The subject patent application was filed on September 8, 2004, naming Jeffrey Schwindt, Michael E. Miller, Joseph L. Mark, John P. Hancock and Charles Butcher as co-inventors. It is directed to a biopsy device having a pneumatic circuit and a hollow cannula through which the biopsied specimen is drawn. The application was filed as a continuation of U.S. Patent Application No. 10/639,569 (the "'569 application") with a Declaration signed only by Mr. Schwindt and claims priority under 35 USC § 120 through U.S. Patent No. 6,638,235 (the "'235 patent") back to U.S. Patent No. 6,758, 824 (the "'824 patent"). A copy of the application is enclosed. Also enclosed is a Declaration for signature by each of the Suros co-inventors. It has already been executed by Jeffery Schwindt. We do not at this time know whether or not you represent the Suros co-inventors, or whether they even have any on-going relationship with, or obligation to Suros. Accordingly, we are also addressing this letter to the Suros co-inventors individually. If you represent the Suros co-inventors, please have the Declaration signed by Michael E. Miller, Joseph L. Mark, John P. Hancock and Charles Butcher (the "Suros co-inventors") and return it to us at your earliest convenience.

The subject patent application was filed after Mr. Schwindt reviewed the disclosure and claims of the '824 patent, the '235 patent and the '569 application, each of which is assigned to Suros Surgical Systems. The '569 application is a division of the application from which the '235 patent issued, which application resulting in the '235 patent is a continuation-in-part of the

R. Terrance Rader
January 4, 2005
Page 2

application from which the '824 patent issued. As discussed in various correspondence and meetings between Suros, Mr. Schwindt and their respective attorneys, Mr. Schwindt believes and asserts that he is at least a co-inventor of at least some of the claimed subject matter of those patents and that application. As part of our effort to resolve the inventorship issue, we have filed the captioned application with claims 1-37 identical to claims 1-37 in U.S. Patent 6,758,824, with claims 38-40 identical to claims 1-3 of both the '235 patent and the '569 application as filed, with claims 41-43 identical to claims 4-6 of the '569 application, and with claim 47 substantially similar to claim 7 of the '569 application, but naming an inventive entity including Mr. Schwindt, to provoke an interference action. Filed contemporaneously with the application was a Request for Interference.

Mr. Schwindt's assertion that he is a co-inventor of the claimed invention of the '235 patent, the '824 patent and the '569 application as filed is based in part on the following facts. As discussed in our June 4, 2004, letter to your firm, in our July 1, 2004, meeting with Suros and the Henderson Daily lawyers, and in our August 11, 2004, meeting with Suros and you, Mr. Schwindt's undisputed circuit appears in Fig. 10 in each of the '824 patent, the '235 patent and the '569 application. This circuit is described in the specifications of each of the '824 patent, the '235 patent and the '569 application and aspects of it are claimed in the '824 patent and in the '569 application as filed. Other of Mr. Schwindt's inventive contribution allegedly appear in each of the '824 patent, the '235 patent and the '569 application.

We understand that the '569 application has been amended and that at least two further continuing applications claim priority to the '569 application. Perhaps one or more of these applications, or even others currently unknown to us, will be brought into the interference action. So too, perhaps one or more of Mr. Schwindt's pending applications might have overlapping subject matter and/or might need to have the inventive entity determined. In addition, as you suggested during the August 11 meeting, Mr. Schwindt may have a claim of sole inventorship to all or a portion of the circuit itself. Accordingly, we are interested in further exploring the contribution, if any, of the Suros inventors to the circuit itself, and to any of Mr. Schwindt's pending applications, either through personal meetings or through the interference process.

There is at least one alternative to proceeding with the captioned application and interference action. Suros, as assignee of the '824 patent, the '235 patent and the '569 application, could petition the Commissioner to issue a Certificate naming Jeffrey Schwindt as a co-inventor of the '824 patent, the '235 patent, and could petition to amend inventorship of the '569 application and any related and overlapping applications. If Suros is willing to correct the inventorship of the '824 patent, the '235 patent and the '569 application by naming Schwindt as a co-inventor, we would have no need to pursue the interference action.

Please contact us at your earliest convenience to discuss this matter in greater detail. In particular, please indicate whether or not Suros will be willing to file a petition for correction of

BARNES & THORNBURG

R. Terrance Rader
January 4, 2005
Page 3

inventorship under 37 C.F.R. Section 1.324 and, if you represent them, whether the Suros co-inventors will execute the enclosed Declaration. In the absence of a response by January 18, 2005, we will assume that Suros refuses to file a petition for correction of inventorship under 37 C.F.R. Section 1.324 and that the Suros co-inventors will not execute the enclosed Declaration.

As a final matter, and further to your letter to Michael McCrory of December 15, 2004, Mr. Schwindt assures us that during the Radiological Society of North America (RSNA) conference he made no representations about any patent infringement claim against Suros. Rather, he mentioned that there was a dispute as to inventorship. Therefore, any RSNA participants who might be concerned about the "veracity" of this representation, may be assured by you and/or Suros that such a dispute in fact exists, as discussed in the above mentioned correspondence and conferences and in the form of a Request for Interference in the United States Patent and Trademark Office. Finally, you mentioned that Mr. James Pearson, Suros' President, separately communicated with Mr. Schwindt concerning this matter. We request that Mr. Pearson send any correspondence concerning this matter to our attention, rather than to Mr. Schwindt directly. Similarly, we have advised Mr. Schwindt not to engage in any direct communication with Mr. Pearson or with Suros.

We look forward to your cooperation in arriving at an amicable resolution.

Very truly yours,

James R. Sweeney II

JRS:lar
Enclosures
cc:    Jeff Schwindt
       Michael E. Miller
       Joseph L. Mark
       John P. Hancock
       Charles Butcher
       Gene Henderson, Esq.
       Michael McCrory, Esq.
       Donald Knebel, Esq.

INDS02 JRS 693020v1

BARNES & THORNBURG LLP

15452-75957

BIOPSY APPARATUS

RELATED APPLICATIONS

The present application is a continuation of U.S. Patent application Serial Number 10/639,569 filed on August 12, 2003, which is a division of U.S. Patent application Serial Number 09/864,031, filed on May 23, 2001, now U.S. Patent Number 6,638,235, which in turn is a continuation-in-part of U.S. Patent application Serial Number 09/707,022 filed on Nov. 6, 2000, now U.S. Patent Number 6,758,824.

FIELD OF THE INVENTION

This invention relates to biopsy instruments and methods for taking a biopsy. More specifically, this invention relates to disposable biopsy devices for removing several tissue samples using a single insertion.

BACKGROUND OF THE INVENTION

In the diagnosis and treatment of breast cancer, it is often necessary to remove multiple tissue samples from a suspicious mass. The suspicious mass is typically discovered during a preliminary examination involving visual examination, palpitation, X-ray, MRI, ultrasound imaging or other detection means. When this preliminary examination reveals a suspicious mass, the mass must be evaluated by taking a biopsy in order to determine whether the mass is malignant or benign. Early diagnosis of breast cancer, as well as other forms of cancer, can prevent the spread of cancerous cells to other parts of the body and ultimately prevent fatal results.

A biopsy can be performed by either an open procedure or a percutaneous method. The open surgical biopsy procedure first requires localization of the lesion by insertion of a wire loop, while using visualization technique, such as X-ray or ultrasound. Next, the patient is taken to a surgical room where a large incision is made in the breast, and the tissue surrounding the wire loop is removed. This procedure causes significant trauma to the breast tissue, often leaving disfiguring results and requiring considerable recovery time for the patient. This is often a deterrent to patients receiving the medical care they require. The open technique, as compared to the percutaneous method, presents increased risk of infection and bleeding at the sample site. Due to these disadvantages, percutaneous methods are often preferred.

15452-75957

Percutaneous biopsies have been performed using either Fine Needle Aspiration or core biopsy in conjunction with real-time visualization techniques, such as ultrasound or mammography (X-ray). Fine Needle Aspiration involves the removal of a small number of cells using an aspiration needle. A smear of the cells is then analyzed using cytology techniques. Although Fine Needle Aspiration is less intrusive, only a small amount of cells are available for analysis. In addition, this method does not provide for a pathological assessment of the tissue, which can provide a more complete assessment of the stage of the cancer, if found. In contrast, in core biopsy a larger fragment of tissue can be removed without destroying the structure of the tissue. Consequently, core biopsy samples can be analyzed using a more comprehensive histology technique, which indicates the stage of the cancer. In the case of small lesions, the entire mass may be removed using the core biopsy method. For these reasons core biopsy is preferred, and there has been a trend towards the core biopsy method, so that a more detailed picture can be constructed by pathology of the disease's progress and type.

The first core biopsy devices were of the spring advanced, "Tru-Cut" style consisting of a hollow tube with a sharpened edge that was inserted into the breast to obtain a plug of tissue. This device presented several disadvantages. First, the device would sometimes fail to remove a sample, therefore, requiring additional insertions. This was generally due to tissue failing to prolapse into the sampling notch. Secondly, the device had to be inserted and withdrawn to obtain each sample, therefore, requiring several insertions in order to acquire sufficient tissue for pathology.

The biopsy apparatus disclosed in U.S. Pat. No. 5,526,822 to Burbank, et al was designed in an attempt to solve many of these disadvantages. The Burbank apparatus is a biopsy device that requires only a single insertion into the biopsy site to remove multiple tissue samples. The device incorporates a tube within a tube design that includes an outer piercing needle having a sharpened distal end for piercing the tissue. The outer needle has a lateral opening forming a tissue receiving port. The device has an inner cannula slidingly disposed within the outer cannula, and which serves to cut tissue that has prolapsed into the tissue receiving port. Additionally, a vacuum is used to draw the tissue into the tissue receiving port.

Vacuum assisted core biopsy devices, such as the Burbank apparatus, are available in handheld (for use with ultrasound) and stereotactic (for use with X-ray) versions. Stereotactic devices are mounted to a stereotactic unit that locates the lesion and positions the

2

15452-75957

needle for insertion. In preparation for a biopsy using a stereotactic device, the patient lies face down on a table, and the breast protrudes from an opening in the table. The breast is then compressed and immobilized by two mammography plates. The mammography plates create images that are communicated in real-time to the stereotactic unit. The stereotactic unit then signals the biopsy device and positions the device for insertion into the lesion by the operator.

In contrast, when using the handheld model, the breast is not immobilized. Rather the patient lies on her back and the doctor uses an ultrasound device to locate the lesion. The doctor must then simultaneously operate the handheld biopsy device and the ultrasound device.

Although the Burbank device presents an advancement in the field of biopsy devices, several disadvantages remain and further improvements are needed. For example, the inner cutter must be advanced manually, meaning the surgeon manually moves the cutter back and forth by lateral movement of a knob mounted on the outside of the instrument or by one of the three pedals at the footswitch. Also, the vacuum source that draws the tissue into the receiving port is typically supplied via a vacuum chamber attached to the outer cannula. The vacuum chamber defines at least one, usually multiple, communicating holes between the chamber and the outer cannula. These small holes often become clogged with blood and bodily fluids. The fluids occlude the holes and prevent the aspiration from drawing the tissue into the receiving port. This ultimately prevents a core from being obtained, a condition called a "dry tap."

In addition, many of the components of the current biopsy devices are reusable, such as the driver portions, which control the outer and inner needles. This poses several notable disadvantages. First, the reusable portion must be cleaned and/or sterilized. This increases the time necessary to wrap up the procedure, which ultimately affects the cost of the procedure. In addition, the required clean-up and/or sterilization of reusable parts increases the staffs' potential exposure to body tissues and fluids. Finally, the reusable handle is heavy, large and cumbersome for handheld use.

A further disadvantage is that current biopsy devices comprise an open system where the tissue discharge port is simply an open area of the device. A surgical assistant must remove the tissue from the open compartment using forceps and place the tissue on a sample plate. This ritual must be followed for every sample and, therefore, multiple operators are required. In addition, the open system increases the exposure to potentially infectious materials, and requires increased handling of the sample. As a practical matter, the open system also substantially increases the clean-up time and exposure, because a significant

3

15452-75957

amount of blood and bodily fluid leaks from the device onto the floor and underlying equipment.

Additionally, when using the current biopsy devices, physicians have encountered significant difficulties severing the tissue. For instance, the inner cutter often fails to completely sever the tissue. When the inner cutting needle is withdrawn, no tissue sample is present (dry tap), and therefore, reinsertion is required. In the case of the Burbank apparatus, the failure to completely sever the tissue after the first advancement of the inner cutter results in a necessary second advancement of the inner cutter. In this event, the procedure is prolonged, which is significant because the amount of trauma to the tissue and, ultimately, to the patient is greatly affected by the length of the procedure. Therefore, it is in the patient's best interest to minimize the length of the procedure by making each and every attempt at cutting the tissue a successful and complete cut.

Additionally, when using the "tube within a tube" type biopsy device, the inner cutter can lift up into the tissue receiving opening during cutting. This lifting causes the inner cutter to catch on the edge of the tissue receiving opening, which ultimately results in an incomplete cut and dulling of the blade, rendering the blade useless.

Also, prior devices often produce small tissue samples. As the inner cutter advances, the cutting edge not only starts to sever the tissue, it also pushes the tissue in front of the cutter. This results in a tissue sample that is smaller than the amount of tissue drawn into the tissue receiving opening.

An additional disadvantage of the prior devices is presented by the complexity of the three-pedal footswitch. Prior devices utilized a three-pedal footswitch; one pedal for advancing the inner cannula, another pedal for retracting the inner cannula, and a third pedal for turning on the aspiration. Operation of the three pedals is difficult and awkward.

These disadvantages become even more significant when using the handheld biopsy device. For instance, the physician must operate the biopsy device and the ultrasound probe simultaneously making it particularly difficult to manually advance of the inner cutter. In addition, when an assistant is required to remove each sample from the open discharge port, use of the handheld device becomes even more awkward. Due to these disadvantages, many physicians have declined to use the handheld models.

This is unfortunate because, some lesions that can signify the possible presence of cancer cannot be seen using the stereotactic unit. In these cases, the doctor must resort to either the handheld device or open surgical biopsy. Due to the difficulties associated with the handheld device, doctors often choose the open surgical biopsy, which is particularly

4

15452-75957

unfortunate because a majority of the lesions that cannot be seen using the stereotactic unit turn out to be benign. This means that the patient has unnecessarily endured a significant amount of pain and discomfort; not to mention extended recovery time and disfiguring results. In addition, the patient has likely incurred a greater financial expense because the open surgical technique is more difficult, time consuming and costly, especially for those patient without health insurance.

The disadvantages of the open surgical technique coupled with the odds that the lesion is benign present a disincentive for the patient to consent to the biopsy. The added discomfort alone is enough to cause many patients to take the risk that the lesion is benign. The acceptance of this risk can prove to be fatal for the minority of cases where the lesion is malignant.

Finally, current vacuum assisted biopsy devices are not capable of being used in conjunction with MRI. This is due to the fact that many of the components are made of magnetic components that interfere with the operation of the MRI. It would be desirable to perform biopsies in conjunction with MRI because it currently is the only non-invasive visualization modality capable of defining the margins of the tumor.

In light of the foregoing disadvantages, a need remains for a tissue removal device that reliably applies a vacuum without becoming plugged with blood and bodily fluids. A need also remains for a tissue removal device that is entirely disposable so that both exposure to bio-hazard and clean-up time are significantly minimized, while convenience is maximized. A further need remains for a tissue removal device that completely severs the maximum amount of tissue without requiring numerous attempts at cutting the tissue. A need also remains for a tissue removal device that is MRI compatible. Finally, a need remains for a biopsy tissue removal device that is completely automated, therefore making the handheld biopsy device a more efficient and attractive option.

SUMMARY OF THE INVENTION

The present invention fulfills the aforementioned needs by providing a disposable tissue removal device comprising a cutting element mounted to a handpiece. The cutting element includes an outer cannula defining a tissue-receiving opening and an inner cannula concentrically disposed within the outer cannula.

The outer cannula has a trocar tip at its distal end and a cutting board snugly disposed within the outer cannula. The inner cannula defines an inner lumen that extends the length of the inner cannula, and which provides an avenue for aspiration. The inner cannula

5

15452-75957

terminates in an inwardly beveled, razor-sharp cutting edge and is driven by, both a rotary motor, and a reciprocating motor. As the inner cannula moves past the tissue-receiving opening, the inwardly beveled edge helps to eliminate the risk of catching the edge on the tissue-receiving opening. At the end of its stroke, the inner cannula makes contact with the cutting board to completely sever the tissue. The cutting board is made of a material that is mechanically softer than the cutting edge yet hard enough to withstand the force of the inner cannula.

An aspiration is applied to the inner lumen through an aspiration tube. The aspiration tube communicates with a collection trap that is removably mounted to the handpiece. The aspiration draws the sample into the tissue-receiving opening and after the tissue is cut, draws the tissue through the inner cannula to a collection trap.

In a specific embodiment, both the rotary motor and the reciprocating motors are hydraulic motors. Because hydraulic motors do not require any electrical components, this feature allows all of the components to be fabricated of MRI compatible materials.

In another embodiment, the tissue-receiving opening is formed by opposite longitudinal edges that form a number of teeth. The teeth face away from the cutting board at the distal end of the outer cannula. The teeth help prevent the forward motion of the tissue in the opening as the inner cannula moves forward toward the cutting board. This feature maximizes the length and overall size of the core, ultimately resulting in a more efficient lesion removal.

In another embodiment, the outer cannula incorporates a stiffening element opposite the tissue-receiving opening. This stiffening element aids in maintaining the longitudinal integrity of the outer cannula as it is advanced through the tissue.

In addition to the inwardly beveled edge of the inner cannula, one embodiment incorporates additional features to prevent the inner cannula from rising up into the tissue-receiving opening. A bead of stiffening material may be affixed to the inner wall of the outer cannula, or a dimple may be formed in the inner wall of the outer cannula. The bead, or dimple urges the inner cannula away from the tissue-receiving opening and prevents the inner cannula from catching on the opening.

DESCRIPTION OF THE FIGURES

FIG. 1 is a top perspective view of a tissue biopsy apparatus in accordance with one embodiment of the present invention.

6

15452-75957

FIG. 2 is a top elevational view of the tissue biopsy apparatus shown in FIG. 1.

FIG. 3A and FIG. 3B are side cross-sectional views of the tissue biopsy apparatus depicted in FIGS. 1 and 2, with the tissue cutting inner cannula shown in its retracted and extended positions.

FIG. 4 is a perspective view of a cover for the tissue biopsy apparatus as shown FIG. 1.

FIG. 5 is an enlarged side cross-sectional view of the operating end of the tissue biopsy apparatus depicted in FIGS. 1 and 2.

FIG. 6 is a side partial cross-sectional view of working end of a tissue biopsy apparatus in accordance with an alternative embodiment.

FIG. 7 is an end cross-sectional view of the apparatus depicted in FIG. 6, taken along line 7-7 as viewed in the direction of the arrows.

FIG. 8 is an end cross-sectional view similar to FIG. 7 showing a modified configuration for a stiffening member.

FIG. 8(a) is an end cross-sectional view similar to FIG. 7 showing a modified configuration for another stiffening member.

FIG. 9 is an enlarged side cross-sectional view of a fluid introduction port at the hub connecting the outer cannula to the handpiece for a tissue biopsy apparatus as depicted in FIG. 1.

FIG. 10 is a schematic drawing of the hydraulic control system for the operation of the tissue biopsy apparatus shown in FIG. 1.

FIG. 11 is a schematic drawing of a control system for an electric rotary motor for use with the apparatus of the present invention.

FIG. 12 is a top elevational view of a tissue biopsy apparatus according to a further embodiment of the present invention.

FIG. 13 is a side cross-sectional view of the biopsy apparatus shown in FIG. 12, taken along line 13-13 as viewed in the direction of the arrows.

FIG. 14 is a side cross-sectional view of a motor assembly incorporated into the biopsy apparatus shown in FIG. 12.

FIG. 15 is an end elevational view from the left end of the assembly depicted in FIG. 14.

FIG. 16 is an end elevational view of the right end of the assembly depicted in FIG. 14.

7

15452-75957

FIG. 17 is a top elevational view of a rotary motor assembly in accordance with one specific embodiment of the invention.

FIG. 18 is a side elevational view of a cannula hub for engagement with the assembly depicted in FIG. 14.

FIG. 19 is a rear elevational view of the cannula hub shown in FIG. 18.

FIG. 20 is a side cross-sectional view of the cannula hub shown in FIG. 18.

FIG. 21 is a top perspective view of an upper housing component of the biopsy apparatus depicted in FIG. 12.

FIG. 22 is an end cross-sectional view of the upper housing shown in FIG. 21, taken along line 22-22 as viewed in the direction of the arrows.

FIG. 23 is a top perspective view of a lower housing for use with the biopsy apparatus shown in FIG. 12.

FIG. 24 is a top elevational view of the lower housing shown in FIG. 23.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

For the purposes of promoting an understanding of the principles of the invention, reference will now be made to the embodiments illustrated in the drawings and specific language will be used to describe the same. It will nevertheless be understood that no limitation of the scope of the invention is thereby intended. The invention includes any alterations and further modifications in the illustrated devices and described methods and further applications of the principles of the invention which would normally occur to one skilled in the art to which the invention relates.

A tissue biopsy apparatus 10 in accordance with one embodiment of the present invention is shown in FIGS.

The apparatus 10 includes a cutting element 11 mounted to a handpiece 12. The cutting element 11 is sized for introduction into a human body. Most particularly, the present invention concerns an apparatus for excising breast tissue samples. Thus, the cutting element 11 and the overall biopsy apparatus 10 are configured for ease of use in this surgical environment. In the illustrated embodiment, the biopsy apparatus 10 is configured as a hand-held device. However, the same inventive principles can be employed in a tissue biopsy apparatus that is used stereotatically in which the apparatus is mounted on a support fixture that is used to position the cutting element 11 relative to the tissue to be sampled. Nevertheless, for the purposes of understanding the present invention, the tissue biopsy apparatus will be described as a hand-held device.

8

15452-75957

The cutting element 11 is configured as "tube-within-a-tube" cutting device. More specifically, the cutting element 11 includes an outer cannula 15 terminating in a tip 16. Preferably, the tip is a trocar tip that can be used to penetrate the patient's skin. Alternatively, the tip 16 can simply operate as a closure for the open end of the cannula 15. In this instance, a separate introducer would be required.

The cutting element 11 further includes an inner cannula 17 that fits concentrically within the outer lumen 27 (FIG. 5) of the outer cannula 15. In the most preferred embodiment, both a rotary motor 20 (FIG. 1) and a reciprocating motor 22 drive the inner cannula 17. Both motors are supported within the handpiece 12. Again, in accordance with the preferred embodiment the rotary motor 20 and reciprocating motor 22 are configured for simultaneous operation to translate the inner cannula 17 axially within the outer cannula 15, while rotating the inner cannula 17 about its longitudinal axis.

One specific configuration of the working end of the cutting element 11 is depicted in FIG. 5. The outer cannula 15 defines a tissue-receiving opening 25, which communicates with the outer lumen 27. A pair of opposite longitudinal edges 26 (FIGS. 1 and 2) define the tissue-receiving opening 25. The outer cannula 15 is open at its distal end 28 with the trocar tip 16 engaged therein. Preferably, the trocar tip 16 forms an engagement hub 30 that fits tightly within the distal end 28 of the outer cannula 15. The hub 30 can be secured by welding, press-fit, adhesive or other means suitable for a surgical biopsy instrument.

The working end of the cutting element 11 further includes a cutting board 31 that is at least snugly disposed within the outer lumen 27 at the distal end 28 of the outer cannula 15. Most preferably, the cutting board 31 is in direct contact with the engagement hub 30 of the trocar tip 16. The cutting board 31 can be permanently affixed within the outer cannula 15 and/or against the engagement hub 30 of the trocar tip.

The inner cannula 17 defines an inner lumen 34 that is hollow along the entire length of the cannula to provide for aspiration of the biopsy sample. The inner cannula 17 terminates in a cutting edge 35. Preferably the cutting edge 35 is formed by an inwardly beveled surface 36 to provide a razor-sharp edge. The inwardly beveled surface helps eliminate the risk of catching the edge 35 on the tissue-receiving opening 25 of the outer cannula. In addition, the beveled surface 36 helps avoid pinching the biopsy material between the inner and outer cannulas during a cutting stroke.

In a specific embodiment, both the outer cannula 15 and the inner cannula 17 are formed of a surgical grade metal. Most preferably, the two cannulae are formed of

9

15452-75957

stainless steel. In the case of an MRI compatible device, the cannulae can be formed of Inconel, Titanium or other materials with similar magnetic characteristics. Likewise, the trocar tip 16 is most preferably formed of stainless steel honed to a sharp tip. The trocar tip 16 can be suitably bonded to the outer cannula 15, such as by welding or the use of an appropriate adhesive. In some embodiments, the inner and outer cannulae can be formed of a non-metallic material of appropriate strength and stiffness.

The cutting board 31 is formed of a material that is configured to reduce the friction between the cutting edge 35 of the inner cannula 17 and the cutting board 31. The cutting edge 35 necessarily bears against the cutting board 31 when the inner cannula 17 is at the end of its stroke while severing a tissue sample. Since the inner cannula is also rotating, the cutting edge necessarily bears directly against the cutting board 31, particularly after the tissue sample has been cleanly severed. In prior devices, the impact-cutting surface has been formed of the same material as the cutting element. This leads to significant wear or erosion of the cutting edge. When numerous cutting cycles are to be performed, the constant wear on the cutting edge eventually renders it incapable of cleanly severing a tissue sample.

Thus, the present invention contemplates forming the cutting board 31 of a material that reduces this frictional wear. In one embodiment, the cutting board 31 is formed of a material that is mechanically softer than the material of the cutting edge 35. However, the cutting board 31 cannot be so soft that the cutting edge 35 forms a pronounced circular groove in the cutting board, which significantly reduces the cutting efficiency of the inner cannula. In a most preferred embodiment of the invention, the cutting board 31 is formed of a plastic material, such as polycarbonate, ABS or DELRIN.RTM..

Returning again to FIGS. 1, 2 and 3A-3B, the rotary motor 20 includes a motor housing 39 that is sized to reciprocate within the handpiece 12. The housing 39 defines a pilot port 40 that is connected to the hydraulic control system 150 (see FIG. 10) by appropriate tubing. The present invention contemplates that the motor 20 can be a number of hydraulically powered rotating components. Most preferably, the motor 20 is an air motor driven by pressured air. Thus, the motor 20 includes a vaned rotor 42 that is mounted on a hollow tubular axle 43 extending through the motor housing 39. The axle 43 is supported on bearings 44 at opposite ends of the housing so that the rotor 42 freely rotates within the motor housing 39 under pneumatic pressure.

In the illustrated embodiment, tubular axle 43 is connected to the proximal end 37 of the inner cannula 17 by way of a coupler 46. The ends of the two tubes are mounted within the coupler 46 and held in place by corresponding set screws 47. Preferably the

10

15452-75957

coupler 46 is formed of a plastic material that provides a generally airtight seal around the joint between the inner cannula 17 and the tubular axle 43. It is important that the coupler 46 provide a solid connection of the inner cannula 17 to the rotating components of the motor 20 so that the inner cannula 17 does not experience any torrential slip during the cutting operation.

Since the inner cannula 17 provides an avenue for aspiration of the biopsy sample, the invention further contemplates an aspiration tube 50 that mates with the tubular axle 43. Thus, the tissue aspiration path from the working end of the cutting element 11 is along the inner lumen 34 of the inner cannula 17, through the tubular axle 43 of the rotary motor 20, and through the aspiration tube 50 to a tissue collection location in the form of a collection trap 55. In order to maintain the vacuum or aspiration pressure within this aspiration path, the aspiration tube 50 must be fluidly sealed against the tubular axle 43. Thus, the motor housing 39 defines a mounting hub 51 into which the aspiration tube 50 is engaged. The position of the aspiration tube 50 is fixed by way of a set screw 52 passing through the mounting hub 51. In contrast to the joint between the inner cannula 17 and the tubular axle 43, the joint between the aspiration tube 50 and the tubular axle 43 allows relative rotational between the two components. The tubular axle 43, of course, rotates with the rotor 42. However, the aspiration tube 50 need not rotate for use with the biopsy apparatus of the present invention. The mounting hub 51 can include an arrangement of seal rings (not shown) at the joint between the aspiration tube 50 and the tubular axle 43 to further seal the aspiration system.

The aspiration tube 50 communicates with a collection trap 55 that is removably mounted to the handpiece 12. The collection trap 55 includes a pilot port 107 that is connected by appropriate tubing to the hydraulic control system 150, as described in more detail herein. For the present purposes, it is understood that a vacuum or aspiration pressure is drawn through the pilot port 107 and the collection trap 55. This vacuum then draws a tissue sample excised at the working end of the cutting element 11, all the way through the inner cannula 17, tubular axle 43 and aspiration tube 50 until it is deposited within the trap. Details of the collection trap 55 will be discussed herein.

As explained above, the present invention contemplates an inner cannula 17 that performs its cutting operation by both rotary and reciprocating motion. Thus, the handpiece 12 supports a reciprocating motor 22. In one aspect of the invention, both motors 20 and 22 are hydraulically powered, most preferably pneumatically. This feature allows the motors to be formed of plastic, since no electrical components are required. In fact, with the

11

15452-75957

exception of the outer cannula 15, trocar tip 16 and inner cannula 17, every component of the biopsy apparatus 10 in accordance with the present invention can be formed of a non-metallic material, most preferably a medical grade plastic. Thus, the biopsy apparatus 10 is eminently compatible with surgical imaging systems that may be used during the biopsy procedure. The compatibility of the apparatus 10 with Magnetic Resonance Imaging (MRI) is important because MRI is currently the only non-invasive visualization modality capable of defining the margins of the tumor. In addition, since the biopsy apparatus is formed of a relatively inexpensive plastic (as opposed to a more expensive metal), the entire apparatus can be disposable. Moreover, the elimination of substantially all metal components reduces the overall weight of the handpiece 12, making it very easily manipulated by the surgeon.

Referring most specifically to FIGS. 3A and 3B, the reciprocating motor 22 includes a pneumatic cylinder 60. The cylinder 60 includes a pilot port 61 that connects the cylinder to the hydraulic control system 150 through appropriate tubing. The motor 22 includes a piston 63 that reciprocates within the cylinder 60 in response to hydraulic fluid pressure provided at the pilot port 61. The piston 63 includes a central bore 64 for mounting the piston 63 to the aspiration tube 50. In one embodiment, the aspiration tube 50 is press-fit within the bore 64. The engagement between the aspiration tube 50 and the piston 63 can be enhanced by use of a set screw (not shown) or an adhesive or epoxy. At any rate, it is essential that the aspiration tube 50 and piston 63 move together, since the motor 22 must eventually drive the inner cannula 17 axially within the outer cannula.

It should be understood that in addition to powering the inner cannula, the piston 63 also reciprocates the rotary motor 20, which is essentially mounted to the reciprocating aspiration conduit. This movement is depicted by comparing the position of the rotary motor 20 between FIG. 3A and FIG. 3B. More specifically, the motor 20 as well as the aspiration conduit, including the inner cannula 17, moves within the handpiece 12. Preferably, the handpiece housing 70 is provided with openings 73 (FIG. 3B) at its opposite ends for slidably supporting the aspiration tube 50 and inner cannula 17. Since the distal housing 70 is preferably formed of a plastic material, no thrust bearings or rotary bearings are necessary to accommodate low friction axial movement of the cannula through the housing openings 73.

The biopsy apparatus 10 includes a handpiece 12 that carries all of the operating components and supports the outer and inner cannulas. The handpiece 12 includes a distal housing 70 within which is disposed the rotary motor 20. The distal end 71 of the housing 70 is configured into a fitting 72. This fitting 72 engages a mating flange 77 on an

12

15452-75957

outer cannula hub 75. The hub 75 supports the outer cannula 15 within an engagement bore 76 (see FIG. 3B).

In accordance with one aspect of the present invention, the engagement between the outer cannula hub 75 and the distal end 71 of the housing 70 need not be airtight. In other words, the mating components of the fitting between the two parts need not be capable of generating a fluid-tight seal. In accordance with one embodiment of the invention, the engagement between the hub 75 and the housing 70 for supporting the outer cannula 15 provides a leak path through the outer lumen 27 to the atmosphere. In the use of the tissue biopsy apparatus 10, providing aspiration through the inner lumen 34 of the inner cutting cannula 17 will draw tissue through the inner lumen. As the tissue advances farther along the lumen, in some instances a vacuum can be created behind the advancing tissue. At some point in these instances, the tissue will stop advancing along the length of the inner lumen because the vacuum behind the tissue sample equals the vacuum in front of the tissue sample that is attempting to draw the sample to the collection trap 55. Thus, the leak path through the outer lumen 27 allows atmospheric air to fall in behind the tissue sample when the inner cutter is retracted from the cutting board. The atmospheric air helps to relieve the vacuum behind the advancing tissue and aids in drawing the tissue down the length of the aspiration channel to the collection trap 55. However, in some applications, particularly where smaller "bites" of the target tissue are taken, the atmospheric air leak path is not essential.

Preferably the fitting 72 and the mating flange 77 can be engaged by simple twisting motion, most preferably via Luer-type fittings. In use, the cannula hub 75 is mounted on the handpiece 12, thereby supporting the outer cannula 15. The handpiece can then be used to project the outer cannula into the body adjacent the sample site. In certain uses of the biopsy apparatus 10, it is desirable to remove the handpiece 12 from the cannula hub 75 leaving the outer cannula 15 within the patient. For example, the outer cannula 15 can be used to introduce an anesthetic. In other applications, once the target tissue has been completely excised, the outer cannula can be used to guide a radio-opaque marker to mark the location the removed material.

Returning again to the description of the housing 70, the housing defines an inner cavity 79 that is open through an access opening 81. The access opening 81 is preferably provided to facilitate assembly of the tissue biopsy apparatus 10. The distal end 71 of the housing 70 can be provided with a pair of distal braces 80 that add stiffness to the distal end 71 while the apparatus is in use. The braces 80 allow the distal housing 70 to be

13

15452-75957

formed as a thin-walled plastic housing. Similar braces can be provided at the opposite end of the distal housing as necessary to add stiffness to the housing.

The distal housing is configured to support the reciprocating motor 22 and in particular the cylinder 60. Thus, in one embodiment of the invention, the proximal end 83 of the distal housing 70 defines a pressure fitting 84. It is understood that this pressure fitting 84 provides a tight leak-proof engagement between the distal end 88 of the cylinder 60 and the proximal end 83 of the housing. In one specific embodiment, the pressure fitting 84 forms a spring cavity 85 within which a portion of the return spring 66 rests. In addition, in a specific embodiment, the pressure fitting 84 defines distal piston stop 86. The piston 63 contacts these stops at the end of its stroke. The location of the piston stop 86 is calibrated to allow the cutting edge 35 to contact the cutting board 31 at the working end of the cutting element 11 to allow the cutting edge to cleanly sever the biopsy tissue.

In the illustrated embodiment, the cylinder 60 is initially provided in the form of an open-ended cup. The open end, corresponding to distal end 88, fastens to the pressure fitting 84. In specific embodiments, the pressure fitting can include a threaded engagement, a press-fit or an adhesive arrangement.

The cylinder cup thus includes a closed proximal end 89. This proximal end defines the pilot port 61, as well as a central opening 62 (FIG. 3B) through which the aspiration tube 50 extends. Preferably, the proximal end 89 of the cylinder 60 is configured to provide a substantially airtight seal against the aspiration tube 50 even as it reciprocates within the cylinder due to movement of the piston 63. The proximal end 89 of the cylinder 60 defines a proximal piston stop 90, which can either be adjacent the outer cylinder walls or at the center portion of the proximal end. This proximal piston stop 90 limits the reverse travel of the piston 63 under action of the return spring 66 when pressure within the cylinder has been reduced.

In a further aspect of the invention, the collection trap 55 is mounted to the handpiece 12 by way of a support housing 93. It should be understood that in certain embodiments, the handpiece 12 can be limited to the previously described components. In this instance, the collection trap 55 can be situated separate and apart from the handpiece, preferably close to the source of vacuum or aspiration pressure. In this case, the proximal end of the aspiration tube 50 would be connected to the collection trap by a length of tubing. In the absence of the collection trap 55, the aspiration tube 50 would reciprocate away from and toward the proximal end of the cylinder 60, so that it is preferable that the handpiece includes a cover configured to conceal the reciprocating end of the aspiration tube.

14

15452-75957

However, in accordance with the most preferred embodiment, the collection trap 55 is removably mounted to the handpiece 12. A pair of longitudinally extending arms 94, that define an access opening 95 therebetween, forms the support housing 93. The support housing 93 includes a distal end fitting 96 that engages the proximal end 89 of cylinder 60. A variety of engagements are contemplated, preferably in which the connection between the two components is generally airtight. The proximal end 97 of the support housing 93 forms a cylindrical mounting hub 98. As best shown in FIG. 1, the mounting hub 98 surrounds a proximal end of the collection trap 55. The hub forms a bayonet-type mounting groove 99 that receives pins 103 attached to the housing 102 of the trap 55. A pair of diametrically opposite wings 104 can be provided on the housing 102 to facilitate the twisting motion needed to engage the bayonet mount between the collection trap 55 and the support housing 93. While the preferred embodiment contemplates a bayonet mount, other arrangements for removably connecting the collection trap 55 to the support housing 93 are contemplated. To be consistent with one of the features of the invention, it is preferable that this engagement mechanism be capable of being formed in plastic.

In order to accommodate the reciprocating aspiration tube, the support housing 93 is provided with an aspiration passageway 100 that spans between the proximal and distal ends of the housing. Since the aspiration tube 50 reciprocates, it preferably does not extend into the collection trap 55. As excised tissue is drawn into the trap 55, a reciprocating aspiration tube 50 can contact the biopsy material retained within the trap. This movement of the tube can force tissue into the end of the tube, clogging the tube. Moreover, the reciprocation of the aspiration tube can compress tissue into the end of the trap, thereby halting the aspiration function.

The collection trap 55 includes a housing 102, as previously explained. The housing forms a pilot port 107, which is connectable to a vacuum generator. Preferably in accordance with the present invention, appropriate tubing to the hydraulic control system 150 connects the pilot port 107. The trap 55 includes a filter element 110 mounted within the trap. In the preferred embodiment, the filter element is a mesh filter than allows ready passage of air, blood and other fluids, while retaining excised biopsy tissue samples, and even morcellized tissue. In addition, the filter element 110 is preferably constructed so that vacuum or aspiration pressure can be drawn not only at the bottom end of the filter element, but also circumferentially around at least a proximal portion of the element 110. In this way, even as material is drawn toward the proximal end of the filter, a vacuum can still be drawn through other portions of the filter, thereby maintaining the aspiration circuit.

15

15452-75957

The handpiece 12 can include individual covers for closing the access opening 81 in the distal housing 70 and the access openings 95 in the support housing 93. Those covers can support tubing for engagement with the pilot ports 40 and 61. Alternatively and most preferably, a single cover 13 as depicted in FIG. 4, is provided for completely enclosing the entire handpiece. The distal end 71 of the housing 70 can define a number of engagement notches 115 equally spaced around the perimeter of the distal end. The handpiece cover 13 can then include a like number of equally distributed tangs 117 projecting inwardly from the inner surface from the 118. These tangs are adapted to snap into the engagement notches 115 to hold the cover 113 in position over the handpiece 12. The cover can be attached by sliding axially over the handpiece 12. The cover 13 can include fittings for fluid engagement with the two pilot ports 40 and 61. Alternatively, the cover can be formed with openings for insertion of engagement tubing to mate with the respective pilot ports to provide hydraulic fluid to the rotary motor 20 and the reciprocating motor 22. In a specific embodiment, the cover 13 extends from the distal end 71 of the distal housing 70 to the proximal end 97 of the support housing 93. The cover can thus terminate short of the bayonet mounting feature between the support housing and the collection trap 55. Although not shown in the figures, the proximal end 97 of the support housing 93 can be configured to include a similar array of engagement notches with a corresponding array of mating tangs formed at the proximal end of the cover 13.

It can be appreciated from the foregoing discussion that the biopsy apparatus 10 of the present invention provides a complete "closed" tissue excision and recovery system. In other words, unlike prior biopsy devices, the apparatus 10 is fluid tight so that no bodily fluids can escape. Biopsy procedures with many prior devices involves significant blood splatter due to the nature in which the tissue samples are extracted and recovered. With the present invention, the biopsy apparatus 10 provides a closed path from the tissue receiving opening 25 to the collection trap 55, while still maintaining the highly efficient reciprocating and rotating cutting operation.

Referring now to FIGS. 6-8, alternative embodiments of the outer cannula are depicted. As shown in FIG. 6 an outer cannula 125 includes a tissue-receiving opening 126. The opening is formed by opposite longitudinal edges 127. In one specific embodiment, a number of teeth 129 are formed at each longitudinal edge 127. As depicted in the figure, the teeth are proximally facing--i.e., away from the cutting board 31 (not shown) at the distal end of the outer cannula. With this orientation, the teeth 129 help prevent forward motion of tissue drawn into the opening 126 as the inner cannula 17 moves forward toward the cutting

16

15452-75957

board. In prior devices, as the reciprocating cutting element advances through the outer cannula, the cutting edge not only starts to sever the tissue, it also pushes tissue in front of the inner cannula. Thus, with these prior devices, the ultimate length of the biopsy sample retrieved with the cut is smaller than the amount of tissue drawn into the tissue-receiving opening of the outer cannula. With the teeth 129 of the outer cannula 125 of this embodiment of the invention, the tissue sample removed through the inner cannula 17 is substantially the same length as the tissue-receiving opening 126. As the inner cannula 17 advances into the tissue, each of the teeth 129 tends to hold the tissue in place as the cutting edge 35 severs the tissue adjacent the outer cannula wall. With this feature, each "bite" is substantially as large as possible so that a large tissue mass can be removed with much fewer "bites" and in a shorter period of time. In addition to supporting the subject tissue as the inner cannula advances, the teeth can also cut into the tissue to prevent it from retracting out of the opening as the inner cuffing cannula 17 advances.

The outer cannula 125 depicted in FIG. 6 can also incorporate a stiffening element 131 opposite the tissue-receiving opening 126. The stiffening element 131 adds bending stiffness to the outer cannula 125 at the distal end in order to maintain the longitudinal integrity of the outer cannula 125 as it is advanced into a tissue mass. In some prior devices that lack such a stiffening element, the working end of the cutting device is compromised as it bends slightly upward or downward as the outer cannula passes into the body. This bending can either close or expand the tissue-receiving opening, which leads to difficulties in excising and retrieving a tissue sample. The cutting mechanism of the present invention relies upon full, flush contact between the cutting edge of the inner cannula 17 and the cutting board 31. If the end of the outer cannula 125 is slightly askew, this contact cannot be maintained, resulting in an incomplete slice of the tissue sample.

As depicted in the cross-sectional view of the FIG. 7, the stiffening element 131 in one embodiment is a crimp extending longitudinally in the outer wall of the cannula substantially coincident with the tissue-receiving opening 126. The outer cannula 125' depicted in FIG. 8 shows two additional versions of a stiffening element. In both cases, a bead of stiffening material is affixed to the outer cannula. Thus in one specific embodiment, a bead 131' is adhered to the inner wall of the outer cannula. In a second specific embodiment, a bead 131" is affixed to the outside of the outer cannula. In either case, the beads can be formed of a like material with the outer cannula, and in both cases, the beads provide the requisite additional bending stiffness. Another version of a stiffening element is shown if

17

15452-75957

FIG. 8(a). In this case, a layer 131'" of additional stainless steel is bonded to the outer wall of the outer cannula 125".

Returning to FIG. 6, a further feature that can be integrated into the outer cannula 125 is the dimple 135. One problem frequently experienced by tube-within-a-tube cutters is that the inner reciprocating cutter blade contacts or catches on the outer cannula at the distal edge of the tissue-receiving opening. With the present invention, the dimple 135 urges the inner cannula 17 away from the tissue-receiving opening 126. In this way, the dimple prevents the cutting edge of the inner cannula 17 from catching on the outer cannula as it traverses the tissue-receiving opening. In the illustrated embodiment of FIG. 6, the dimple 135 is in the form of a slight crimp in the outer cannula 125. Alternatively, as with the different embodiments of the stiffening element, the dimple 135 can be formed by a protrusion affixed or adhered to the inner surface of the outer cannula. Preferably, the dimple 135 is situated immediately proximal to the tissue-receiving opening to help maintain the distance between the cutting edge and the tissue-receiving opening.

As previously described, the outer cannula 15 is supported by a hub 75 mounted to the distal end of the handpiece. In an alternative embodiment depicted in FIG. 9, the outer cannula hub 140 provides a mean for introducing fluids into the outer lumen 27 of the outer cannula. Thus, the hub 140 includes an engagement bore 141 within which the outer cannula 15 is engaged. The hub also defines a flange 142 configured for mating with the fitting 72 at the distal end 71 of the housing 70. Thus, the outer cannula hub 140 is similar to the hub 75 described above. With this embodiment, however, an irrigation fitting 145 is provided. The fitting defines an irrigation lumen 146 that communicates with the engagement bore 141.

Ultimately, this irrigation lumen is in fluid communication with the outer lumen 27 of the outer cannula 15. The irrigation fitting 145 can be configured for engagement with a fluid-providing device, such as a syringe. The hub 140 thus provides a mechanism for introducing specific fluids to the biopsy site. In certain procedures, it may be necessary to introduce additional anesthetic to the sampling site, which can be readily accommodated by the irrigation fitting 145.

As discussed above, the preferred embodiment of the tissue biopsy apparatus 10 according to the present invention relies upon hydraulics or pneumatics for the cutting action. Specifically, the apparatus includes a hydraulic rotary motor 20 and a hydraulic reciprocating motor 22. While the apparatus 10 can be adapted for taking a single biopsy slice, the preferred use is to completely remove a tissue mass through successive cutting

18

15452-75957

slices. In one typical procedure, the cutting element 11 is positioned directly beneath a tissue mass, while an imaging device is disposed above the mass. The imaging device, such as an ultra-sound imager, provides a real-time view of the tissue mass as the tissue biopsy apparatus 10 operates to successively remove slices of the mass. Tissue is continuously being drawn into the cutting element 11 by the aspiration pressure or vacuum drawn through the inner cannula 17. Successive reciprocation of the inner cannula 17 removes large slices of the mass until it is completely eliminated.

In order to achieve this continuous cutting feature, the present invention contemplates a hydraulic control system 150, as illustrated in the diagram of FIG. 10. Preferably the bulk of the control system is housed within a central console. The console is connected to a pressurized fluid source 152. Preferably the fluid source provides a regulated supply of filtered air to the control system 150.

As depicted in this diagram of FIG. 10, pressurized fluid from the source as provided at the several locations 152 throughout the control system. More specifically, pressurized fluid is provided to five valves that form the basis of the control system.

At the left center of the diagram of FIG. 10, pressurized fluid 152 passes through a pressure regulator 154 and gauge 155. The gauge 155 is preferably mounted on the console for viewing by the surgeon or medical technician. The pressure regulator 154 is manually adjustable to control the pressurized fluid provided from the source 152 to the two-position hydraulic valve 158. The valve 158 can be shifted between a flow path 158a and a flow path 158b. A return spring 159 biases the hydraulic valve to its normal position 158a.

In the normally biased position of flow path 158a, the valve 158 connects cylinder pressure line 161 to the fluid source 152. This pressure line 161 passes through an adjustable flow control valve 162 that can be used to adjust the fluid flow rate through the pressure line 161. Like the pressure gauge 155 and pressure regulator 154, the adjustable flow control valve 162 can be mounted on a console for manipulation during the surgical procedure.

The pressure line 161 is connected to the pilot port 61 of the reciprocating motor 22. Thus, in the normal or initial position of the hydraulic control system 150, fluid pressure is provided to the cylinder 60 to drive the piston 63 against the biasing force of the return spring 66. More specifically with reference to FIG. 3B, the initial position of the hydraulic valve 158 is such that the reciprocating motor and inner cannula are driven toward the distal end of the cutting element. In this configuration, the inner cannula 17 covers the tissue-receiving opening 25 of the outer cannula 15. With the inner cannula so positioned, the

19

15452-75957

outer cannula can be introduced into the patient without risk of tissue filling the tissue-receiving opening 25 prematurely.

Pressurized fluid along cylinder pressure 161 is also fed to a pressure switch 165. The pressure switch has two positions providing flow paths 165a and 165b. In addition, an adjustable return spring 166 biases this switch to its normal position at which fluid from the pressure source 152 terminates within the valve. However, when pressurized fluid is provided through cylinder pressure line 161, the pressure switch 165 moves to its flow path 165b in which the fluid source 152 is hydraulically connected to the pressure input line 168. This pressure input line 168 feeds an oscillating hydraulic valve 170. It is this valve that principally operates to oscillate the reciprocating motor 22 by alternately pressurizing and releasing the two-position hydraulic valve 158. The pressure switch 165 is calibrated to sense an increase in pressure within the cylinder pressure line 161 or in the reciprocating motor cylinder 60 that occurs when the piston 66 has reached the end of its stroke. More specifically, the piston reaches the end of its stroke when the inner cannula 17 contacts the cutting board 31. At this point, the hydraulic pressure behind the piston increases, which increase is sensed by the pressure valve 165 to stroke the valve to the flow path 165b.

The oscillating hydraulic valve 170 has two positions providing flow paths 170a and 170b. In position 170a, input line 179 is fed to oscillating pressure output line 172. With flow path 170b, the input line 179 is fed to a blocked line 171. Thus, with fluid pressure provided from pressure switch 165 (through flow path 165b), the oscillating valve 170 opens flow path 170a which completes a fluid circuit along output line 172 to the input of the hydraulic valve 158.

Fluid pressure to output line 172 occurs only when there is fluid pressure within input line 179. This input line is fed by valve 176, which is operated by foot pedal 175. The valve 176 is biased by a return spring 177 to the initial position of flow path 176a. However, when the foot pedal 175 is depressed, the valve 176 is moved against the force of the spring to flow path 176b. In this position, pressurized fluid from the source 152 is connected to the foot pedal input line 179. When the oscillating hydraulic valve 170 is in its initial position flow path 170a, pressurized fluid then flows through input line 179 to output line 172 and ultimately to the hydraulic valve 158.

The fluid pressure in the output line 172 shifts the valve 158 to the flow path 158b. In this position, the fluid pressure behind the piston 63 is relieved so that the return spring 66 forces the piston toward the proximal end. More specifically, the return spring retracts the inner cannula 17 from the tissue cutting opening 25. The relief of the fluid

20

15452-75957

pressure in line 161 also causes the pressure switch 165 to return to its initial neutral position of flow path 165a, due to the action of the return spring 166. In turn, with the flow path 165a, the pressure input line 168 is no longer connected to the fluid source 152, so no pressurized fluid is provided to the oscillating hydraulic valve 170. Since this valve is not spring biased to any particular state, its position does not necessarily change, except under conditions described herein.

Returning to the foot pedal 175 and valve 176, once the foot pedal is released, the biasing spring 177 forces the valve 176 from its flow path 176b to its normal initial flow path 176a. In this position the foot pedal input line 179 is no longer connected to the fluid source 152. When the oscillating valve 170 is at flow path 170a, the fluid pressure through output line 172 is eliminated. In response to this reduction in fluid pressure, hydraulic valve 158 is shifted to its original flow path 158a by operation of the return spring 159. In this position, the cylinder pressure line 161 is again connected to the fluid source 152, which causes the reciprocating motor 22 to extend the inner cannula 17 to its position blocking the tissue-receiving opening 25. Thus, in accordance with the present invention, the hydraulic control system 150 starts and finishes the tissue biopsy apparatus 10 with the tissue-receiving opening closed. It is important to have the opening closed once the procedure is complete so that no additional tissue may be trapped or pinched within the cutting element 11 as the apparatus is removed from the patient.

Thus far the portion of the hydraulic control system 150 that controls the operation of the reciprocating motor 22 has been described. The system 150 also controls the operation of the rotary motor 20. Again, in the most preferred embodiment, the motor 20 is an air motor. This air motor is controlled by another hydraulic valve 182. As shown in FIG. 10, the initial position of the valve provides a flow path 182a in which the fluid source 152 is connected to blocked line 183. However, when the hydraulic valve 182 is pressurized, it moves to flow path 182b in which the fluid source 152 is connected to the pilot port 140 of the air motor. In this position, pressurized fluid continuously drives the air motor 20, thereby rotating the inner cannula 17. It can be noted parenthetically that a muffler M can be provided on the air motor to reduce noise.

The rotary motor hydraulic valve 182 is controlled by fluid pressure on pressure activation line 180. This activation line 180 branches from the foot pedal input line 179 and is connected to the foot pedal switch 176. When the foot pedal 175 is depressed, the switch moves to its flow path 176b. In this position the pressure activation line 180 is connected to the fluid source 152 so fluid pressure is provided directly to the rotary motor

21

15452-75957

hydraulic valve 182. As with the other hydraulic valves, the valve 182 includes a biasing spring 184 that must be overcome by the fluid pressure at the input to the valve.

It should be understood that since the fluid control for the rotary motor 20 is not fed through the oscillating hydraulic valve 170, the motor operates continuously as long as the foot pedal 175 is depressed. In addition, it should also be apparent that the speed of the rotary motor 20 is not adjustable in the illustrated embodiment. Since the motor 20 is connected directly to the fluid source 152, which is preferably regulated at a fixed pressure, the air motor actually operates at one speed. On the other hand, as discussed above, the reciprocating motor 22 is supplied through a pressure regulator 154 and a flow control valve 162. Thus, the speed of reciprocation of the cutting blade 35 is subject to control by the surgeon or medical technician. The reciprocation of the cutting element 11 can be a function of the tissue being sampled, the size of the tissue biopsy sample to be taken, and other factors specific to the particular patient. These same factors generally do not affect the slicing characteristic of the cutting edge 35 achieved by rotating the inner cannula.

The hydraulic control system 150 also regulates the aspiration pressure or vacuum applied through the aspiration conduit, which includes the inner cannula 17. In the illustrated embodiment, the pressure activation line 180 branches to feed an aspiration valve 185. The valve is movable from its initial flow path 185a to a second flow path 185b. In the initial flow path, the fluid source 152 is connected to a blocked line 186. However, when fluid pressure is applied on line 180, the valve 185 shifts against the biasing spring 187 to the flow path 185b. In this path, the venturi element 190 is connected to the fluid source. This venturi element thus generates a vacuum in a vacuum control line 193 and in aspiration line 191. Again, as with the air motor, the venturi element 190 can include a muffler M to reduce noise within the handpiece.

As long as the foot pedal 175 is depressed and the valve 176 is in its flow path 176b, fluid pressure is continuously applied to the aspiration hydraulic valve 195 and the venturi element 190 generates a continuous vacuum or negative aspiration pressure. As with the operation of the rotary motor, this vacuum is not regulated in the most preferred embodiment. However, the vacuum pressure can be calibrated by a selection of an appropriate venturi component 190.

When the venturi component 190 is operating, the vacuum drawn on control line 193 operates on vacuum switch 194. A variable biasing spring 195 initially maintains the vacuum switch 194 at its flow path 194a. In this flow path, the vacuum input line 196 is not connected to any other line. However, at a predetermined vacuum in control line 193, the

22

15452-75957

valve moves to flow path 194b. In this position, the vacuum input line 196 is connected to pressure line 192. In the preferred embodiment, the vacuum switch 194 operates in the form of a "go-nogo" switch--in other words, when the aspiration vacuum reaches a predetermined operating threshold, the vacuum switch is activated. When the vacuum switch 184 is initially activated, it remains activated as long as the foot pedal is depressed. Thus vacuum input line 196 is continuously connected to pressure line 192 as long as the foot pedal 175 is depressed.

Looking back to the hydraulic valve 158, the fluid pressure in line 192, and ultimately in vacuum input line 196, is determined by the state of valve 158. When the valve 158 is in its flow path 158a in which regulated fluid pressure is provided to the reciprocating motor 22, the pressure line 192 is dead. However, when the valve 158 moves to flow path 158b, pressure line 192 is connected to the regulated fluid source. Pressurized fluid then flows from pressure line 192, through vacuum switch flow path 194b, through vacuum input line 196 to the left side of oscillating valve 170, causing the valve to stroke to flow path 170b. When the oscillating valve 170 is in this flow path, output line 172 is dead, which allows valve 158 to move to its flow path 158a under the effect of the return spring 159. In this state, valve 158 allows pressurized fluid to again flow to the reciprocating motor 22 causing it to move through the next cutting stroke.

Thus, when both the valve 158 and the vacuum switch 194 are moved to their alternate states, pressurized fluid passes from line 192, through vacuum input line 196, and through an adjustable flow control valve 197 to a second input for the oscillating hydraulic valve 170. Pressure on the vacuum input line 196 shifts the oscillating valve 170 to its second position for flow path 170b. In this position, pressurized fluid passing through the foot pedal valve 176 terminates within valve 170. As a consequence, the pressure in output line 172 drops which allows the hydraulic valve 158 shift back to its original position 158a under operation of the return spring 159. In this position, fluid pressure is again supplied to the reciprocating motor 22 to cause the piston 66 to move through its cutting stroke.

It should be appreciated that the oscillating valve 170 is influenced by fluid pressure on lines 168 and 196, and that these lines will not be fully pressurized at the same time. When the system is initially energized, pressure from source 152 is automatically supplied to reciprocating motor 22 and pressure valve 165, causing the valve to move to flow path 165b. In this state, line 168 is pressurized which shifts oscillating valve 170 to the left to state 170a. The oscillating valve will remain in that state until line 196 is pressurized, regardless of the position of pressure switch 165. It can also be appreciated that in the preferred embodiment, the fluid pressure on line 196 does not increase to operating levels

23

15452-75957

until the foot pedal 175 has been depressed and the aspiration circuit has reached its operating vacuum.

In an alternative embodiment, the vacuum switch 194 can be calibrated to sense fine changes in vacuum. In this alternative embodiment, the completion of this return stroke can be determined by the state of the vacuum switch 194. The vacuum switch 194 can operate as an indicator that a tissue sample has been drawn completely through the aspiration conduit into the collection trap 55. More specifically, when the vacuum sensed by vacuum switch 194 has one value when the inner cannula is open to atmospheric pressure. This vacuum pressure changes when a tissue sample is drawn into the inner cannula 17. The vacuum pressure changes again when the tissue is dislodged so that the inner cannula is again open to atmospheric pressure. At this point, the inner cannula 17 is clear and free to resume a cutting stroke to excise another tissue sample. Thus, the vacuum switch 194 can stroke to its flow path 194b to provide fluid pressure to the left side of the oscillating valve 170, causing the valve to stroke to flow path 170b.

It can be appreciated from this detail explanation that the hydraulic control system 150 provides a complete system for continuously reciprocating the axial motor 22. In addition, the system provides constant continuous pressure to both the rotary motor 20 and the aspiration line 191, so long as the foot pedal 175 is depressed. Once the foot pedal is released, fluid pressure in activation line 180 drops which causes the air motor control valve 182 and the aspiration control valve 185 to shift to their original or normal positions in which fluid pressure is terminated to those respective components. However, in the preferred embodiment, pressure is maintained to the reciprocating motor 22 because the motor is fed through valve 158, which is connected directly to the fluid source 152.

The hydraulic control system 150 in the illustrated embodiment incorporates five controllable elements. First, the fluid pressure provided to activate the reciprocating motor 22 is controlled through the regulator 154. In addition, the fluid flow rate to the piston 66 is controlled via the adjustable control valve 162. The pressure at which the pressure switch 165 is activated is determined by an adjustable return spring 166. Likewise, the aspiration pressure vacuum at which the vacuum switch 194 is activated is controlled by an adjustable return spring 195. Finally the adjustable flow control valve 197 controls the fluid flow from the vacuum switch 194 to the oscillating hydraulic valve 170. Each of these adjustable elements controls the rate and duration of oscillation of the reciprocating motor 22.

In the preferred embodiment, the pressure switch 165 essentially operates as an "end of stroke" indicators. In other words, when the inner cannula 17 reaches the end of its

24

15452-75957

forward or cutting stroke, it contacts the cutting board 31. When it contacts the cutting board, the pressure in the cylinder pressure line 161 changes dramatically. It is this change that causes the pressure switch 165 to change states. This state change causes the oscillating valve 170 to shift valve 158 to terminate fluid pressure to the motor 22, causing it to stop its cutting stroke and commence its return stroke.

During this return stroke, the excised tissue sample is gradually drawn along the aspiration conduit. Also during the return stroke, fluid pressure bleeds from pressure line 161 and pressure switch 165 and ultimately from line 168 feeding oscillating valve 170. When this valve strokes, fluid pressure bleeds from valve 158 allowing the valve to return to state 158a to pressurize the motor 22 for a new cutting stroke. The operation of each of these hydraulic valves introduces an inherent time delay so that by the time the pressure to the reciprocating motor 22 has been restored the aspiration vacuum has pulled the tissue sample through the entire aspiration conduit and into the collection trap 55.

The use of a hydraulically controlled inner cutting cannula provides significant advantages over prior tissue cutting devices. The use of hydraulics allows most of the operating components to be formed of inexpensive and light-weight non-metallic materials, such as medical-grade plastics. The hydraulic system of the present invention eliminates the need for electrical components, which means that electrical insulation is unnecessary to protect the patient.

Perhaps most significantly, the hydraulically controlled reciprocation of the inner cutting cannula provides a cleaner and better-controlled cut of biopsy tissue. Since the reciprocating motor 22 is fed from a substantially constant source of pressurized fluid, the pressure behind the motor piston 63 remains substantially constant throughout the cutting stroke. This substantially constant pressure allows the inner cutting cannula to advance through the biopsy tissue at a rate determined by the tissue itself.

In other words, when the cutting edge 35 encounters harder tissue during a cutting stroke, the rate of advancement of the motor piston 63 and therefor the inner cannula 17 decreases proportionately. This feature allows the cutting edge to slice cleanly through the tissue without the risk of simply pushing the tissue. The rotation of the cutting edge can facilitate this slicing action. When the inner cannula encounters less dense tissue, the constant pressure behind the piston 63 allows the cutting edge to advance more quickly through the tissue.

In alternative embodiment, the rotary motor 20 can consist of an electric motor, rather than a pneumatic motor. As depicted in FIG. 11, the pressure activation line 180

25

15452-75957

can be fed to an on-off pressure switch 198 that is governed by an adjustable bias spring 199. When the activation line 180 is pressurized the switch 198 establishes a connection between an electric reciprocating motor 20 and a battery pack 200. Preferably, the battery pack 200 is mounted within the handpiece 12, but can instead be wired to an external battery contained within the console.

In the preferred embodiment, the tissue biopsy apparatus 10 depicted in FIG. 1 has an overall length of under sixteen inches (16") and an outer diameter less than one and one quarter inches (1.25"). The outer cannula and therefore the cutting element 11 have a length measured from the handpiece 12 of approximately five inches (5"). The outer cannula preferably has a nominal outer diameter of 0.148" and a nominal inner diameter of 0.136". The inner cannula most preferably has a nominal outer diameter of 0.126" so that it can reciprocate freely within the outer cannula without catching on the tissue cutting opening. The inner cannula has a nominal wall thickness of 0.010", which yields a nominal inner lumen diameter of about 0.106."

The length of the tissue-receiving opening determines the length of biopsy sample extracted per each oscillation of the reciprocating motor 22. In one specific embodiment, the opening has a length of about 0.7", which means that a 0.7" long tissue sample can be extracted with each cutting cycle. In order to accommodate a large number of these biopsy tissue slugs, the collection trap can have a length of about 2.5" and a diameter of about 0.05". Of course, the interior volume of the collection trap can vary depending upon the size of each biopsy slug and the amount of material to be collected. In a specific embodiment, the filter disposed within the collection trap 55 manufactured by Performance Systematix, Inc. of Callondoni, Mich.

In accordance with a specific embodiment, the cutting stroke for the inner cannula is about 0.905". The return spring 66 within the reciprocating motor 22 is preferably a conical spring to reduce the compressed height of the spring, thereby allow a reduction in the overall length of the hydraulic cylinder 60. In addition, the return spring 66 can be calibrated so that the return stroke occurs in less than about 0.3 seconds. Preferably, the inwardly beveled surface 36 of cutting edge 35 is oriented at an approximately 30.degree. angle.

The aspiration pressure vacuum is nominally set at 27 in.Hg. during the cutting stroke. When the cannula is retracted and the outer lumen 27 is open, the vacuum pressure is reduced to 25 in.Hg. This aspiration pressure normally allows aspiration of a tissue sample in less than about 1 second and in most cases in about 0.3 second. In

26

15452-75957

accordance with a most preferred embodiment, the hydraulic control system 150 preferably is calibrated so that the inner cannula dwells at its retracted position for about 0.3 seconds to allow complete aspiration of the tissue sample. Adjusting the return spring 195 of the vacuum switch 194 can control this dwell rate.

In a preferred embodiment, the inner cannula 17 can advance through the cutting stroke in about two seconds. This stroke speed can be accomplished with a regulated pressure at source 152 of about 20 p.s.i. When the inner cannula reaches the end of its cutting stroke, the pressure can increase at about five p.s.i. per second. Preferably, the return spring 166 of the pressure switch 165 is set so that the end of cutting stroke is sensed within about 0.5 seconds.

In a modification of the present invention, a tissue biopsy apparatus 300 is configured as depicted in FIGS. 12-24. As with the biopsy apparatus 10 of the prior figures, the apparatus 300 includes a cutting element 302 mounted to a user manipulable handpiece 305. The handpiece includes an upper housing 310, and a lower housing 311 (see FIG. 13). A cannula hub 312 is mounted to the handpiece 305 to support the outer cannula 303 of the cutting element 302 in a fashion similar to that described above. The biopsy apparatus 300 further includes a filter canister 315 that is removably mounted to the handpiece 305, again in a manner similar to that described above.

In this embodiment, the biopsy apparatus 300 incorporates a secondary lumen 320 that engages the cannula hub 312. The secondary lumen 320 can be used to supply a quantity of irrigation fluid or a measured quantity of air to the cutting element, in a manner described below. In the illustrated embodiment, the upper housing 310 preferably includes a channel 322 defined along its entire length. The channel is configured to receive the secondary lumen 320 therein with the lumen recessed within the housing so as to not interfere with the ability of the surgeon to comfortably grip the biopsy apparatus 300.

Referring now to FIG. 13, it can be seen that the biopsy apparatus 300 includes a reciprocating motor assembly 330 and a rotary motor assembly motor 332. Each of these assemblies is constructed similar to the like assemblies described above. In the present embodiment, the reciprocating motor assembly 330 includes a housing 340 that is contained within the upper and lower housing 310, 311 that define the handpiece 305.

The reciprocating motor 334 is similar to the motor described above. The motor includes a tube fitting 335 for receiving a hollow tube 337 (see FIG. 13). The tube 337 is connected to the hydraulic control system 150 depicted in FIG. 10 to provide an alternating supply of pressurized air to the reciprocating motor 334 in a manner described above.

27

15452-75957

As shown in FIGS. 13 and 14, the housing 340 includes a pair of opposite rails 341, which serve as guides for reciprocation of the rotary motor 332. As shown in FIG. 17, the rotary motor 332 includes opposite anti-rotation wings 355 that ride along the rails 341 as the motor 332 is reciprocated, and at the same time resist rotation of the rotary motor 332 during its operation. The rotary motor 332 further includes a tube fitting 357 that is arranged to engage a hollow tube 358 (see FIG. 13) which, like the tube 337, provides a connection to the hydraulic control system 150.

The housing 340 forms a Luer fitting 345 at its distal end 342, as illustrated in FIG. 16. The Luer fitting includes a circumferential recess 347 and a number of spaced flanges 348. Preferably, four such flanges spaced at 90.degree. intervals are incorporated into the Luer fitting 345. The recess 347 defines an enlarged gap 349 between one pair of flanges. Moreover, a number of retention dimples 350 are defined at the base of the circumferential recess 347, as depicted in FIGS. 14 and 15.

The Luer fitting 345 is configured to mate with the cannula hub 312. As shown in FIGS. 18-20, the cannula hub 312 includes a number of Luer wings 370 corresponding in number to the plurality of flanges 348. Each of the wings 370 is configured to fit within the recess the 347 between flanges 348. One of the wings 370 includes an enlargement 371 that prevents the cannula 312 from being improperly oriented, or more specifically assures a pre-determined orientation of the tissue receiving opening of the cannula 312. The enlargement 371 is preferably configured to fit within the enlarged gap 349 of the Luer fitting 345 to insure an upward orientation of the cutting element 302, as depicted in FIGS. 12 and 13.

The bottom surface of the cannula hub 312 defines a number of protuberances 372. Each of the protuberances is sized to fit within one of the retention dimples 350 of the Luer fitting 345. Thus, when the hub is pushed into the recess 347 and rotated, each of the protuberances 372 engages within a corresponding dimples to hold the cannula hub 312 in place.

The cannula hub 312 includes a central bore 376 extending through the hub. One portion 377 of the bore is sized to tightly receive the outer cannula 303 of the cutting element 302 as described with respect to outer cannula 15. Preferably, the outer cannula 303 is engaged in a substantially fluid tight fit. The hub 312 is configured for removable engagement with the Luer fitting 345 of the handpiece 305 so the entire handpiece can be removed from the hub 312 while the outer cannula 303 is still in place within the patient.

28

15452-75957

When the handpiece is removed, the inner cutting element 304 is withdrawn from the lumen 306 of the outer cannula, since the inner cutting element is connected to the reciprocating motor assembly 334 as described above. Thus, the cannula hub 312 and outer cannula 302 remain at the surgical site to permit introduction of medical treatments or other instruments through the bore 376 and lumen 306. For instance, a local anaesthetic, drug or treatment material, such as a radioactive pellet, can be introduced in this manner, before, during or after the biopsy procedure. Moreover, other surgical instruments, such as a visualization scope, can be guided to the biopsy site through the hub 312 and cannula 302.

The cannula hub 312 also includes a tube fitting 375. The Tube fitting 375 mates with the secondary lumen 320 that traverses the outer length of the handpiece 305. The fitting 375 can be of any suitable configuration for providing a fluid-tight engagement between the fitting and a tube.

Referring to back to FIG. 14, the reciprocating motor assembly motor housing 340 also includes a proximal end 360 that defines a mounting hub 361. The mounting hub is similar to the hub 98 described above, and is particularly configured to engage the filter canister 315. As indicated above, the hub and canister interface can be in the form of a bayonet mount to provide a fluid tight quick release engagement. The proximal end of the housing 340 defines a circumferential flange 363 that is sealed against the ends of the upper and lower housings 310, 311 of the handpiece 305. A pair of tube cutouts 365 are formed at the perimeter of the flange 363 to provide a passageway for the hydraulic tubes 337 and 358 supplying pressurized fluid to the reciprocating and rotary motors.

In order to accommodate the tubes, as well as to firmly support the working components of the handpiece 305, the upper and lower housings 310 and 311 can be configured as shown in FIGS. 21-24. In a specific embodiment, the upper housing 310 includes an interior channel 380 that passes substantially along the entire length of the interior of the upper housing 310. This interior channel is aligned with one of the tube cutouts 365 in the flange 363 of the housing 340. This interior channel can provide a pathway for the tube 358 feeding pressurized fluid to the rotary motor assembly 332. The upper housing 310 further defines a number of interior support walls 382. These walls project into the interior space and serve as a bulkhead for supporting the various working components of the handpiece 305.

Likewise, the lower housing 311 includes a number of interior support walls 385. In addition, near the proximal end 360, the lower housing 311 can include a longitudinal support rib 387 that preferably is arranged to support the reciprocating motor 334. At least

29

15452-75957

some of the interior support wall 385 of the lower housing 311 can define tube cutouts 389 to receive the tube 337 feeding pressurized fluid to the reciprocating motor 334.

In addition, the lower housing 311 can include a number of mounting holes 395. These mounting holes can be arranged to permit mounting of the tissue biopsy apparatus 300 on an existing biopsy table. In the preferred embodiment of the invention, the biopsy apparatus 300 can be mounted on a slideable carriage that can be separately driven to project the cuffing element 302 into the patient. Support beds of this type are well known and the mounting feature 395 of the handpiece 305 can be specifically configured to accommodate any particular support bed.

Preferably, the upper and lower housings 310, 311 include interlocking mating edges 397, 398, respectively. In a most preferred embodiment, the edges include press-fit male/female interfaces. When all the components are assembled within the housing 340, the upper and lower housings 310, 311 can be sandwiched about the housing 340, with the mating edges 397 and 398 in engagement. In one specific embodiment, the engagement can simply be a removable snap-fit, while in other embodiments, the engagement can be permanent, such as by the use of an adhesive.

The tissue biopsy apparatus 300 can be connected to the hydraulic control system 150 described above. Each of the components can operate in a manner similar to that described above. The cannula hub 312 provides a fluid interface for the external secondary lumen 320 which can be used to introduce a fluid, such as a saline solution, to the surgical site. In this embodiment, a saline flush can be contained in a hermetically sealed bag, such as bag 400 depicted in FIG. 12.

In one preferred embodiment, a pinch valve 402 can engage the secondary lumen, preferably adjacent the saline bag 400. The pinch valve can be opened at the moment that the cutting blade starts to retract from the cutting opening. The pinch valve 402 can be controlled to remain open for a pre-determined period of time, but is preferably closed before the cutting blade advances forward to make the next biopsy cut. Likewise, the amount of time that the pinch valve remains open to allow the saline flush to enter the cutting element 302 can be calibrated based upon a pre-determined volume of fluid desired at the surgical site. In some procedures, the pinch valve 402 remains open for 1-2 seconds, although in certain applications, a shorter time in the range of 0.5 seconds may be preferred. The valve operation can be calibrated to achieve a specific fluid volume, such as about 1 cc of saline.

In one particular embodiment, the hydraulic control system 150 depicted in FIG. 10 can be modified to incorporate a fluid line branching from the line 192. As described

30

15452-75957

above, the line 192 is pressurized when the reciprocating motor starts its return stroke. Pressure in the branch fluid line can be used to open the pinch valve 402, while a drop in pressure can operate to close the valve. Alternatively, the pinch valve can be electrically controlled, again in response to fluid pressure in line 192 which signals the beginning of the motor return stroke. The closure of the pinch valve 402 can be dictated by a drop in pressure in line 192 or by an increase in pressure in line 161, which arises as the reciprocating motor begins its cutting stroke. It is understood that while a pinch valve is described, other on-off type fluid valves can be utilized to control the timing of fluid flow through the lumen 320 and cannula hub 312.

Several benefits arise by providing the saline flush. One primary benefit is that the saline flush can keep the cutting element clean of blood and tissue that might otherwise clot or jam the advancement of the inner cutting member. A further benefit is that the saline can facilitate drawing tissue into the cutting opening during the cutting cycle. Moreover, the saline flush can help propel the excised tissue toward the collection canister.

As an alternative, or an adjunct, the secondary lumen 320 can be used to introduce a puff of air into the cutting element 302. The puff of air, like the saline can be used to keep the interior channel of the cutting element clean. If properly pressurized, the introduction of air can prevent blood from flowing into the cutting element 302 as the cutting member and excise tissue sample is retracted. Thus, the saline bag 400 can be replaced with a source of pressurized air. In certain applications, the air source can provide air pressurized to 3-5 p.s.i.g. As with the saline flush, the secondary lumen 320 can be closed as the cutting blade advances to remove a tissue sample, and opened as the blade starts to retract. The pressurized air will pass around the outside of the inner cutting blade toward the opening at the end of the cutting element 302. The pressure of this puff of air can be calibrated as necessary to counteract the blood pressure at the surgical site and keep the blood from flowing into the cutting element 302.

The tissue biopsy apparatus 10 or 300 described above provides significant advantages over prior biopsy devices. One significant benefit is that the apparatus of the present invention is completely closed. This feature means that no fluid, such as blood, can escape or leak from the biopsy apparatus 10 or 300. In prior devices, the each extracted tissue sample is drawn into a removable opening that is open to the atmosphere. The present invention does not include any component that is open to the atmosphere, with the exception of the secondary lumen 320 which is controllably open to atmosphere to keep the aspiration passageway open and clean. The present invention provides a system for repeatably and

31

15452-75957

precisely withdrawing uniformly sized biopsy samples. With each stroke of the cutting blade, a uniformly dimension biopsy sample is withdrawn and pulled into the collection canister at the proximal end of the apparatus. Thus, the biopsy apparatus 10 and 300 of the present invention can readily remove an entire lesion or region of suspect tissue. This is a significant improvement over prior devices that are only capable of extracting a limited quantity of tissue for biopsy evaluation only.

While the invention has been illustrated and described in detail in the drawings and foregoing description, the same is to be considered as illustrative and not restrictive in character. It should be understood that only the preferred embodiments have been shown and described and that all changes and modifications that come within the spirit of the invention are desired to be protected.

EXAMPLES

### Example 1

Eighteen trial biopsies were performed upon patients after obtaining informed consent and preparing the patients according to standard biopsy procedures. In each case, biopsies were performed according to the following procedure. The patient was positioned on her back on the surgical table, and the lesion was located using ultrasound. A small incision was made in the breast. While viewing the lesion using ultrasound, an early embodiment of the present invention was inserted into the breast with the tissue receiving opening adjacent the lesion. The cutter was engaged to sample and/or remove the lesion. The lesions varied in size from 6-22 mm. The surgeon's comments are provided in Table 1.

1TABLE 1 Surgeon's Comments Regarding the Use of Early Embodiments of the Present Biopsy Device Trial Number Surgeon's Comments 1 Went very well, lesion took approximately 50 seconds to go away 2 Large fatty breast, very difficult to get needle to mass; eventually successfully removed 3 Successfully removed without problems 4 Went very well; lesion gone in 4-5 cores 5 Two lesions attempted (1) lesion easily removed, (2) inner cutter was riding up and catching the opening 6 Only took 4-5 cores to disappear 7 Started getting good cores, then stopped cutting due to secondary electrical break 8 Lesion appeared to be totally gone, cores were up to 25 mm in length 9 Only got 4-5 good cores, then stopped cutting due to inner cutter riding up 10 No problems 11 No problems at all 12 Lesion was easily palpable but very mobile which made access difficult. Used tactile sensation to manipulate tumor into aperture which worked very well; very good cores; Took 4.5 minutes but many of the cores were fatty as a lot of the time I was missing the lesion

32

15452-75957

before realizing that palpitation was better 13 Took 3-4 cores then quit cutting, blade was dulled, probably due to deflection of tip downward 14 Went very well, no problems 15 Went well, no problems 16 Went well, no problems 17 Went very well 18 Went very well, the suction tubing collapsed, need stronger tubing; filter did fill up requiring stopping to empty, might need larger filter

Table 1 illustrates the success of the present invention in its early stage of development. A majority of the trials, trials 1-6,8, 1-12, and 14-18, resulted in a successful removal of the lesion with little to no problems. Lesions were removed quickly and, in some cases, only a few cores were required (see trials 1, 4, and 6). In trial number 8 it was noted that the cores were up to 25 mm in length.

In some trials, the surgeon experienced difficulties removing the lesion because the inner cutting blade would ride up and catch on the tissue receiving opening (see trials 5, and 9). However, this problem has been resolved in the present invention by integrating a crimp in the outer cannula. The crimp forms a dimple that protrudes from the inner surface of the cannula and into the outer lumen. As the inner cannula passes the dimple, the dimple forces the inner cannula away from the tissue-receiving opening and prevents the inner cannula from riding up into the opening. In a further embodiment, the cutting edge of the inner cannula is inwardly beveled. This inwardly beveled surface also helps eliminate risk of catching by guiding the inner cannula back into the hollow outer cannula. In addition, to prevent the deflection of the tip downward, as noted in trial 13, a stiffening element is provided on the outer cannula opposite the tissue-receiving opening.

Example 2

Surgeons performing biopsies using the device of this invention and a device having the features of U.S. Pat. No. 5,526,822 to Burbank provided feedback as to the efficiency of each device. The surgeons' input was used to calculate the amount of time and the number of strokes necessary to remove a lesion. Table 2 compares the amount of time and the number of strokes necessary to remove comparable lesions using each device.

2TABLE 2 Comparison of Removal Times and Number of Strokes of the Present Biopsy Device with the Prior Art Device Present Biopsy Device Prior Art Removal Times (sec) Lesion Diameter 10 80 500 13 135 845 16 205 1280 No. of Strokes Lesion Diameter 10 16 25 13 27 42 16 41 64

This data demonstrates that the present tissue biopsy apparatus consistently removes a lesion with fewer strokes and in less time than the prior cutter. The present tissue

15452-75957

biopsy device performs 80% faster than the prior cutter, which ultimately results in reduced trauma to the tissue.

CONCLUSION

The biopsy devices of this invention reliably, quickly and efficiently sample and remove lesions in tissue.

15452-75957

What is claimed:

1. A tissue cutting device comprising:

an outer cannula defining an outer lumen and a tissue-receiving opening adjacent a distal end of said outer cannula communicating with said outer lumen;

an inner cannula slidably disposed within said outer lumen and defining a inner lumen from an open distal end to an open opposite proximal end, said inner cannula defining a cutting edge at said open distal end operable to sever tissue projecting through said tissue receiving opening;

a first hydraulic rotary motor operably coupled to said inner cannula to rotate said inner cannula within said outer cannula;

a second hydraulic reciprocating motor operably coupled to said inner cannula to translate said inner cannula within said outer cannula while said inner cannula rotates; and

a hydraulic system connecting said first and second hydraulic motors to a source of pressurized fluid.

2. The tissue cutting device of claim 1 further comprising a cutting board disposed at said distal end of said outer cannula.

3. The tissue cutting device of claim 2 wherein said cutting board is formed of a resilient plastic material having a hardness less than a hardness of said inner cannula at said cutting edge, but sufficient to substantially prevent permanent deformation of said cutting board under pressure from said cutting edge as said inner cannula rotates and reciprocates against said cutting board.

4. The tissue cutting device of claim 1 wherein said cutting edge is an inwardly beveled surface.

5. The tissue cutting device of claim 4 further comprising a dimple in an inner surface of said outer cannula immediately proximal to said tissue-receiving opening, said dimple sized to fit between said inner cannula and said outer cannula.

6. The tissue cutting device of claim 1 further comprising a handpiece removably engageable to said outer cannula and supporting said inner cannula, said first hydraulic rotary motor, and said second hydraulic reciprocating motor.

7. The tissue cutting device of claim 6 further comprising a collection trap removably mountable to said handpiece and in communication with said proximal end of said inner lumen.

35

15452-75957

8. The tissue cutting device of claim 7 wherein said collection trap includes a filter element disposed within said collection trap.

9. The tissue cutting device of claim 7 further comprising a vacuum source in fluid communication with said collection trap to aspirate tissue through said inner lumen into said collection trap.

10. The tissue cutting device of claim 6 further comprising a cover removably engageable to and enclosing said handpiece.

11. The tissue cutting device of claim 10 wherein said cover includes:

at least one tang projecting inwardly from an inner surface thereof; and

said handpiece defines at least one engagement notch configured for receiving a corresponding one of said at least one tang for engaging said cover to said handpiece.

12. The tissue cutting device of claim 1 wherein said outer cannula further includes a stiffening element along a length thereof for increasing a bending resistance of said outer cannula.

13. The tissue cutting device of claim 12 wherein said stiffening element includes a longitudinally extending rib defined in an outer surface of said outer cannula.

14. The tissue cutting device of claim 13 wherein said rib includes a bead adhered to a surface of said outer cannula.

15. The tissue cutting device of claim 13 wherein said rib includes a crimp in said outer cannula.

16. The tissue cutting device of claim 12 wherein said stiffening element is substantially diametrically opposite the tissue-receiving opening.

17. The tissue cutting device of claim 12 wherein said stiffening element includes a layer of rigid material bonded to a surface of said outer cannula.

18. The tissue cutting device of claim 17 wherein said material is stainless steel.

19. The tissue cutting device of claim 1 further comprising a vacuum source in fluid communication with said inner lumen at said proximal end of said inner cannula to aspirate tissue through said inner lumen.

20. The tissue cutting device of claim 1 further comprising:

an irrigation lumen in fluid communication with said outer lumen; and

a source of irrigation fluid in communication with said irrigation lumen.

21. The tissue cutting device of claim 20 wherein said source of fluid includes an anesthetic fluid.

36

15452-75957

22. The tissue cutting device of claim 1 further comprising a dimple in an inner surface of said outer cannula immediately proximal to said tissue-receiving opening, said dimple sized to fit between said inner cannula and said outer cannula.

23. The tissue cutting device of claim 1 wherein said tissue-receiving opening includes a pair of opposite sides extending longitudinally along said outer cannula, at least one of said opposite sides defining at least one tooth arranged to engage tissue drawn into said opening when said cannula is inserted into a body.

24. The tissue cutting device of claim 23 wherein at least one of said opposite sides defines a plurality of teeth, said teeth angled proximally away from said distal end of said outer cannula.

25. The tissue cutting device of claim 23 wherein each of said opposite sides defines a plurality of teeth, said teeth angle proximally away from said distal end of said outer cannula.

26. The tissue cutting device of claim 1 further comprising a trocar tip having an engagement hub configured to fit tightly within said distal end of said outer cannula.

27. The tissue cutting device of claim 26 further comprising a cutting board disposed within said outer lumen affixed to said engagement hub.

28. The tissue cutting device of claim 1 further comprising:

a tubular axle having a distal end and a proximal end; and

a coupler connecting said distal end of said tubular axle to said proximal end of said inner cannula,

wherein said first hydraulic rotary motor is coupled to said tubular axle to rotate said axle and said inner cannula therewith.

29. The tissue cutting device of claim 28 wherein said first hydraulic rotary motor includes:

a motor housing having opposite ends and defining a pilot port in fluid communication with said hydraulic system to receive said pressurized fluid;

a rotor rotatably disposed within said housing and connected to said axle extending through said housing; and

bearing surfaces at said opposite ends of said housing for rotatably supporting said axle.

30. The tissue cutting device of claim 29 wherein said second hydraulic reciprocating motor includes:

15452-75957

a hydraulic cylinder having a second pilot port in fluid communication with said hydraulic system to receive said pressurized fluid;

a piston slidably disposed within said cylinder; and

a hollow tube in fluid communication with said proximal end of said tubular axle,

said tube engaged to said piston and operably coupled to said first hydraulic rotary motor to move said first hydraulic rotary motor as said piston slides within said cylinder.

31. The tissue cutting device of claim 30 wherein said second hydraulic reciprocating motor further includes:

a return spring disposed within said cylinder and biased against said piston to move said piston, said housing and said inner cannula in a direction away from distal end of said outer cannula.

32. The tissue cutting device of claim 31 further comprising:

a collection trap in fluid communication with said hollow tube; and

a vacuum source in fluid communication with said collection trap to aspirate tissue through said inner lumen, said hollow axle and said tube into said collection trap.

33. The tissue cutting device of claim 1 wherein said second hydraulic reciprocating motor includes:

a hydraulic cylinder having a pilot port in fluid connection with said hydraulic system to receive said pressurized fluid;

a piston disposed within said cylinder and operably coupled to said inner cannula to move said inner cannula within said outer cannula toward said distal end of said outer cannula;

a return spring disposed within said cylinder and biased against said piston to move said piston and said inner cannula within said outer cannula in a direction away from distal end of said outer cannula.

34. The tissue cutting device of claim 1, wherein said hydraulic system includes:

a manual switch disposed between an output line and said source of pressurized fluid, said manual switch operable in a first position to connect said output line to said source, and in a second position to disconnect said output line from said source;

38

15452-75957

a first pressure actuated switch disposed between said source of pressurized fluid and said first motor, said first switch operable in response to fluid pressure in said output line to connect or disconnect said first motor to/from said source; and

a second pressure actuated switch disposed between said source of pressurized fluid and said second motor, said second switch operable in response to fluid pressure in said output line to connect or disconnect said second motor to/from said source.

35. The tissue cutting device of claim 34, wherein said hydraulic system includes a vacuum source.

36. The tissue cutting device of claim 35, wherein:

said vacuum source includes a venturi device; and

said hydraulic system includes a third pressure actuated switch disposed between said source of pressurized fluid and said venturi device, and third switch operable in response to fluid pressure in said output line to connect or disconnect said venturi device to/from said source.

37. The tissue cutting device of claim 34, wherein:

said second hydraulic motor includes a hydraulic cylinder having a piston operably coupled to said inner cannula, a hydraulic input connected to said second pressure actuated switch and a return spring disposed within said cylinder and operating on said piston against fluid pressure at said hydraulic input; and

said hydraulic system further includes an oscillating switch disposed between said output line and said second pressure actuated switch, said oscillating switch operable in response to fluid pressure in said hydraulic cylinder to connect or disconnect said hydraulic input to/from said second pressure actuated switch.

38. A tissue cutting device comprising:

an elongated handpiece defining an elongated channel on an outer surface of said handpiece;

a cannula hub mounted to said handpiece and having a fluid port;

a tube connected at one end to said fluid port and having an opposite end connectable to a fluid source, said tube disposed within said elongated channel and sized to be recessed within said channel relative to said outer surface an outer cannula supported at a proximal end by said cannula hub and defining a tissue-receiving opening adjacent a distal end thereof, and

a lumen between said proximal and distal ends in fluid communication with said fluid port of said cannula hub; and an inner cutting member slidably disposed within said

39

15452-75957

lumen of said outer cannula and defining a cutting edge at said distal end operable to sever tissue projecting through said tissue-receiving opening.

39. The tissue cutting device of claim 38, further comprising a fluid source connected to said opposite end of said tube, said fluid source including: a container holding a supply of a fluid; and a valve between said container and said fluid port and operable to control the flow of fluid from said container through said tube.

40. The tissue cutting device of claim 39, wherein said valve is a pinch valve engaged about said tube.

41. A method for performing a tissue biopsy at a sample site within a patient comprising the steps of:

introducing an outer cannula into the patient with a tissue receiving opening adjacent the sample site;

providing a medical treatment through the outer cannula at the sample site;

connecting the outer cannula to a tissue biopsy handpiece having a pneumatic motor-driven tissue cutting cannula with the tissue cutting cannula extending into the outer cannula;

operating the tissue biopsy handpiece to excise tissue through the tissue receiving opening; and

storing the excised tissue for subsequent examination.

42. A tissue cutting device for removing tissue from a patient comprising:

an outer cannula configured for introduction into the patient and defining a tissue-receiving opening adjacent a distal end thereof;

an inner cannula slidably disposed within said outer cannula and defining a lumen from an open distal end to an open opposite end,

said inner cannula further defining a cutting edge at said open distal end operable to sever tissue projecting through said tissue-receiving opening;

a pneumatic motor assembly operably coupled to said inner cannula to rotate and reciprocate said inner cannula within said outer cannula;

a vacuum source fluidly coupled to said inner cannula for generating a vacuum in said lumen of said inner cannula to draw severed tissue therethrough; and

a tissue collection chamber interposed between said vacuum source and said open opposite end of said inner cannula to receive severed tissue drawn into said chamber by the vacuum.

40

15452-75957

43. The tissue cutting device of claim 42, wherein said tissue collection chamber includes a filter permitting passage of fluid therethrough while retaining the severed tissue within said chamber.

44. The tissue cutting device of claim 42 further comprising a pneumatic control circuit having a vacuum switch, the vacuum switch being configured to sense changes in vacuum in order to indicate whether the severed tissue has been drawn completely into said chamber.

45. The tissue cutting device of claim 44 wherein the pneumatic circuit further comprises a pressure switch, the pressure switch being configured to sense an end of stroke condition as indicated by an increased backpressure.

46. The tissue cutting device of claim 45 wherein the inner cannula advances through the tissue to be severed at a speed that is proportional to the tissue's density.

47. A tissue cutting device comprising:

an outer cannula defining a tissue-receiving opening adjacent a distal end thereof;

an inner cannula slidably disposed within said outer cannula and defining a lumen from an open distal end to an open opposite proximal end, said inner cannula defining a cutting edge at said open distal end operable to sever tissue projecting through said tissue-receiving opening;

a pneumatic rotary motor operably coupled to said inner cannula to rotate said inner cannula within said outer cannula;

a pneumatic reciprocating motor operably coupled to said pneumatic rotary motor to translate said rotary motor and thereby translate said inner cannula within said outer cannula while said inner cannula rotates; and

a handpiece supporting said pneumatic rotary motor and said pneumatic reciprocating motor, said handpiece including a pair of opposite rails, wherein said pneumatic rotary motor includes a pair of opposite outwardly projecting wings configured to be slidably supported on said opposite rails to resist rotation of said pneumatic rotary motor while permitting said pneumatic rotary motor to translate relative to said rails.

48. The tissue cutting device of claim 47 further comprising a pneumatic control circuit having a vacuum switch, the vacuum switch being configured to sense changes in vacuum in order to indicate whether the severed tissue has been drawn completely into said chamber.

41

15452-75957

49 The tissue cutting device of claim 48 wherein the pneumatic circuit further comprises a pressure switch, the pressure switch being configured to sense an end of stroke condition as indicated by an increased backpressure.

50. The tissue cutting device of claim 49 wherein the inner cannula advances through the tissue to be severed at a speed that is proportional to the tissue's density.

15452-75957

## ABSTRACT

A disposable tissue removal device comprises a "tube within a tube" cutting element mounted to a handpiece. The inner cannula of the cutting element defines an inner lumen and terminates in an inwardly beveled, razor-sharp cutting edge. The inner cannula is driven by both a pneumatic rotary motor and a pneumatic reciprocating motor. At the end of its stroke, the inner cannula makes contact with the cutting board to completely sever the tissue. An aspiration vacuum is applied to the inner lumen to aspirate excised tissue through the inner cannula and into a collection trap removably mounted to the handpiece. The rotary and reciprocating motors are hydraulically or pneumatically powered through a foot pedal operated pneumatically circuit. In one embodiment, the cutting element includes a cannula hub that can be connected to a fluid source, such as a valve-controlled saline bag.

INDS02 JRS 676523v1



**Fig. 1**



**Fig. 2**



**Fig. 3A**



**Fig. 3B**



Fig. 5



Fig. 4

Title: BIOPSY APPARATUS
Inventor(s): Schwindt et al.
Docket: 15452-75957



**Fig. 8**



**Fig. 8(a)**



**Fig. 6**



**Fig. 9**

**Fig. 7**



*Fig. 11*

*Fig. 10*



Fig. 12

Fig 13

Docket: 15452-75957
Inventor(s): Schwindt et al.
Title: BIOPSY APPARATUS



Fig. 14

Fig. 15

Fig. 16

Fig. 17

Fig. 18

Fig. 19

Fig. 20

Title: BIOPSY APPARATUS
Inventor(s): Schwindt et al.
Docket: 15452-75957



*Fig. 22*



*Fig. 24*



*Fig. 21*



*Fig. 23*

Sep 07 04 02:25p     Air Systems Eng           3178427980           p.3

| | Docket No.<br>15452-75957 |
|---|---|

# Declaration For Patent Application

## English Language Declaration

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled

the specification of which

(check one)

☒ is attached hereto.

☐ was filed on ___ ___ ___ as United States Application No. or PCT International

Application Number ___ ___ ___ ___

and was amended on ___ ___ ___ ___

(if applicable)

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR 1.56, including for continuation-in-part applications, material information which became available between the filing date of the prior applications and the national or PCT international filing date of the continuation-in-part application.

I hereby claim foreign priority benefits under 35 U.S.C. 119(a)-(d) or (f), or 365(b) of any foreign application(s) for patent, inventor's or plant breeder's rights certificate(s), or 365(a) of any PCT International application which designated at least one country other than the United States of America, listed below and have also identified below, by checking the box, any foreign application for patent or inventor's or plant breeder's rights certificate(s), or any PCT International application having a filing date before that of the application on which priority is claimed.

Prior Foreign Application(s)

| | | | Priority Not Claimed |
|---|---|---|---|
| ___ | ___ | ___ | ☐ |
| (Number) | (Country) | (Day/Month/Year Filed) | |
| ___ | ___ | ___ | ☐ |
| (Number) | (Country) | (Day/Month/Year Filed) | |
| ___ | ___ | ___ | ☐ |
| (Number) | (Country) | (Day/Month/Year Filed) | |

Form PTO-SB-01 (9-96) (Modified)          P02A/REV02          Patent and Trademark Office-U.S. DEPARTMENT OF COMMERCE

I hereby claim the benefit under 35 U.S.C. Section 119(e) of any United States provisional application(s) listed below:

_____             _____
(Application Serial No.)             (Filing Date)

_____             _____
(Application Serial No.)             (Filing Date)

_____             _____
(Application Serial No.)             (Filing Date)

I hereby claim the benefit under 35 U. S. C. Section 120 of any United States application(s), or Section 365(c) of any PCT International application designating the United States, listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States or PCT International application in the manner provided by the first paragraph of 35 U.S.C. Section 112, I acknowledge the duty to disclose to the United States Patent and Trademark Office all information known to me to be material to patentability as defined in Title 37, CFR Section 1.56 which became available between the filing date of the prior application and the national or PCT International filing date of this application:

| 10/639,569 | August 12, 2003 | pending |
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |
| 09/864,031 | May 23, 2001 | patented |
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |
| 09/707,022 | November 6, 2000 | patented |
| (Application Serial No.) | (Filing Date) | (Status) |
| | | (patented, pending, abandoned) |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of sole or first inventor
**Jeffrey Schwindt**

Sole or first inventor's signature                                             Date
                                                                                9/7/04

Residence
6359 Brokenhurst Road, Indianapolis, Indiana 46220

Citizenship
US

Post Office Address
6359 Brokenhurst Road, Indianapolis, Indiana 46220

---

Full name of second inventor, if any
**Michael E. Miller**

Second inventor's signature                                                    Date

Residence
4560 W. Woodpecker Lane, Trafalgar, Indiana 46181

Citizenship
US

Post Office Address
4560 W. Woodpecker Lane, Trafalgar, Indiana 46181

---

Full name of third inventor, if any
**Joseph L. Mark**

Third inventor's signature                                                     Date

Residence
5154 N. Capitol Avenue, Indianapolis, Indiana 46208

Citizenship
US

Post Office Address
5154 N. Capitol Avenue, Indianapolis, Indiana 46208

---

Full name of fourth inventor, if any
**John P. Hancock**

Fourth inventor's signature                                                    Date

Residence
11565 E. 116th Street, Fishers, Indiana 46038-8953

Citizenship
US

Post Office Address
11565 E. 116th Street, Fishers, Indiana 46038-8953

Form PTO-FB-110 (8-83) (Modified)                    Patent and Trademark Office-U.S. DEPARTMENT OF COMMERCE

Sep 07 04 02:25p    Air Systems Eng                3178427980              p.6

Full name of fifth inventor, if any
**Charles Butcher**

Fifth inventor's signature                                                              Date

Residence
361 Patoka Place, Carmel, Indiana 46032

Citizenship
US

Post Office Address
361 Patoka Place, Carmel, Indiana 46032

---

Full name of sixth inventor, if any

Sixth inventor's signature                                                              Date

Residence

Citizenship

Post Office Address

---

Full name of seventh inventor, if any

Seventh inventor's signature                                                            Date

Residence

Citizenship

Post Office Address

---

Full name of eighth inventor, if

Eighth inventor's signature                                                             Date

Residence

Citizenship

Post Office Address





**RADER,**

**FISHMAN**

**& GRAUER**
PLLC

**VIA CERTIFIED MAIL**

*39533 Woodward Ave., Ste. 140*
*Bloomfield Hills, Michigan 48304*
*Tel: (248) 594-0600*
*Fax: (248) 594-0610*

**Bradley J. Diedrich**
**(248) 594-0651**
**bjd@raderfishman.com**

May 17, 2004

Mr. Jeffrey Schwindt
President
Air Systems Engineering, Inc.
5142 E. 65th Street
Indianapolis, IN 46220

Re:    U.S. Patent Application Publication Nos. US 2003/0196693 A1, US
2003/0199786 A1 and US 2003/0199787 A1.

Dear Mr Schwindt:

Our firm is outside counsel to Suros Surgical Systems, Inc. and in that connection, we
have reviewed your recently published U.S. patent applications bearing publication numbers US
2003/0196693 A1, US 2003/0199786 A1 and US 2003/0199787 A1. Based on the scope of the
proposed patent claims contained in all three applications, it is readily apparent that these
applications are attempting to claim inventions for which you are *not* the true or only inventor.
Indeed, each of the inventions claimed in the above-identified applications were conceived in
whole or in part by representatives of Suros and disclosed to you in confidence for the purpose of
manufacturing products for our client's business.

Please keep in mind U.S. patent law mandates that any patent naming a person who
cannot lay claim to such an invention is invalid. Particularly, 35 U.S.C. §115 of the U.S. Patent
Code requires that each inventor applying for a patent must assert by oath or declaration that he
believes himself to be an ***original*** and ***first*** inventor of the claimed invention. Similarly, under
35 U.S.C. §116, when an invention is made by two or more persons jointly, the inventors shall
apply for patent jointly and *each* make the required oath. Moreover, 35 U.S.C. §102(f) prohibits
a person from obtaining a patent if he did not himself invent the subject matter recited in the
claims. Because each of the proposed claims in your patent applications recite an invention
derived from representatives of Suros Surgical Systems, Inc. (several of which have already been
patented by Suros), or improperly list you as the sole inventor, the proposed claims are invalid as
a matter of law.

*Worldwide Intellectual Property Matters • Patents • Trademarks • Litigation • Copyrights • U.S. and Foreign Portfolio Management*
*Computer and Internet Law • Trade Secrets • Unfair Competition*

Bloomfield Hills          Washington, D.C.          Salt Lake City          Tokyo



Mr. Jeffrey Schwindt
May 17, 2004
Page 2

    Suros Surgical Systems, Inc. has invested considerable effort in the development of innovative products for the medical industry, including pneumatically operated biopsy devices. The resulting intellectual property is of significant value to Suros. Therefore, we ask that you immediately and expressly abandon each of the above-identified patent applications pending in the U.S. Patent Office, as well as any other foreign or domestic patent applications claiming an invention derived from representatives of Suros Surgical Systems, Inc. We look forward to hearing from you or your patent counsel within the next two weeks and ask that you forward to us a copy of the paperwork filed in the U.S. Patent Office expressly abandoning the applications.

Very truly yours,

**RADER, FISHMAN & GRAUER PLLC**

Bradley J. Diedrich

BJD/kln

cc:    Jim Pearson
        Gene Henderson, Esq.
        R. Terrance Rader, Esq.



# BARNES & THORNBURG

11 South Meridian Street
Indianapolis, Indiana 46204-3535 U.S.A.
(317) 236-1313
Fax (317) 231-7433

James R. Sweeney II
(317) 231-7771
Email: jsweeney@btlaw.com

www.btlaw.com

June 4, 2004

Bradley J. Diedrich, Esq.
Rader, Fishman & Grauer PLLC
39533 Woodward Ave., St. 140
Bloomfield Hills, MI 48304



Re:    U.S. Patent Application Publication Nos. 2003/019663,
US 3003/0199786 A1 and US 2003/0199787 A1

Dear Mr. Diedrich:

In your letter of May 17, 2004, you correctly note that "when an invention is made by two or more persons jointly, the inventors shall apply for a patent jointly." You further observe that a person cannot obtain a patent "if he did not himself invent the subject matter recited in the claims." You go on to assert that claims that fail to list the true inventors are invalid as a matter of law, and then, without facts or legal authority, demand that Mr. Schwindt abandon his patent applications. Surely, you are familiar with 37 CFR § 1.48 which allows correction of inventorship in an application. So too, you must be familiar with interference practice between an application and another application or patent to see in fact who was the first to invent, and or to correct inventorship. Finally, 35 U.S.C. § 256 provides for correction of inventorship in an issued patent in a federal district court action. We have had much success in the past with such 256 actions.

Like you and your client, we and our client are interested in sorting out the true inventive entity of not only our client's applications, but those applications and patent assigned to Suros. Therefore, we propose a meeting at the offices of Periculum Capital Company, LLC, here in Indianapolis on, **Wednesday, June 9, 2004,** so that your clients can distinctly point out what they contributed to Mr. Schwindt's claims. Assuming your clients can also corroborate any such claims, then we will decide whether to name them as joint inventors as provided for in the above cited laws and rules, or to amend the claims accordingly. Abandoning the applications is not appropriate.

For his part, Mr. Schwindt will welcome the opportunity to point out those portions of your client's claims to which Mr. Schwindt made an inventive contribution. For example, Figure 10 of U.S. Patent Application Publication No. US 2004/0049128 A1 represents a drawing conceived and prepared by Mr. Schwindt and delivered to the alleged "true inventors" of that application number 10/639,569. The claims go on to recite Mr. Schwindt's invention depicted in Figure 10. Clearly, Mr. Schwindt should be named as a joint inventor on at least this application. Investigation is ongoing with respect to Suros' other patents and applications. In any event, as

Bradley J. Diedrich, Esq.
June 4, 2004
Page 2

noted, whether amicably via rule 48, or through available adversarial means such as filing a 256 action in federal court, we are prepared to ensure that Mr. Schwindt's rights are protected.

As you may know, Mr. Schwindt is a Suros shareholder. Because of Periculum and the relationship of Mr. Schwindt with Suros, Mr. Schwindt acquired the shares. We therefore think it important that the proposed meeting take place in Periculum's offices, and with the attendance of Periculum's counsel, and other principals. This is especially so in light of various representations by Suros to shareholders and prospective shareholders regarding the inventive entity of their intellectual property. We suspect that such a meeting will resolve these issues satisfactorily, amicably, and prior to any filings in federal court.

We look forward to your prompt reply.

Regards,

James R. Sweeney II

JRS:kat

cc:    Jeffrey R. Schwindt
       Donald Knebel, Esq.
       William Coffey, Esq.
       Michael K. McCrory, Esq.
       Christopher M. Caniff (Periculum Capital Co., LLC)